# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

     -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
DEBORAH BELLEAU**

     I, Deborah Belleau, being first duly cautioned and sworn, and being more than age

eighteen years of age and competent to testify about the matters contained herein, hereby declare

and state as follows upon personal knowledge or information:

     1.  I was employed by Victoria's Secret Stores Brand Management ("VBM") in

Reynoldsburg, Ohio, from October 15, 2006 through January 27, 2008.  I am currently employed

by Victoria's Secret Stores, LLC ("VSS") in Reynoldsburg, Ohio.  I was an Executive Assistant

throughout my employment at VBM and remain an Executive Assistant today.  During my

employment at VBM, I supported Executive Vice President of Human Resources Larry Fultz.

     2.  In my own experience, and based on my observations of and interactions with other

Executive Assistants, while all Executive Assistants at VBM performed complex work that

1

required a high level of independent judgment, the complexity of the job of an Executive

Assistant typically increased as the level of responsibility of the executive being supported rose.

In other words, as a general rule, the higher the level of the executive, the more complex the job

of the Executive Assistant and the more knowledge and decision-making ability required to do it

well.

3.   Throughout the time that I was an Executive Assistant at VBM, I was paid on an

exempt, salaried basis (as I still am today).  I was never paid overtime as an Executive Assistant,

nor required to "clock in" or otherwise record my hours of work.  I kept no records of my hours

worked at VBM.

4.   I estimate that I worked an average of about 50 hours per week at VBM.  Although

my hours of work varied somewhat, on most days I arrived at work at around 7:30 in the

morning and left between 5:00 and 5:30 in the evening, Monday through Friday.  Although this

schedule included an hour for lunch each day, I often ate lunch at my desk.  I typically performed

work during some of my lunch hour.  If I needed to run a personal errand during the course of

the day, or needed to leave early for a doctor's appointment or for some other personal reason, I

had the discretion to do that, and I  typically did not record that time as PTO (paid time off) or

otherwise record it.

5.   During the summer months when I was at VBM, our office observed what are known

as "summer hours."  This meant that most of the office staff left, and stopped working, at around

1:00 on alternate Friday afternoons during the summer.  I did not record the number of Fridays

(or any other days) that I did or did not work at VBM, and to my knowledge no one else

recorded my time either.  However, my scheduled time out of the office (whether for summer

Fridays or otherwise) typically would have appeared as a "banner" on my bosses' calendars, so

2

as to keep them informed of my schedule. Also, my recorded PTO (paid time off), which I typically took in increments of one day or more, would also reflect time I was off from work.

6. I occasionally read and/or responded to my work email on evenings or weekends while employed at VBM.

7. I spent approximately 75-80% of my working time at VBM attending to Mr. Fultz's calendar and related issues. Because so much of his work was meeting-based, and because he traveled a great deal, it was critical that I keep his calendar current and accurate. His calendar was, in essence, the platform of his work, as being in the right place, at the right time, with the correct group of people, with the correct materials, made the difference between his being able to do his job effectively or being unable to do it effectively. As a result, I spent well over half of my time reviewing and responding to meeting requests on his behalf, resolving scheduling conflicts on his calendar, and otherwise assisting in planning his schedule. In so doing, I routinely exercised my own independent judgment and discretion regarding these extremely significant aspects of Mr. Fultz's work. I did this through a combination of my experience, my knowledge of the Company and the people working there, the relationships I built with Executive Assistants and others across the business, and my skills as an administrator. While I consulted Mr. Fultz on those rare scheduling conflicts which, in my judgment, required his input to resolve, I routinely made other long- and short-term scheduling decisions on his behalf without consulting him.

8. Because the fashion retail business is so dynamic, the work I performed at VBM was neither routine nor repetitive. For example, the type of meeting, what was required for the meeting, when the meeting must be held, and who must attend constantly changed depending on what was being developed or launched. This meant that Mr. Fultz's priorities and needs changed

3

along with those of the business.  It was my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.  I also used my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for Mr. Fultz.

9.  Like Mr. Fultz, many other executives at the Company spent a great deal of time in business meetings with other executives, third parties, or both.  Consequently, it was important that the various executives' schedules be coordinated.  Each week a group of the Executive Assistants and administrative assistants met together for approximately one hour to review, plan, and coordinate our bosses' schedules.  Among other things, we discussed our executives' upcoming deliverables and travel, and identified and attempted to resolve any scheduling conflicts among our bosses' schedules. This meeting was organized and conducted by the Executive Assistants ourselves; no one else at the Company instructed us to do this or provided any of the content.

10. I operated as a "gatekeeper" for Mr. Fultz, in that meeting requests for him typically were directed through me.  I frequently and routinely used my judgment to determine the priority of these requests.  It was only when I was for some reason unsure about what the priorities should be that I consulted Mr. Fultz.

11.  I was responsible for coordinating Mr. Fultz 's calendar with his travel schedule and also made travel arrangements for him.

12.  I also routinely reviewed Mr. Fultz 's emails.  I determined which ones were most important and brought those to his attention.  Occasionally I would interrupt a meeting he was attending to alert him to a particularly important email.  In order to make such judgments, I

leveraged my knowledge of his priorities, as well as my knowledge of, and judgment about, the importance of various issues within the business.

13.   I also process Mr. Fultz 's expenses.  In so doing, I was required to be familiar with the Company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on his behalf.

