# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                   Plaintiffs,

       -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                   Defendants.
-----------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
MOLLY GEBENSLEBEN**

      I, Molly Gebensleben, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

      1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio.  I have been employed by VBM since September 21, 2008.  I have been an Executive Assistant throughout my employment at VBM.     I have been an Executive Assistant for 30 years. I currently support Peter Horvath, Chief Operating Officer, Victoria's Secret Stores.

      2.  During the time I have been an Executive Assistant at VBM, I have been paid on an exempt, salaried basis.  I have never been paid overtime as an Executive Assistant, nor been

required to "clock in" or otherwise record my hours of work.  I have kept no records of my hours worked.

3.  I estimate that I currently work an average of about 45 hours per week.  Although my hours of work vary somewhat, on most days I arrive at work at about 8:30 in the morning and leave at around 5:30 or 6:00 in the evening, Monday through Friday.  I sometimes perform work during some of my lunch hour, but on other occasions I do no work during the lunch hour.  I often spend a portion of my lunch hour reading industry publications or business-related information on various websites.  If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I have the discretion to do that, and I  typically do not record that time as PTO (paid time off) or otherwise record it.

4.  During the summer months, our office observes what are known as "summer hours." This means that most of the office staff leaves/stops working at around 1:00 on Fridays during the summer.  Rather than take these half-days off, however, I have developed a system together with another Executive Assistant, Kendra Clanin, to take a full day off four Fridays in the summer while Kendra takes the same number of select Fridays.  I fill in for her while she is off work on summer Fridays, and she then fills in for me when I am off on the other summer Fridays.  This is a system that Kendra and I developed on our own.  We are able to do this because, due to the general impact of the summer hours system as a whole, Friday afternoons tend to be "slow" times in which not as many meetings or other business activities take place.  I do not record the number of Fridays (or any other days) that I do or do not work, and to my knowledge no one else records my time either.  The only exception to this would be my recorded PTO (paid time off), which I typically take in increments of one day or more.

5.  I frequently read and/or respond to my work email on evenings or weekends.  I do this of my own initiative; I have not been specifically instructed by anyone to do this.  The most common reason that I check emails when I am away from the office is so that I can see if I received answers to emails I sent before leaving the office or to allow myself to be "up to speed" on whatever information may otherwise be waiting for me when I arrive at the office the next day.  Mr. Horvath has never instructed me to do this.

6.  I spend well over half of my working time attending to Mr. Horvath's calendar, email and related issues.  Of this time, the majority is devoted to calendar-related issues.  Because so much of his work is meeting-based, it is critical that I keep his calendar current and accurate.    In managing his calendar, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of Mr. Horvath's work.  I do this through a combination of my extensive experience, my knowledge of the Company and the people who work here, my knowledge of Mr. Horvath's business interests and professional style, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. While I consult Mr. Horvath on those rare scheduling conflicts which, in my judgment, require his input to resolve, I routinely make other long- and short-term scheduling decisions on his behalf without consulting him.

7.  Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched.  This means that Mr. Horvath's priorities and needs change along with those of the business.  It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.  I also use my knowledge of these

3

changes in deciding among conflicting meeting requests and making other scheduling decisions for Mr. Horvath.

8.   Like Mr. Horvath, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both.  Consequently, it is important that the various executives' schedules be coordinated.  Each week the Executive Assistants and administrative assistants meet together for approximately one hour to review, plan, and coordinate our boss' schedules.  The meeting often is done by conference call and is typically held on a Thursday.  Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules.  Our typical process is for Executive Assistant, Kendra Clanin, to develop an agenda for the meeting in advance, with input from the other assistants.

9.   I am responsible for determining which, if any, materials Mr. Horvath needs in order to participate in various meetings he attends, and for providing those materials to him.  This requires me, on my own initiative, to review his calendar on a frequent basis, identify upcoming meetings, identify what materials he will need for those meetings, then compile those materials for him.  I am expected to act independently, think on my own, and proactively manage his calendar and related issues.

10. I operate as a "gatekeeper" for Mr. Horvath, in that meeting requests for him typically are directed through me.  I use my judgment to determine the priority of these requests.  It is only on those rare occasions when I am for some reason unsure about what the priorities should be that I consult Mr. Horvath on such conflicts.