14. During my employment at VBM, there was no single Company-wide method or system for organizing files, emails, or other documents.  To my knowledge, each Executive Assistant (including me) developed his or her own organizational and filing systems for both hard copy and electronic information.  I thus developed my own systems for organizing my own records and information and, where appropriate, that of Mr. Fultz as well.  Similarly, because to my knowledge there was no formal training of administrative assistants, each of us has had to learn on our own how best to do the many facets of our jobs.  Quite often, we Executive Assistants taught each other the ropes, so to speak, of the job and provided mentoring and direction to newer Assistants.

15.   My work at VBM required me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the Company that was not to be shared with outsiders, and internally confidential information.  As an example of this second category, I routinely was privy to information regarding the salaries and performance reviews of Mr. Fultz's direct reports.  I was required to have a high level of discretion as to how confidential information was treated and who needed to or should be able to see it.

16. I rarely leave the building during the work day at VBM.  It was rare for Mr. Fultz (or anyone else) to ask that I perform tasks away from the office, personal or otherwise.

17. I did not do any personal work or personal errands for Mr. Fultz.

18. I have never seen any evidence of any kind that any executive at VBM (or, for that matter, at VSS) holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

19. Virtually every aspect of my job at VBM required the routine exercise of my discretion and independent decision-making, which was in turn based on a combination of my expertise and skills, my knowledge of Company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arose, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I supported.

20. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed me that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

21. I understand that this Declaration was obtained for purposes of the defense of the Litigation, which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the Plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for

6

providing my statement.  Ms. Ford told me that she does not represent me individually.  I understand that she represents only the Defendants in the Litigation.

22.   The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.


I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.


_Deborah Belleau_
Deborah Belleau

_11-6-09_
Date

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                          Plaintiffs,

        -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                         Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
ALEJANDRA CAMBEIRO**

I, Alejandra Cambeiro, being first duly cautioned and sworn, and being more that age

eighteen years of age and competent to testify about the matters contained herein, hereby declare

and state as follows upon personal knowledge or information:

    1.  I am employed by Victoria's Secret Stores Brand Management ("VBM"), and have

been since November 4, 2007. I have been an Executive Assistant throughout my employment

with VBM.

    2.  During the time I have been an Executive Assistant at VBM, I have been paid on an

exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been

required to "clock in" or otherwise record my hours of work. I have kept no records of my hours

worked.

    3.  Although my hours vary depending on the specific needs of the business during

different times of the year, I estimate that I work an average of 45 hours per week. This has been

true throughout my tenure as an Executive Assistant at VBM. Typically, I work from 9:30 –
6:00 Monday through Friday. However, during times when my department is particularly busy
(as it is at several times during the course of a year), I work from 8:30 – 7:00, Monday through
Friday. Although my schedule includes an hour for lunch, I often eat lunch at my desk and
perform work during some or most of my lunch hour. If I need to run a personal errand during
the course of the day, or need to leave early or arrive late due to a doctor's appointment or for
some other personal reason, I do not record that time as PTO (paid time off) or otherwise record
it. My practice is to take PTO only in increments of one day or longer.

4. I routinely read and/or respond to my work email on evenings or weekends. My
usual pattern is to check for relevant messages at least once every evening after work and again
in the morning before leaving for work. I do this of my own initiative, because I like to be "up to
speed" and to know what is likely to be waiting for me when I arrive back at the office. No one
has ever instructed me to do this or required it of me.

5. Unlike most other Executive Assistants at VBM, I support a large number of
Executives (currently seven in all). This is due in large part to the fact that the department I
support is located in a building (79 5th Avenue in New York) where I am the only Executive
Assistant, leading to a need for me to provide support to all of the Executives at that particular
location. Of the seven Executives I currently support, the two for whom I provide the most
support are Kimberly Schraub, Senior Vice President of Design, and Claudine Rankin, Senior
Vice President of Print, Pattern and Graphics.

6. In August, 2009 an Administrative Assistant, Brianne Shumaker, was hired to assist
me, at my request. I have been responsible for the majority of her on-boarding and training. My

understanding is that Ms. Shumaker currently reports to, and supports, Ivy Epstein, but that, when our current transition period ends, Ms. Shumaker will report to me.

7.   I spend well over half of my working time on calendar management and related issues, primarily for Ms. Schraub and Ms. Rankin.  Because so much of their work is meeting-based, it is critical that I keep my executives' calendars current and accurate.  Their calendars are, in essence, the platform of their work, as  being in the right place, at the right time, with the correct group of people, with the correct materials, makes the difference between their being able to do her job effectively or being unable to do it effectively.  As a result, I spend over half of my time reviewing and responding to meeting requests on their behalf, resolving scheduling conflicts on their calendars, and otherwise assisting in planning their schedules.  In so doing, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of their work. While I consult them on those rare scheduling conflicts which, in my judgment, require their input to resolve, I make other scheduling decisions on their behalf on a routine and frequent basis.

8.   I operate as a "gatekeeper" for my Executives, in that meeting requests for them typically are directed through me. I use my judgment to determine the priority of these requests. I use a variety of methods to resolve scheduling conflicts that arise for my Executives.  A typical pattern for me to follow in such situations would be to call the Executive Assistant for the Executive who is requesting a conflicting meeting to find out what the subject matter of the meeting is so that I can determine whether the proposed new meeting might have priority over the existing meeting.  I then make a determination about the relevant priorities of the meetings (and then resolve any conflicts on my own) based on my knowledge of each of my Executive's

3

particular priorities and preferences, as well as the overall priorities of the business and the responsibilities and seniority of the Executives requesting the various meetings.