11. I am responsible for coordinating Mr. Horvath's calendar with his travel schedule and also make national and international travel arrangements for him.

4

12.  I also review Mr. Horvath's emails.  I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, he needs to see.  I exercise my discretion in deciding which if any emails to flag for his attention or to print out for his review.  I also decide, on my own, which emails to respond to on his behalf.

13. I am also authorized to order supplies on behalf of the company. This responsibility is shared with Executive Assistants, Barb Losacco (who has primarily responsibility for this task) and Kendra Clanin.  I am authorized to order, on the company's behalf, supplies which are contained on an approved core list.  I require no one else's approval or signature to make these orders.  Items which are not on the core list require higher level approval.

14.  I also process Mr. Horvath's expenses.  In so doing I reconcile Mr. Horvath's travel receipts to credit card billing statements and provide relevant information to the company's accounting department.  I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to record and process such expenses on his behalf.

15.  My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  This information includes extensive financial and strategic information about the company, as well as salary and performance information concerning executives who report to Mr. Horvath. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

16. I rarely leave the building during the work day.  It is extremely rare for Mr. Horvath (or anyone else) to ask that I perform tasks away from the office, personal or otherwise.  When

exiting our building (which is in Reynoldsburg, Ohio) no badge "swipe" is required.  Not every

entrance to the building requires a badge to be swiped in order to gain entry either.  The building

has two entrances, one of which (the main entrance) requires no swipe to enter during business

hours and the other of which does require a swipe for entry.  However, even the records of

swipes on this second door would not show a full record of the times associates came and went

from the building, both because no swipe is required to leave the building and because, if two

people are entering the building at the same time, or if someone is entering when another person

is exiting, not every person's entry to the building will be reflected in a swipe of their own

badge.

17.  I have never seen any evidence of any kind that any executive at this company holds

or has demonstrated any bias of any kind toward pregnant women, women with children, or

women who have taken a leave of absence.

18.  Virtually every aspect of my job requires the routine exercise of my discretion and

independent decision-making, which is in turn based on a combination of my expertise and

skills, my knowledge of company policies and procedures, my ability to research and otherwise

develop solutions when difficulties arise, my ability to work collaboratively with other Executive

Assistants, my discretion, and my ability to learn and act upon the personal preferences and

needs of the executive I support.

19.  Based on my observations, there are variances in the job duties performed by

different Executive Assistants at VBM.

20.  I voluntarily spoke with Jackie Ford, one of the attorneys representing the

Defendants in <u>Fredda Malena v. Victoria's Secret Direct, LLC, et al.</u> (the "Litigation"), with

respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required

to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

21.   I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants.  The statements made in this Declaration are truthful and voluntary.  I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful.  Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her.  She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement.  Ms. Ford told me that she does not represent me individually.  I understand that she represents only the Defendants in the Litigation.

22.   The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.


I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

Molly Gebenslebben
Date   11/02/19

11/02/2009 7097765

# EXHIBIT I

Fax sent by : 3038                    TEST                    10-04-09 09:37a    Pg: 2/9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

    Plaintiffs.

-against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

    Defendants.

----------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

DECLARATION OF
JOSEPHINE GILIBERTI

I, Josephine Giliberti, being first duly cautioned and sworn, and being more than age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

1.  I am employed by Victoria's Secret Direct Brand Management, LLC dba Victoria's Secret Direct New York, LLC ("VSN") in New York, New York. I have been employed by VSN since October, 2007. I have never been employed by Victoria's Secret Stores Brand Management, Inc. ("VBM") or Limitedbrands Direct Media Productions, Inc. ("VDM"). Throughout my employment at VSN, I have been an Executive Assistant. I have worked for various entities as an Executive Assistant since 1993.

2.  Throughout my career as an Executive Assistant (including the entire period of my employment at at VSN), I have been paid on an exempt, salaried basis. I have never been paid

1

overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work. I have kept no records of my hours worked.

3.   I estimate that I currently work an average of about 45 - 50 hours per week.   Although my hours of work vary somewhat, on most days I arrive at work between 8:00 and 8:15 in the morning and leave at around 5:30 in the evening, Monday through Friday.   Although this includes an hour for lunch, I often eat lunch at my desk and perform work during some of my lunch hour.   If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I typically do not record that time as PTO (paid time off) or otherwise record it.