9.   I am responsible for providing my Executives with materials they need in order to participate in various meetings they attend.  This requires me, on my own initiative, to review their calendars on a frequent basis, identify upcoming meetings, identify what materials they will need for those meetings, then gather or print those materials for them.   I also book conference rooms for meetings, arrange technical support as needed, and take overall responsibility for making sure that meetings called by my executives are properly arranged and supported.  I am expected to think on my own and to proactively manage their calendars and related issues.

10. I make travel arrangements for all of the Executives I support, and make my own travel arrangements as well, because I travel on occasion in support of the Executives I work with.  I estimate that I have work-related out-of-town travel about once a month, on average. These trips last anywhere from one to three days each. My duties during these trips vary, but examples of things I typically do during such trips include calendar management for my Executives (related in part to the functions being done on the trip itself), and overall coordination of people, products, locations and supplies involved in the particular project that is the subject of the trip.

11.   I also process the expenses of the Executives I support (as well as my own work-related travel expenses).  In so doing I reconcile their travel receipts to credit card billing statements and provide relevant information to the Company's accounting department.  In order to do this, I am required to be familiar with the company's policies regarding expense reimbursements and with the Ariba system used to process expenses.

4

12.   My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  I am required to have a high level of discretion.  As an example, I see the performance reviews and salary information for individuals reporting to my Executives, and also work numerous other forms of confidential and proprietary business information.

13.   I have never seen any evidence of any kind that any executive at VBM holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

14. Based on my observations, there are variances in the job duties among Executive Assistants at VBM.  From what I have observed, these variances are due to a variety of factors, including such things as the level of seniority of the executive being supported and the nature of that executive's work.

15. I learned most if not all of my job duties on my own; no one taught me how to do my job or formally trained me. I learned by doing, by observing, by learning about the business and about my executives' particular interests and priorities, by exercising my own judgment, and by learning from other Executive Assistants.

16.   I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time.  She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

17.   I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants.  The statements made in this Declaration are truthful and voluntary.  I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful.  Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her.  She told me if I experienced any retaliation, I could contact Human Resources immediately.  Also, I know that I will receive no special treatment for providing my statement.  Ms. Ford told me that she does not represent me individually.  I understand that she represents only the Defendants in the Litigation.

18.   The statements made in this Declaration are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Alejandra Cambeiro                     12/17/09
Date

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                          Plaintiffs,

          -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                        Defendants.
--------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
KENDRA CLANIN**

      I, Kendra Clanin, being first duly cautioned and sworn, and being more that age eighteen

years of age and competent to testify about the matters contained herein, hereby declare and state

as follows upon personal knowledge or information:

      1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in

Reynoldsburg, Ohio.  I have been employed by VBM since July 17, 2005.  I have been an

Executive Assistant throughout my employment at VBM.  As my boss, Lori Greeley, has been

promoted over time to higher levels of responsibility (leading to her current position as CEO), I,

too, have taken on higher levels of responsibility as her Executive Assistant.  In my own

experience, and based on my observations of and interactions with other Executive Assistants,

the level and complexity of the job of Executive Assistant typically increases as the level of   .

responsibility of the executive being supported rises. In other words, as a general rule, the higher the level of the executive, the more complex the job of the Executive Assistant.

2. During the time I have been an Executive Assistant at VBM, I have been paid on an exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work. I have kept no records of my hours worked.

3. I estimate that I currently work an average of about 45 hours per week. Although my hours of work vary somewhat, on most days I arrive at work a little before 8:00 in the morning and leave at around 5:30 in the evening, Monday through Friday. Although this includes an hour for lunch, I often bring my lunch from home and eat lunch at my desk. I sometimes perform work during some of my lunch hour, but on other occasions I do no work during the lunch hour. If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I have the discretion to do that, and I typically do not record that time as PTO (paid time off) or otherwise record it.

4. During the summer months, our office observes what are known as "summer Fridays." This means that most of the office staff leaves stops working at around 1:00 on Fridays during the summer. Rather than take these half-days off, however, I have developed a system together with another Executive Assistant, Molly Gebensleben, to take a full day off every other Friday while Molly take the alternating Fridays off. I fill in for her while she is off work on summer Fridays, and she then fills in for me when I am off on the other summer Fridays. This is a system that Molly and I developed on our own. We are able to do this because, due to the general impact of the summer Fridays system as a whole, Friday afternoons tend to be "slow" times in which not as many meetings or other business activities take place. I

do not record the number of Fridays (or any other days) that I do or do not work, and to my knowledge no one else records my time either. The only exception to this would be my recorded PTO (paid time off), which I typically take in increments of one day or more.

5.    I occasionally, but not routinely, read and/or respond to my work email on evenings or weekends. I do this of my own initiative; I have not been specifically instructed by anyone to do this. The most common reason that I check them from home is so that I can see if I received answers to emails I sent before leaving the office or to allow myself to be "up to speed" on whatever information may otherwise be waiting for me when I arrive at the office the next day.