4.   I currently am the Executive Assistant to Steven Goldsmith, Executive Vice President of Internet and Marketing.   I also provide support to other executives who report to Mr. Goldsmith.

5.   I spend over half of my working time attending to Mr. Goldsmith's calendar and related issues.   Because so much of his work is meeting-based, it is critical that I keep his calendar current and accurate.   His calendar is, in essence, the platform of his work, as being in the right place, at the right time, with the correct group of people, with the correct materials, makes the difference between his being able to do his job effectively or being unable to do it effectively.   As a result, I spend over half of my time reviewing and responding to meeting requests on his behalf, resolving scheduling conflicts on his calendar, and otherwise assisting in planning his schedule.   In so doing, I frequently and routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of Mr. Goldsmith's work. I do this through a combination of my extensive experience, my knowledge of the Company and the people who work here, my knowledge of the priorities of various functions and tasks within

2

the business, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. While I consult Mr. Goldsmith on any scheduling conflicts which, in my judgment, require his input to resolve, I routinely make other long- and short-term scheduling decisions (and resolve other scheduling conflicts) on his behalf without consulting him.

6.    Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched.  This means that Mr. Goldsmith's priorities and needs change along with those of the business.  It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.  I also use my knowledge of these changes in deciding among conflicting meeting requests and making others scheduling decisions for Mr. Goldsmith.

7.    Like Mr. Goldsmith, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both.  Consequently, it is important that the various executives' schedules be coordinated.  Each week the Executive Assistants and administrative assistants meet together (typically on Thursdays) for approximately one hour to review, plan, and coordinate our boss' schedules.  Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules.  In working daily on Mr. Goldsmith's complex calendar and related issues, I collaborate with other assistants on a regular basis.  It is critically important that the other assistants and I work together collaboratively to negotiate conflicts to ensure that our Executives are able to do their work effectively.

3

8.   It is my job to stay ahead of my boss, in the sense that I need to be planning ahead and anticipating the things he will need to have, and the places he will need to be, in order to do his job effectively.

9.   In order to do my job effectively, I must win the trust and confidence of both other assistants and other Executives.  This is true because of the collaborative nature of our work (both the work of the assistants and the work of the executives).

10.  I am responsible for determining which materials Mr. Goldsmith needs in order to participate in various meetings he attends and for providing those materials to him.  This requires me, on my own initiative, to review his calendar on a frequent basis, identify upcoming meetings, identify what materials he will need for those meetings, then compile those materials for him.  I am expected to act independently, think on my own, and proactively manage his calendar and related issues.

11.  I operate as a "gatekeeper" for Mr. Goldsmith, in that meeting requests typically are directed through me.  I use my judgment to determine the priority of these requests.  It is only when I am for some reason unsure about what the priorities should be that I consult Mr. Goldsmith.

12.  I am responsible for coordinating Mr. Goldsmith's calendar with his travel schedule and also make travel arrangements for him.

13.  I also review Mr. Goldsmith's emails.  Although he reviews the majority of his emails himself, I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, he needs to see.  I exercise my discretion in deciding which if any emails to highlight for his attention or to print out for his review.

4

14. I also process Mr. Goldsmith's expenses. In so doing I reconcile Mr. Goldsmith's travel receipts to credit card billing statements and provide relevant information to the company's accounting department. I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on his behalf and on behalf of the other executives I support.

15. My work routinely requires me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. As an example, I routinely see the performance reviews of Mr. Goldsmith's direct reports and have seen compensation information as well. In light of the nature of Mr. Goldsmith's work, I also see a great deal of confidential information about the company's finances and a wide variety of other types of confidential corporate information. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

16. I have never seen any executive (or anyone else) at this company show any negative bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

17. I make an effort to take my PTO at times when Mr. Goldsmith is also on PTO. When I am on PTO, the typical practice is for other another executive assistant (usually Tammy Reyes) to fill in for me. I do not believe that a "temp" could simply be "dropped in" to do my job in my absence. This is because my job requires the routine exercise of my discretion, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a solution when difficulties arise, my

5

ability to work collaboratively with other executive assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

18.  Based on my observations, there are variances in the job duties performed by different executive assistants at the company.