6.    I spend approximately two-thirds of my working time attending to Ms. Greeley's calendar, email and related issues. Of this time, the majority is devoted to calendar-related issues. Because so much of her work is meeting-based, it is critical that I keep her calendar current and accurate. Her calendar is, in essence, the platform of her work, as being in the right place, at the right time, with the correct group of people, with the correct materials, makes the difference between her being able to do her job effectively or being unable to do it effectively. More often that not, she has meetings back to back throughout the work day, with few (if any) breaks. As a result, I spend over half of my time reviewing and responding to meeting requests on her behalf, resolving scheduling conflicts on her calendar, and otherwise assisting in planning her schedule. In so doing, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of Ms. Greeley's work. I do this through a combination of my experience, my knowledge of the Company and the people who work here, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. While I consult Ms. Greeley on those rare scheduling conflicts which,

3

in my judgment, require her input to resolve, I routinely make other long- and short-term scheduling decisions on her behalf without consulting her.

7. In addition to my calendar responsibilities for Ms. Greeley individually, I also have the responsibility of maintaining what is known as the Stores Company Calendar. This is a cross-functional calendar on which meetings and events are scheduled as much as two years in advance. In maintaining this calendar I work cross-functionally with other departments, and particularly with other executive assistants. The things being coordinated on this calendar including executives' international travel, domestic travel, a wide variety of meetings involving a wide variety of executives and others, and other events. I asked to be given this additional responsibility because I thought it would be a great way to learn more about the business as a whole. In my view, the more I know about the business as a whole, the more effectively I can support Ms. Greeley

8. Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive. For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched. This means that Ms. Greeley's priorities and needs change along with those of the business. It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision. I also use my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for Ms. Greeley.

9. Like Ms. Greeley, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both. Consequently, it is important that the various executives' schedules be coordinated. Each week the Executive Assistants and.

4

administrative assistants meet together for approximately one hour to review, plan, and coordinate our boss' schedules. The meeting often is done by conference call. Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules. This meeting is organized and conducted by the Executive Assistants ourselves; no one else at the company instructs us to do this or provides any of the content. For most of the meetings, I take responsibility for developing an agenda for the meeting in advance, with input from the other assistants.

10. I am responsible for determining which if any materials Ms. Greeley needs in order to participate in various meetings she attends, and for providing those materials to her. This requires me, on my own initiative, to review her calendar on a frequent basis, identify upcoming meetings, identify what materials she will need for those meetings, then compile those materials for her. I am expected act independently, think on my own, and proactively manage her calendar and related issues.

11. I operate as a "gatekeeper" for Ms. Greeley, in that meeting requests typically are directed through me. I use my judgment to determine the priority of these requests. It is only when I am for some reason unsure about what the priorities should be that I consult Ms. Greeley.

12. I am responsible for coordinating Ms. Greeley's calendar with her travel schedule and also make national and international travel arrangements for her.

13. I also review Ms. Greeley's emails. I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, she needs to see. I exercise my discretion in deciding which if any emails to flag for her attention or to print out for her review. I also decide, on my own, which emails to respond to on her behalf.

5

14. I have the authority and responsibility to order supplies on behalf of the company. This responsibility is shared with another Executive Assistant, Barb Losacco (who has primarily responsibility for this task). I am authorized to order, on the company's behalf, supplies which are contained on an approved core list. I require no one else's approval or signature to make these orders. Items which are not on the core list require Pam's approval. I also am responsible for authorizing any executives' requests for company-paid magazine subscriptions. Such requests are approved based on the level of the executive (Director or above) and the specific publication requested.

15. I also process Ms. Greeley's expenses. In so doing I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on her behalf.

16. I occasionally prepare PowerPoint presentations and other reports for Ms. Greeley. In doing so I commonly draw from existing reports and exercise my judgment about how to pull excerpts from those prior presentations into new presentations which meet her specific needs. Ms. Greeley then makes the final decisions about the content of the presentations.

17. My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

18. I rarely leave the building during the work day. It is extremely rare for Ms. Greeley (or anyone else) to ask that I perform tasks away from the office, personal or otherwise. When exiting our building (which is in Reynoldsburg, Ohio) no card "swipe" is required. Not every

6

entrance to the building requires a badge to be swiped in order to gain entry either. The building has two entrances, one of which (the main entrance) requires no swipe to enter during business hours and the other of which does require a swipe for entry. However, even the records of swipes on this second door would not show a full record of the times individuals came and went from the building, both because no swipe is required to leave the building and because, if two people are entering the building at the same time, or if someone is entering when another person is exiting, not every person's entry to the building will be reflected in a swipe of their own badge.

19. It is extremely rare for Ms Greeley to ask me to perform any personal errands for her. On rare occasions I will pick up Ms. Greeley's lunch for her.

20. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

21. Virtually every aspect of my job requires the routine exercise of my discretion and independent decision-making, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

22. Based on my observations, there are variances in the job duties performed by different Executive Assistants at the company.

23. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with

respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

24.   I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

25.   The statements made in this Declaration (consisting of eight pages) are truthful and voluntary.


I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

_Kendra Clanin_
Kendra Clanin

_Oct. 19, 2009_
Date

8

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                 Plaintiffs,

      -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                 Defendants.
-----------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
BRENDA DEBOLT**

     I, Brenda Debolt, being first duly cautioned and sworn, and being more than age eighteen

years of age and competent to testify about the matters contained herein, hereby declare and state

as follows upon personal knowledge or information:

     1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in

Reynoldsburg, Ohio, and have been employed at VBM since December 16, 2007.  I have been

an Executive Assistant throughout my employment at VBM and have over a decade of

experience, for various entities, as an Executive Assistant.  I currently support Sharen Turney,

President and CEO.