19.  I rarely if ever perform any personal errands for Mr. Goldsmith (or any other executive).

20.  I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time.  She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

21.  I understand that this Declaration was obtained for purposes of the defense of the "Litigation," which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants.  The statements made in this Declaration are truthful and voluntary.  I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful.  Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with his.  She told me if I experienced any retaliation, I could contact Human Resources immediately.  Also, I know that I will receive no special treatment for providing my statement.  Ms. Ford told me that she does not represent me individually.  I understand that she represents only the Defendants in the Litigation.

22.  The statements made in this Declaration (consisting of 7 pages) are truthful and voluntary.

6

Fax sent by : 3038                    TEST                    10-04-09 09:39p          Pg: 8/8

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Josephine Giliberti

Josephine Giliberti          10/16/09
Date

# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

      -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
AHMINA R. GRAHAM**

    I, Ahmina R. Graham, being first duly cautioned and sworn, and being more that age

eighteen years of age and competent to testify about the matters contained herein, hereby declare

and state as follows upon personal knowledge or information:

    1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in

Reynoldsburg, Ohio.  I have been employed by VBM since August, 2006.

    2.  During the entire time I have been an Executive Assistant at VBM, I have been paid

on an exempt, salaried basis.  I have never been paid overtime as an Executive Assistant, nor

been required to "clock in" or otherwise record my hours of work.  I have kept no records of my

hours worked.

    3.  I estimate that I currently work an average of about 45 - 50 hours per week.  Although

my hours of work vary somewhat, on most days I arrive at work around 8:30 in the morning and

leave between 5:30 and 6:00 in the evening, Monday through Friday.  Although this includes an

1

hour for lunch, I often eat lunch at my desk and perform work during some of my lunch hour.  If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I typically do not record that time as PTO (paid time off) or otherwise record it.

4.   I occasionally read and/or respond to my work email on evenings or weekends.  I do this of my own initiative; I have not been specifically instructed by anyone to do this.  I do not have a "Blackberry" or other mobile device for reading or sending emails.  When I check emails from home I do so of my own initiative.  The most common reason that I check them from home is so that I can see if I received answers to emails I sent before leaving the office or to allow myself to get a "heads up" on whatever information may be waiting for me when I arrive at the office the next day.

5.   I currently am the Executive Assistant to Richard Dent, the Chief Operating Officer of PINK.  I also provide support to other executives who report to Mr. Dent.

6.   I spend well over half of my working time attending to Mr. Dent's calendar and related issues.  Because so much of his work is meeting-based, it is critical that I keep his calendar current and accurate.  His calendar is, in essence, the platform of his work, as being in the right place, at the right time, with the correct group of people, with the correct materials, makes the difference between his being able to do his job effectively or being unable to do it effectively.  As a result, I spend over half of my time reviewing and responding to meeting requests on his behalf, resolving scheduling conflicts on his calendar, and otherwise assisting in planning his schedule.  In so doing, I frequently and routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of Mr. Dent's work.  I do this through a combination of my extensive experience, my knowledge of the Company and the

people who work here, my knowledge of the priorities of various functions and tasks within the business, the relationships I have built with Executive Assistants and others across the business and my skills as an administrator. While I consult Mr. Dent on any scheduling conflicts which, in my judgment, require his input to resolve, I routinely make other long- and short-term scheduling decisions (and resolve other scheduling conflicts) on his behalf without consulting him.

7.   Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive. For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched. This means that Mr. Dent's priorities and needs change along with those of the business. It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision. I also use my knowledge of these changes in deciding among conflicting meeting requests and making others scheduling decisions for Mr. Dent.

8.   Like Mr. Dent, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both. Consequently, it is important that the various executives' schedules be coordinated. Each week the Executive Assistants and administrative assistants meet together (typically on Thursdays) for approximately one hour to review, plan, and coordinate our boss' schedules. The meeting often is done by conference call. Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules. In working daily on Mr. Dent's complex calendar and related issues, I collaborate with other assistant son a regular basis. It is critically important that the other assistants and I work together

3

collaboratively to negotiate conflicts to ensure that our Executives are able to do their work effectively.

9. In order to do my job effectively, I must win the trust and confidence of both other assistants and other Executives. This is true because of the collaborative nature of our work (both the work of the assistants and the work of the executives).