     2.  In my experience, and based on my observations of and interactions with other

Executive Assistants, the precise job duties of different Executive Assistants at VBM vary, due

in large part to the differences in responsibilities, subject matter area, and personal preferences among the Executives those assistants support. As a general matter, the higher the level of the Executive being supported, the more complex and extensive the responsibilities of the Executive Assistant supporting that Executive.

3. Throughout my tenure at VBM, I have been paid on an exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work.

4. I estimate that I currently work an average of about 45-50 hours per week and have worked, on average, a similar number of hours per week throughout my employment at VBM. Although my hours of work are somewhat fluid, on most days I arrive at about 7:30 in the morning and leave at about 5:30 in the evening, Monday through Friday. Of my own initiative, I sometimes stay later than 5:30, particular when Ms. Turney is also working late and may, in my judgment, need additional assistance from me. Although this schedule includes an hour for lunch each day, I typically eat lunch at my desk. I typically perform work during some or most of my lunch hour.

5. During the summer months, many people at VBM observe what are known as "summer hours." This means that most of the office staff stops working and leaves the office at around 1:00 on alternate Friday afternoons during the summer. I did not participate in the summer hours program last summer, and to the best of my recollection have never participated in the summer hours program due to the CEO's schedule.

6. If Ms. Turney and I are out of the office at the same time (for example, over the Christmas holidays), I typically have her calls forwarded to my own (personal) phone. I also have a Blackberry and a laptop computer which I use for work purposes. I often use the laptop to

do work from home on weekends. I also typically check my Blackberry when I am out of the office, including when I am on vacation. The main reason I check my Blackberry when out of the office is to stay on top of what's going on in my absence, including Ms. Turney's travel, any changes in her schedule, and any additional support she may need, or questions which may need to be answered, when I am out of the office. I do this (using the laptop and checking my Blackberry when out of the office) of my own initiative; neither Ms. Turney nor anyone else has instructed me to do this.

7. Although I am aware that most Executive Assistants spend half or more of their working time on calendar management issues, this is not the case for me. While my job duties do include some calendar management, another Executive Assistant has primary responsibility for managing Ms. Turney's calendar. The three of us (Ms. Turney, myself, and the other Assistant) routinely meet on a weekly basis to review Ms. Turney's calendar and related issues.

8. Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive. On a daily and ongoing basis, my job requires me to be aware of Ms. Turney's responsibilities and priorities, and to quickly respond to changing circumstances with minimal immediate direction and supervision.

9. On most days, I prepare a binder for Ms. Turney to take home in the evening. This binder includes the materials she needs to review for any meetings to be held the next day. Ms. Turney does not tell me what materials to include in the binder. Instead, it is my responsibility to be familiar with her calendar, her substantive interest and needs, and the nature of the meetings she attends so that I can prepare materials of this nature without any direct supervision from her.

10. I am also responsible for reviewing, on an ongoing basis throughout the day, Ms. Turney's emails. If I determine (using my own judgment) that a particular email is one that she

will want to review, I print the email for her.  I also routinely delete emails that I conclude are "junk" mail or are duplicative (such as those involving a series of emails on the same subject). In order to make such judgments about the various priorities of different emails, I leverage my knowledge of my executive's priorities and of the importance of various issues within the business.

11.   I also process Ms. Turney's expense reports.  In so doing, I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on her behalf.

12. Ms. Turney's position requires extensive travel, including international travel.  I plan all her business travel and make the air, hotel, and ground transportation arrangements for each of her trips.  Many of these trips are planned without direct involvement from Ms. Turney; instead, by reviewing her calendar and understanding her needs and those of the business, I make the arrangements myself.  I often organize these complex travel arrangements into spreadsheets to assist her as she is traveling.  This is a process I have developed on my own, of my own initiative.

13. Until about 18 months ago, I routinely traveled with Ms. Turney to New York on approximately a quarterly basis, in order to provide support for her there and to coordinate with my counterpart who supports Ms. Turney in New York.  However, I no longer do this as a routine part of my responsibilities due to cost cutting.

14. Certain types of customer calls or complaints are sometimes forwarded to Ms. Turney for a response.  I screen these on her behalf and forward to the Client Contact Center.

4

15. I am also responsible for reviewing numerous invoices on Ms. Turney's behalf. I routinely approve invoices for courier services. Larger invoices require Ms. Turney's additional review and approval.

16. I also play a role in approving new hires and promotions, as well as salaries and pay increases that fall within Ms. Turney's budgetary responsibility. I make the initial review of the relevant paperwork to make sure that the company's policies and practices have been followed, and that applicable budget guidelines have been followed as well, after which Ms. Turney provides the final approval.

17. Ms. Turney's responsibilities frequently including giving prepared remarks at various events. I proactively coordinate with public relations associates within the company to ensure that the remarks are written in a timely fashion and, where appropriate, later view them to ensure that they contain the messages or information she wants to convey for that particular event.

18. There is no single company-wide method or system for organizing files, emails, or other documents. To my knowledge, each Executive Assistant (including me) develops his or her own organizational and filing systems for both hard copy and electronic information. I have thus developed my own systems for organizing Ms. Turney's files, binders, and other documents. Due to the nature of Ms. Turney's position, my job duties include extensive management and organization of paper documents.