10. I am responsible for determining which materials Mr. Dent needs in order to participate in various meetings he attends and for providing those materials to him. This requires me, on my own initiative, to review his calendar on a frequent basis, identify upcoming meetings, identify what materials he will need for those meetings, then compile those materials for him. I am expected act independently, think on my own, and proactively manage his calendar and related issues. I consider myself to be Mr. Dent's "eyes and ears" for meeting scheduling and preparation, in that it is my job to anticipate and prepare, in advance, what he needs in order to participate in the various meetings he attends or conducts.

11. I operate as a "gatekeeper" for Mr. Dent, in that meeting requests typically are directed through me. I use my judgment to determine the priority of these requests. It is only when I am for some reason unsure about what the priorities should be that I consult Mr. Dent.

12. I am responsible for coordinating Mr. Dent's calendar with his travel schedule and also make national and international travel arrangements for his. I sometimes go outside the company's travel department to make those arrangements, particularly when I know or believe that I can find a better or more cost-effective option through my own research. In making his travel arrangements I use my knowledge of his travel preferences as well as my own knowledge of various airports and travel routes so as to attempt to avoid making arrangements that will ultimately include delayed flights, weather-related complications, or other problems.

4

13.   I also review Mr. Dent's emails.  I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, he needs to see. I exercise my discretion in deciding which if any emails to highlight for his attention or to print out for his review. I also create email folders to assist him (and me) in organizing his emails.

14.   I also process Mr. Dent's expenses.  In so doing I reconcile Mr. Dent's travel receipts to credit card billing statements and provide relevant information to the company's accounting department.  I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on his behalf and on behalf of the other executives I support.

15.   I occasionally draft letters, memos, and other communications for Mr. Dent's review and signature.  I also prepare presentation materials for Mr. Dent's use, typically by pulling information from other sources (such as other presentations or reports).  Mr. Dent then makes the final decisions about the content of the presentations.

16.   I am authorized to periodically purchase supplies for our department, and use my discretion to determine what supplies should be purchased.  I have the responsibility to manage this portion of the budget for our department.

17.   My work routinely requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  As an example, I routinely see the performance reviews of Mr. Dent's direct reports. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

18. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence. I have two children, ages 6 and 16, and have never once experienced any discrimination or negative treatment of any kind due to either my status as a parent or to my need to periodically adjust my schedule to respond to the needs of my children. If anything, I have found the company to be exemplary in its emphasis on work/life balance and supporting associates with families.

19. I make an effort to take my PTO at times when Mr. Dent is also on PTO. When I am on PTO, the typical practice is for other another assistant (Donna Kirk) to fill in for me. I do not believe that a "temp" could simply be "dropped in" to do my job in my absence. This is because my job requires the routine exercise of my discretion, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

20. Based on my observations, there are variances in the job duties performed by different Executive Assistants at the company.

21. I rarely perform any personal errands for Mr. Dent (or any other executive). I occasionally pick up lunch for him if he is detained in a meeting or if it is otherwise (either in his judgment or in mine) inconvenient for his to do that himself. On other occasions I simply do that sort of thing for him as a courtesy.

22. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in <u>Fredda Malena v. Victoria's Secret Direct, LLC, et al.</u> (the "Litigation"), with

respect to the issues set forth in this Declaration. Mr. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

23. I understand that this Declaration was obtained for purposes of the defense of the "Litigation," which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with his. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

24. The statements made in this Declaration (consisting of 7 pages) are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

_____
Ahmina Graham

10/16/09
Date

7

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                      Plaintiffs,


    -against-


VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                    Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
JAMIE HALL**


       I, Jamie Hall, being first duly cautioned and sworn, and being more that age eighteen

years of age and competent to testify about the matters contained herein, hereby declare and state

as follows upon personal knowledge or information:


       1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in

Reynoldsburg, Ohio.  I am currently employed by Victoria's Secret Stores, LLC  ("VSS") but

was previously employed by Victoria's Secret Stores Brand Management (VBM) from July 17,

2005 through March 8, 2009.   I am an Executive Assistant at VSS, and was also an Executive

Assistant throughout my tenure at VBM. Since June, 2007 (first as an employee of VBM and

subsequently as an employee of VSS), I have supported Randy Whitaker, formerly the Vice

President of Finance and now the Senior Vice President of Stores.  Prior to supporting Mr.