19. Similarly, because to my knowledge there is no formal training program for administrative assistants (other than isolated training modules regarding technical supports, such as the Ariba system or the phone system), each of us has had to learn on our own and from each other how best to do the many facets of our jobs. We work together as a team of Assistants and routinely share best practices with each other and pass along to each other information that will

5

help all of us do our jobs effectively.  On occasion I have assisted in training new Assistants by having them "on-board" with me.

20.  My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  As an example of this second category, I routinely handle information regarding the salaries and performance reviews of others in the company.  I am required to have a high level of discretion as to how confidential information is treated and who needs to or should be able to see it.

21.  I estimate that I have provided personal (meaning not strictly business related) assistance to Ms. Turney once or twice a month during my time at VBM.  Such assistance has taken the form of assisting with personal travel or running an errand.  I also pick up her coffee in the morning and lunch daily when she is in Columbus.

22.  I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

23.  Virtually every aspect of my job as an Executive Assistant requires, and always has required, the routine exercise of my discretion and independent decision-making, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

24.  I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with

respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required

to speak with her and that I could have ended our conversation at any time. She also informed

me that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

25.   I understand that this Declaration was obtained for purposes of the defense of

Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims

for alleged overtime compensation on behalf of Executive Assistants and Administrative

Assistants. The statements made in this Declaration are truthful and voluntary.  I am aware that I

might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to

monetary relief if I opt in and the plaintiffs are successful.  Additionally, Ms. Ford informed me

that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with

her.  She told me if I experienced any retaliation, I could contact Human Resources immediately.

Also, I know that I will receive no special treatment for providing my statement.  Ms. Ford told

me that she does not represent me individually.  I understand that she represents only the

Defendants in the Litigation.

26.   The statements made in this Declaration (consisting of seven pages) are truthful and

voluntary.


I declare under penalty of perjury under the laws of the United States of America and the

State of Ohio that the foregoing is true and correct.

_Brenda Debolt_
Brenda Debolt
_12-14-09_
Date

7

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

     -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
CYNTHIA EGAN**

      I, Cynthia Egan, being first duly cautioned and sworn, and being more than age eighteen

years of age and competent to testify about the matters contained herein, hereby declare and state

as follows upon personal knowledge or information:

      1.  I am currently employed by Bath and Body Works, Inc. ("BBW") in Reynoldsburg,

Ohio.  I was employed by Victoria's Secret Stores Brand Management ("VBM") in

Reynoldsburg, Ohio,  from July 17, 2005 until April 15, 2007.  I am an Executive Assistant

currently at BBW and was also an Executive Assistant at VBM.  Starting in late 2004, and

continuing through the period when I was employed by VBM, I supported Chief Operating

Officer Mark Weikel.

1

2.   During the time I was an Executive Assistant at VBM, I was paid on an exempt, salaried basis.  I was never paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work.  I kept no records of my hours worked at VBM and, to my knowledge, no one else kept any records of my hours either.

3.   My schedule when I worked at VBM was similar to the schedule I now work at BBW.  In both environments I have typically worked an average of about 45-50 hours per week.  Although my hours of work vary somewhat, on most days I arrive at work around 8:15 in the morning and leave at around 6:00 in the evening, Monday through Friday.  Although this includes an hour for lunch, I usually eat lunch at my desk and perform work during some of my lunch hour.  If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I typically do not record that time as PTO (paid time off) or otherwise record it.  The same was true when I worked at VBM.

4.   In addition to the hours I worked during the regular work week at VBM,  I occasionally did work on weekends and in the evenings. For example, if an executive I supported had a trip coming up, or needed to make last minute changes to an itinerary or a communication to others in the Company, I might work in the evening or on a weekend to help with that project.

5.   As was true when I worked at VBM, I occasionally, but not routinely, read and/or respond to my work email on evenings or weekends.  I do this of my own initiative; I have not been specifically instructed by anyone to do this.  I do not have a "Blackberry" or other mobile device for reading or sending emails.  The most common reason that I check emails from home is so that I can see if I received answers to emails I sent before leaving the office or to allow

myself to be "up to speed" on whatever information may otherwise be waiting for me when I arrive at the office the next day.

6. During my employment at VBM, I occasionally (though not frequently) did personal errands or assisted with other personal projects for the executive I supported.

7. In my experience both at VBM and BBW, the precise duties of the various Executive Assistants vary. The particular preferences of the executives they work for, as well as the needs of their departments and the overall priorities of the Company as they change from time, are all factors in contributing to these job variances among the Executive Assistants.

8. I currently spend approximately between 50% and 70% of my working time on calendar management issues, and spent approximately the same amount of time on such issues when I worked at VBM. Because so much of the Company's executives' work is meeting-based (both at BBW and at VBM), it has always been critical that I keep my executives' calendars current and accurate. Their calendars are, in essence, the platform of their work, as being in the right place, at the right time, with the correct group of people, with the correct materials, makes the difference between being able to do their jobs effectively or being unable to do them effectively. As a result, at VBM I spent over half of my time reviewing and responding to meeting requests on behalf of Mr. Weikel, resolving scheduling conflicts on his calendar, and otherwise assisting in planning his schedule. In so doing, I routinely exercised my own independent judgment and discretion regarding these extremely significant aspects of Mr. Weikel's work. I did this through a combination of my experience, my knowledge of the Company and the people who worked there, the relationships I had built with Executive Assistants and others across the business, and my skills as an administrator. While I consulted Mr. Weikel on scheduling conflicts which, in my judgment, required his input to resolve, I

routinely made other long- and short-term scheduling decisions on his behalf without consulting him.