1

Whitaker, I supported Vice President of Finance Mark Koenig.  Throughout the time that I was an Executive Assistant at VBM (and continuing during my employment at VSS), I have been paid on an exempt, salaried basis.  I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work.  I have kept no records of my hours worked.

2.  I estimate that while employed at VBM I worked an average of 40 to 45 hours per week.

3.  Although my schedule at VBM included an hour for lunch, I typically ate lunch at my desk (I always took lunch unless I came in late or left early.)  I sometimes performed work during some of my lunch hour.  If I needed to run a personal errand during the course of the day, or occasionally needed to leave early for a doctor's appointment or for some other personal reason, I had the discretion to do that, and I typically did not record that time as PTO (paid time off) or otherwise record it.

4.  During the summer months, our office observes what are known as "summer hours," and the same was true when I was employed by VBM.  This means that most of the office staff stops working and leaves at around 1:00 on alternate Fridays during the summer.  I have never recorded the number of Fridays (or any other days) that I do or do not work, and to my knowledge no one else has recorded my time either.  The only exception to this would be my recorded PTO (paid time off), which I typically have taken in increments of one half day or more.

5.  I periodically read and/or respond to my work email on evenings or weekends, and did so while employed at VBM as well.  I have done this of my own initiative; I have not been specifically instructed by anyone to do this.  The most common reason that I check emails from

2

home is so that I can come up to speed on any issues arising after I leave work each evening, and can bring any important matters to the attention of the executive I support.

6.  I spend approximately two-thirds of my working time attending to management of my executives' calendars, and did so while employed at VBM as well.  Because so much of their work is meeting-based, it is critical that I keep their calendars current and accurate.  As a result, I spend over half of my time (just as I did at VBM) reviewing and responding to meeting requests on their behalf, resolving scheduling conflicts on their calendars, and otherwise assisting in planning their schedule.  In so doing, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of their work.  I do this through a combination of my experience, my knowledge of the Company and the people who work here, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. While on rare occasions I have consulted an executive I was supporting about scheduling conflicts which, in my judgment, required their input to resolve, as an Executive Assistant at both VSS and VBM I have frequently and routinely made other long- and short-term scheduling decisions on their behalf without consulting them.

7.  At both VBM and VSS on a daily basis I have reviewed the calendars of the executives I support.  My practice has been to print out their full calendars for the coming three months so that they, and I, can review them regularly and thoroughly.  I developed this system of calendar notification and review of my own initiative, and have implemented this organizational system and others together with the executives I support.

8.  Because the fashion retail business is so dynamic, the work I have performed at both VBM and VSS has been neither routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change

3

depending on what is being developed or launched. This means that the priorities and needs of the executives I support change along with those of the business. It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision. I have also routinely used my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for the executives I support.

9.   Many executives at VBM and VSS spend a great deal of time in business meetings with other executives, third parties, or both. Consequently, it is important that the various executives' schedules be coordinated. At both VBM and VSS we have had a practice of convening a weekly meeting of Executive Assistants and administrative assistants to review, plan, and coordinate our boss' schedules. Among other things, we typically have discussed our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules. This meeting has been organized and conducted by the Executive Assistants ourselves; no one else instructed us to do this or provided any of the content.

10.   In his role as Senior Vice President of Stores, Mr. Whitaker has frequently traveled to Victoria's Secret store locations all over the country. Many of these trips have been taken via a company-owned jet. Throughout the time I have supported him I have routinely made the arrangements for these jet trips (a process which requires, among other things, obtaining multiple levels of internal approval) and collected and assembled extensive information specific to each trip. For example, on a typical trip Mr. Whitaker will visit approximately eight - ten stores and need 12 specific piece of information per store, all of which I gather from a variety of sources and organized into binders for him. The information I have assembled for him for such trips

4

typically has included sales data for the individual stores, reports regarding the staffing of each store, marketing materials, and a variety of other internal reports.

11. Throughout the time I have supported him I have operated as a "gatekeeper" for Mr. Whitaker, in that meeting requests for him typically have been directed through me. I have been expected and required to use my judgment to determine the priority of these requests. It is only when, on rare occasions, I have for some reason been unsure about what the priorities should be that I have consulted Mr. Whitaker to resolve scheduling conflicts.