9. Because the fashion retail business is so dynamic, the work I performed at VBM was neither routine nor repetitive. This means that Mr. Weikel's priorities and needs changed along with those of the business. It was my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision. I also used my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for Mr. Weikel.

10. Like Mr. Weikel, many other executives at VBM spent a great deal of time in business meetings with other executives, third parties, or both. Consequently, it was important that the various executives' schedules be coordinated. Each week, the Executive Assistants and administrative assistants met together (typically on Thursdays) for approximately one hour to review, plan, and coordinate our bosses' schedules. Among other things, we discussed our executives' upcoming deliverables and travel, and identified and attempted to resolve any scheduling conflicts among our bosses' schedules. We made these decisions of our own initiative and, in the vast majority of cases, did so without consulting any of the executives.

11. I was responsible for determining which materials Mr. Weikel needed in order to participate in various meetings he attended and for providing those materials to him. This required me, on my own initiative, to review his calendar on a frequent basis, identify upcoming meetings, identify what materials he would need for those meetings, then compiling those materials for him. I was expected to act independently, think on my own, and proactively manage his calendar and related issues.

12. I operated as a "gatekeeper" for Mr. Weikel in that meeting requests for him typically were directed through me. I used my judgment to determine the priority of these requests. It was only when I was for some reason unsure about what the priorities should be that I consulted Mr. Weikel.

13. Mr. Weikel's responsibilities required him to make many visits to Company stores around the country. I was responsible for coordinating Mr. Weikel's calendar with his travel schedule and also made national and international travel arrangements for him. Additionally, I was responsible for scheduling Company-owned aircraft for such trips, for which reservations sometimes had to be made up to a year in advance. When scheduling such trips I was responsible not only for reserving the aircraft itself but also for coordinating Mr. Weikel's travel with executives of other offices (including the Chief Executive Officer) and with coordinating the content of the visits with associates in the field and in store, with Mr. Weikel's direct reports, and with many others involve in his complex schedule of out-of-town work.

14. I also routinely reviewed Mr. Weikel's emails. I had the authority and discretion to delete emails that I determined to be "junk" mail, or which were duplicative in some way, or which otherwise were not ones that, in my judgment, he needed or would likely want to see. I routinely exercised my discretion in deciding which if any emails to flag for his attention or to print out for his review.

15. I also processed Mr. Weikel's expenses. In so doing, I reconciled his travel receipts to credit card billing statements and provided relevant information to the Company's accounting department. In so doing, I was required to be familiar with the Company's policies regarding reimbursement of expenses and to record and process such expenses on his behalf.

16. I occasionally drafted emails for Mr. Weikel's's signature. For example, it was not unusual for me to draft emails to his direct reports or to store associates about topics such as what he was going to need for an upcoming visit or what he wanted to discuss on an upcoming trip to visit stores.

17. On an irregular basis, temporary employees reported to me while I was working for Mr. Weikel. I trained them in performing their duties (which were generally in the nature of assisting me and others on temporary projects). I also had the authority and responsibility to sign off on their time sheets; to my knowledge, no approval beyond mine was needed for the authorization of their recorded time (and their pay).

18. My work at VBM required me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the Company that was not to be shared with outsiders, and internally confidential information. As an example of this second category, I routinely assisted Mr. Weikel in the preparation of the performance reviews of his direct reports, and was privy to their salary information as well. I was required to have a high level of discretion as to how this information was treated and who needed to or should be able to see it.

19. I have never seen any evidence of any kind that any executive at this Company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

20. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required

6

to speak with her and that I could have ended our conversation at any time. She also informed me that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

21.   I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the Plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

22.   The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.


I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

*Cynthia A. Egan*
Cynthia Egan
*12. 8. 09*
Date

7

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

              Plaintiffs,

      -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

              Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
KIMBERLY GARAVUSO**

       I, Kimberly Garavuso, being first duly cautioned and sworn, and being more than age

eighteen years of age and competent to testify about the matters contained herein, hereby declare

and state as follows upon personal knowledge or information:

       1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in

Reynoldsburg, Ohio.  I have been employed by VBM since July 17, 2005.  I have been an

Executive Assistant throughout my employment at VBM.  As an Executive Assistant I currently

support Amber Tarshis, Vice President of Marketing, and Amy Stevenson, Associate Vice

President of Customer Relationship Marketing, and Dan Clifford, Director of Marketing.

       2.  During the time I have been an Executive Assistant at VBM, I have been paid on an

exempt, salaried basis.  I have never been paid overtime as an Executive Assistant, nor been

1

required to "clock in" or otherwise record my hours of work. I have kept no records of my hours worked.

3. I estimate that I currently work an average of about 45 hours per week. Although my hours of work vary somewhat, on most days I arrive at work at around 8:30 in the morning and leave at around 5:30 or 6:00 in the evening, Monday through Friday. Although this includes an hour for lunch, I typically eat lunch at my desk and do work during some portion of the lunch hour. If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I have the discretion to do that, and I typically do not record that time as PTO (paid time off) or otherwise record it.