12. I also review Mr. Whitaker's emails, and have done so throughout the time I have been supporting him. I routinely identity emails to which I can respond on his behalf, and then drag those emails to my email inbox from his so that I can respond directly on his behalf. I exercise my independent discretion in deciding which if any emails to flag for his attention or to print out for his review.

13. Throughout the time I have supported him I have also had responsibility for assisting Mr. Whitaker in assessing requests for certain company expenditures. When an email to Mr. Whitaker requests his approval for an expenditure (which is a common occurrence), I routinely research the appropriateness of the expenditure and then send Mr. Whitaker an email indicating whether, in my opinion, the expense is one appropriate for reimbursement under applicable company policy. Based on my observations, Mr. Whitaker routinely accepts my recommendations regarding whether such expenditures are or are not appropriate. I also review the expense reports submitted by Mr. Whitaker's direct reports and, on my own authority, approve any and all of their travel expenses which I conclude are appropriately reimbursable under company policy. In so doing I am required to be familiar with the company's policies

regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on the executives' behalf.

14. I enjoy event planning and have contributed to planning and coordinating a variety of company events at both VBM and VSS.

15. I occasionally have prepared PowerPoint presentations and other reports for Mr. Whitaker. In doing so I have commonly drawn from existing reports and exercised my judgment about how to pull excerpts from those prior presentations into new presentations which met his specific needs and/or to create entirely new presentations at his direction. Mr. Whitaker has then made the final decisions about the content of the presentations.

16. My work at VBM and VSS has required me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. As an example of this latter category, I routinely have had access to wage information and performance reviews for Mr. Whitaker's direct reports. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

17. I rarely if ever leave the Victoria's Secret building during the work day. This was true during my VBM tenure as well as my VSS tenure.

18. It has been extremely rare for Mr. Whitaker (or anyone else) to ask that I perform personal errands. Once in a great while Mr. Whitaker may ask that I grab him a cup of coffee or pick up lunch for him when he is tied up in meetings.

19.   I have never seen any evidence of any kind that any executive at either VSS or VBM holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

20.   To my knowledge there is not now, and has never been, any formal on-boarding process for new Executive Assistants at VBM or VSS nor any formal training for them.  Instead, the common practice has been for Executive Assistants to learn their jobs by observing, and being taught by, other Executive Assistants.  Layered on top of this knowledge is knowledge of the particular executive being supported; because each executive has different needs and preferences regarding the role and duties of his or her Executive Assistant, each Assistant's job duties vary somewhat.

21.   Virtually every aspect of my job at VBM and VSS has required the routine exercise of my discretion and independent decision-making, which is in turn has been based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.  Based on my experience and observations, all of the Executive Assistants at VBM are, and always have been, similarly required to exercise this high level of discretion and independent decision-making.

22.   I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in <u>Fredda Malena v. Victoria's Secret Direct, LLC, et al.</u> (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time.  She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

23.   I understand that this Declaration was obtained for purposes of the defense of

<u>Fredda Malena v. Victoria's Secret Direct, LLC, et al.</u> (the "Litigation"), which alleges claims

for alleged overtime compensation on behalf of Executive Assistants and Administrative

Assistants.  The statements made in this Declaration are truthful and voluntary.  I am aware that I

might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to

monetary relief if I opt-in and the plaintiffs are successful.  Additionally, Ms. Ford informed me

that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with

her.  She told me if I experienced any retaliation, I could contact Human Resources immediately.

Also, I know that I will receive no special treatment for providing my statement.  Ms. Ford told

me that she does not represent me individually.  I understand that she represents only the

Defendants in the Litigation.

24.   The statements made in this Declaration (consisting of eight pages) are truthful and

voluntary.


I declare under penalty of perjury under the laws of the United States of America and the

State of Ohio that the foregoing is true and correct.

_____
Jamie Hall

11-3-09
_____
Date

8

# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

     -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

              Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
PATRICIA KELLY-KERR**

I, Patricia Kelly-Kerr, being first duly cautioned and sworn, and being more that age

eighteen years of age and competent to testify about the matters contained herein, hereby declare

and state as follows upon personal knowledge or information:

    1.   I am employed by Victoria's Secret Stores Brand Management ("VBM"). I have

been employed by VBM since July, 2005.