4. During the summer months, our office observes what are known as "summer hours." This practice has been in place throughout my employment at VBM. "Summer hours" means that most of the office staff leaves stops working at around 1:00 on Fridays during the summer months. We are able to do this because, due to the general impact of the summer hours system as a whole, Friday afternoons tend to be "slow" times in which not as many meetings or other business activities take place. Consistent with the general summer hours schedule of the company, I typically leave work sometime in the early afternoon on summer Fridays and do not perform any additional work for the rest of that day. I do not record the number of Fridays (or any other days) that I do or do not work, and to my knowledge no one else records my time either. However, on days when I am going to be out of the office (both for summer hours and other purposes), I typically circulate that information to my colleagues so that it displays as a "banner" notice on their outlook calendars for those days. Also, my recorded PTO (paid time

off), which I typically take in increments of one day or more, reflects the days when I was not working.

5.   I occasionally do "extra" work on short notice, when the needs of the business require it. For example, on occasions when one of my bosses has needed to work on an urgent project or other time-sensitive matter, I have stayed into the evening to work, or have done work during a weekend to assist in that effort.

6.   The volume of emails I get (and am expected to respond to or otherwise handle) at work is significant.  For example, when I was recently away from work for three days due to an illness, I returned to find  approximately 400 new emails waiting for me that had accumulated in just that three-day period.  I frequently check my emails from home on evenings and weekends. No one has ever instructed me to do this; I do it of my own initiative in order to stay on top of what's happening in the office, so that I can be better prepared to do my job when I return to the office.

7.   I spend approximately 80% of my working time attending to my bosses' calendars and related issues.  Because so much of their work is meeting-based, it is critical that I keep their calendars current and accurate.  Their calendars are, in essence, the platform of their work, as being in the right place, at the right time, with the correct group of people, with the correct materials, makes the difference between her being able to do her job effectively or being unable to do it effectively.   As a result, I spend well over half of my time reviewing and responding to meeting requests on their behalf, resolving scheduling conflicts on their calendars, and otherwise assisting in planning their schedules.  In so doing, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of my bosses' work.  I do this through a combination of my experience, my knowledge of the Company and the people

who work here, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. In order to do my job effectively I have to know who the various players are in the various meetings and communications I receive, what their roles and responsibilities are, and how those roles and responsibilities relate to what my particular executives' roles, priorities, and needs are. When faced with a need to resolve conflicting meeting requests or to make similar types of decisions that will directly effect (and ultimately structure) my bosses' work and their schedules, I typically make the decision on my own, based on my own independent judgment and discretion.

8.   Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive. For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched. This means that my bosses' priorities and needs change along with those of the business. It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision. I also use my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for the executives I support.

9.   Like the executives I support, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both. Consequently, it is important that the various executives' schedules be coordinated. Each week the Executive Assistants and administrative assistants meet together for approximately one hour to review, plan, and coordinate our boss' schedules. The meeting often is done by conference call, and usually occurs on a Thursday. Among other things, we discuss our executives' upcoming

4

deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules.

10. I am responsible for determining which, if any, materials my bosses need in order to participate in various meetings they attend, and for providing those materials to them as necessary. This requires me, on my own initiative, to review their calendars on a frequent basis, identify upcoming meetings, identify what materials they will need for those meetings, then compile those materials for them. I am expected to act independently, think on my own, and proactively manage their calendars and related issues.

11. I operate as a "gatekeeper" for the executives I support, in that meeting requests for them typically are directed through me. I use my judgment to determine the priority of these requests. It is only when I am for some reason unsure about what the priorities should be that I consult one of the executives.

12. I am responsible for coordinating my executives' calendars with their travel schedules and also make travel arrangements for them. When the travel includes store visits (meaning visiting company stores in other areas of the country) I am responsible for making the arrangements, including contacting the stores to coordinate the visit itself, creating an itinerary, and making related travel arrangements.

13. I also review the emails of the executives I support. I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, they need or want to see. I exercise my discretion in deciding which if any of their emails to flag for their her attention or to print out for their review. I also decide, on my own, which emails to respond to on their behalf.

14.  I also process my executives' expenses.  In so doing I reconcile their travel receipts to credit card billing statements and provide relevant information to the company's accounting department.  I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on the executives' behalf.

15.  My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

16. I rarely leave the building during the work day.  Rarely, if ever, have I been asked or required to perform any personal work or personal errands for the executives I support (other than picking up lunch from inside the building for one of the executives).

17. When exiting our building (which is in Reynoldsburg, Ohio) no card "swipe" is required.  Not every entrance to the building requires a badge to be swiped in order to gain entry either.  The building has two entrances, one of which (the main entrance) requires no swipe to enter during business hours and the other of which does require a swipe for entry.  However, even the records of swipes on this second door would not show a full record of the times individuals came and went from the building, both because no swipe is required to leave the building and because, if two people are entering the building at the same time, or if someone is entering when another person is exiting, not every person's entry to the building will be reflected in a swipe of their own badge.

18.  I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

19.  Virtually every aspect of my job requires the routine exercise of my discretion and independent decision-making, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executives I support.

20.  Based on my observations, there are variances in the job duties performed by different Executive Assistants at the company.  In my own case, my responsibilities as an Executive Assistant have varied over the years, as the executives I supported have changed; in my experience, different executives have different expectations or needs, and, because their jobs vary in complexity, the tasks performed by their executive assistant vary somewhat in complexity as well.

21.  I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

22.  I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative

Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

23.   The statements made in this Declaration (consisting of eight pages) are truthful and voluntary.


I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

_Kimberly Garavuso_
Kimberly Garavuso
_11-3-09_
Date