    2.   During the time I have been an Executive Assistant at VBM, I have been paid on an

exempt, salaried basis.   I have never been paid overtime as an Executive Assistant, nor been

required to "clock in" or otherwise record my hours of work.  I have kept no records of my hours

worked.

    3.   I estimate that I work an average of 50 hours per week.  This has been true throughout

my tenure as an Executive Assistant at VBM.  I typically work from 9:00 a.m. until 7:00 pm.,

Monday through Friday.  Although this includes an hour for lunch, I often eat lunch at my desk

and perform work during some of my lunch hour.  On other occasions, I take more than an hour

for lunch and use the time to run errands or go out to lunch or do some other personal task.  If I

take a long lunch, or need to run a personal errand during the course of the day, or need to leave

early for a doctor's appointment or for some other personal reason, I typically do not record that

time as PTO (paid time off) or otherwise record it.

      4.   I regularly, but not routinely, read and/or respond to my work email on evenings or

weekends.  I do this of my own initiative; I have not been specifically instructed by anyone to do

this.

      5.   I currently am the Executive Assistant to Chief Design Officer Janie Schaffer.

      6.   I spend approximately 80% of my working time attending to Ms. Schaffer's calendar

and related issues.  Because so much of her work is meeting-based, it is critical that I keep her

calendar current and accurate.  Her calendar is, in essence, the platform of her work, as being in

the right place, at the right time, with the correct group of people, with the correct materials,

makes the difference between her being able to do her job effectively or being unable to do it

effectively.  As a result, I spend over half of my time reviewing and responding to meeting

requests on her behalf, resolving scheduling conflicts on her calendar, and otherwise assisting in

planning her schedule.  In so doing, I routinely exercise my own independent judgment and

discretion regarding these  extremely significant aspects of Ms. Schaffer's work. While I consult

Ms. Schaffer on scheduling conflicts which, in my judgment, require her input to resolve, I

routinely make other long- and short-term scheduling decisions on her behalf without consulting

her.

      7.  Because the fashion retail business is so dynamic, the work I perform is neither

routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when

the meeting must be held, and who must attend constantly change depending on what is being developed or launched. This means that Ms. Schaffer's priorities and needs change along with those of the business. It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision

8. Like Ms. Schaffer, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both. Consequently, it is important that the various executives' schedules be coordinated. Each week the executive assistants and administrative assistants meet together (typically on Thursdays) for approximately one hour to review, plan, and coordinate our boss' schedules. Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules.

9. I am responsible for determining which materials Ms. Schaffer needs in order to participate in various meetings she attends and for providing those materials to her. This requires me, on my own initiative, to review her calendar on a frequent basis, identify upcoming meetings, identify what materials she will need for those meetings, then compile those materials for her. I am expected act independently, think on my own, and proactively manage her calendar and related issues.

10. I operate as a "gatekeeper" for Ms. Schaffer, in that meeting requests typically are directed through me. I use my judgment to determine the priority of these requests. It is only when I am for some reason unsure about what the priorities should be that I consult Ms. Schaffer.

3

11. Ms. Schaffer works from offices in both New York and London, England. Consequently, I am responsible for coordinating her calendar with her travel schedule and also make national and international travel arrangements for her.

12. I also review Ms. Schaffer's emails. I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, she needs to see. I exercise my discretion in deciding which if any emails to flag for her attention or to print out for her review.

13. I also process Ms. Schaffer's expenses. In so doing I reconcile Ms. Schaffer's travel receipts to credit card billing statements and provide relevant information to the company's accounting department.

14. My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

15. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

16. I make an effort to take my PTO at times when Ms. Schaffer is also on PTO. When I am on PTO, the typical practice is for other assistants to fill in for me. While it might be possible for the company to use a temporary employee to fill in for me for a long absence (assuming that there was a mechanism for training the temporary employee about the various elements of my job), I do not believe that a temp could be "dropped in" to do my job in my

4

absence. This is because my job requires the routine exercise of my discretion, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

17. Based on my observations, there are variances in the job duties among executive assistants at the company.

18. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

19. I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

5

20.   The statements made in this Declaration are truthful and voluntary.


I declare under penalty of perjury under the laws of the United States of America and the

State of New York that the foregoing is true and correct.

_Patricia Kelly-Kerr_
Patricia Kelly-Kerr

_12-3-09_
Date

6