# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

      -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.
-------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
DONNA KIRK**

      I, Donna Kirk, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

      1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio.  I have been employed by VBM since August, 2008.

      2.  During the time I have been an Executive Assistant at VBM, I have been paid on an exempt, salaried basis.  I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work.  I have kept no records of my hours worked.

3. I estimate that I currently work an average of about 50 hours per week. Although my hours of work vary somewhat, on most days I arrive at work around 8:30 in the morning and leave at around 6:30 in the evening, Monday through Friday. Although this includes an hour for lunch, I often eat lunch at my desk and perform work during some of my lunch hour. If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I typically do not record that time as PTO (paid time off) or otherwise record it.

4. I occasionally, but not routinely, read and/or respond to my work email on evenings or weekends. I do this of my own initiative; I have not been specifically instructed by anyone to do this. I do not have a "Blackberry" or other mobile device for reading or sending emails. When I check emails from home I do so of my own initiative. The most common reason that check them from home is so that I can see if I received answers to emails I sent before leaving the office or to allow myself to be "up to speed" on whatever information may otherwise be waiting for me when I arrive at the office the next day.

5. I currently am the Executive Assistant to Denise Landman, the President and CEO of PINK. I also provide support to three other executives who report to Ms. Landman.

6. I spend approximately 85% of my working time attending to Ms. Landman's calendar and related issues. Because so much of her work is meeting-based, it is critical that I keep her calendar current and accurate. Her calendar is, in essence, the platform of her work, as being in the right place, at the right time, with the correct group of people, with the correct materials, makes the difference between her being able to do her job effectively or being unable to do it effectively. As a result, I spend over half of my time reviewing and responding to meeting requests on her behalf, resolving scheduling conflicts on her calendar, and otherwise assisting in

2

planning her schedule. In so doing, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of Ms. Landman's work. I do this through a combination of my extensive experience (I have been an Executive Assistant for 19 years), my knowledge of the Company and the people who work here, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. While I consult Ms. Landman on scheduling conflicts which, in my judgment, require her input to resolve, I routinely make other long- and short-term scheduling decisions on her behalf without consulting her.

7.   Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive. For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched. This means that Ms. Landman's priorities and needs change along with those of the business. It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision. I also use my knowledge of these changes in deciding among conflicting meeting request and making other scheduling decisions for Ms. Landman.

8.   Like Ms. Landman, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both. Consequently, it is important that the various executives' schedules be coordinated. Each week the Executive Assistants and administrative assistants meet together (typically on Thursdays) for approximately one hour to review, plan, and coordinate our boss' schedules. The meeting often is done by conference call. Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules.

9. I am responsible for determining which materials Ms. Landman needs in order to participate in various meetings she attends and for providing those materials to her. This requires me, on my own initiative, to review her calendar on a frequent basis, identify upcoming meetings, identify what materials she will need for those meetings, then compile those materials for her. I am expected act independently, think on my own, and proactively manage her calendar and related issues.

10. I operate as a "gatekeeper" for Ms. Landman, in that meeting requests typically are directed through me. I use my judgment to determine the priority of these requests. It is only when I am for some reason unsure about what the priorities should be that I consult Ms. Landman.

11. I am responsible for coordinating Ms. Landman's calendar with her travel schedule and also make national and international travel arrangements for her.

12. I also review Ms. Landman's emails. I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, she needs to see. I exercise my discretion in deciding which if any emails to flag for her attention or to print out for her review.

13. I also process Ms. Landman's expenses. In so doing I reconcile Ms. Landman's travel receipts to credit card billing statements and provide relevant information to the company's accounting department. I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on her behalf and on behalf of the other executives I support.

14. I occasionally draft letters, memos, and other communications for Ms. Landman's review and signature.

4

15. I occasionally prepare PowerPoint presentations and other reports for Ms. Landman. In doing so I commonly draw from existing reports and exercise my judgment about how to pull excerpts from those prior presentations into new presentations which meet her specific needs. Ms. Landham then makes the final decisions about the content of the presentations.

16. My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

17. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence. I have three sons, and Ms. Landman herself has two young children.

18. I make an effort to take my PTO at times when Ms. Landman is also on PTO. When I am on PTO, the typical practice is for other another assistant (Ahmina Graham) to fill in for me. I do not believe that a "temp" could simply be "dropped in" to do my job in my absence. This is because my job requires the routine exercise of my discretion, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

19. Based on my observations, there are variances in the job duties performed by different Executive Assistants at the company.

20. I rarely perform any personal errands for Ms. Landman (or any other executive). I occasionally pick up lunch for her if she is detained in a meeting or if it is otherwise (either in her judgment or in mine) inconvenient for her to do that herself. On other occasions I simply do that sort of thing for her as a courtesy.

21. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

22. I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

23. The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.

6

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

_Donna Kirk_
Donna Kirk

_October 9, 2009_
Date

# EXHIBIT N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

    -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
JANETTE MCCANN**

       I, Jan McCann, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

       1.   I am employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio, and have been employed at VBM since January 20, 2008.  I have been an Executive Assistant throughout my employment at VBM.   Because my former boss, Dennis Armstrong (who was the Senior Vice President of Human Resources) recently left the company, I am now supporting Executive Vice President of Human Resources Rocky Felice, and Associate Vice Presidents of Human Resources Terri Bardi and Jackie Sheets.

2.    In my experience, and based on my observations of and interactions with other Executive Assistants, the precise job duties of different Executive Assistants vary, due in large part to the responsibilities, subject matter area, and personal preferences of the executives those assistants support.  For example, among the three executives I am currently supporting, there are significant differences in the nature and amount of calendar management, email management, office organization, expense report processing, and other functions I perform for each of them, due primarily to their personal preferences and different working styles.

3.    Throughout my tenure at VBM, I have been paid on an exempt, salaried basis.  I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work.  I have kept no records of my hours worked.

4.    I estimate that I currently work an average of about 45 hours per week and have worked, on average, a similar number of hours per week throughout my employment at VBM. Although my hours of work are somewhat fluid, on most days I arrive at about 9:00 in the morning and leave between 5:30 and 6:00 in the evening, Monday through Friday.  Although this schedule includes an hour for lunch each day, I often eat lunch at my desk.  I typically perform work during some of my lunch hour.  If I need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I have the discretion to do that, and I  typically do not record that time as PTO (paid time off) or otherwise record it.

5.    During the summer months, our office observes what are known as "summer hours." This means that most of the office staff leaves stops working and leaves the office at around 1:00 on alternate Friday afternoons during the summer.  I have participated in this program and left early on many summer Fridays over my years at VBM.  I have not recorded the number of

Fridays (or any other days) that I did or did not work or did or did not leave early, and to my knowledge no one else has recorded my time either.  The only exception to this would be my recorded PTO (paid time off), which I typically take in increments of one day or more.

6.   I occasionally read and/or respond work emails from home, most commonly on Sunday evenings.   I do this of my own initiative, so that I can be "up to speed" on Monday mornings; no one has ever instructed me to do this.

7.   During the time I supported Dennis Armstrong, I spent approximately 60% of my working time managing his calendar.  For the three executives I am currently supporting, I spend far less time on calendar management; I would estimate that for the three of them combined I am only spending about 30 – 40% of my time on calendar management.  In each case, the executives I have supported spend a great deal of their time in meetings, which are in essence the platform of their work.  Although the different executives I have supported have requested different levels of calendar-related support (since some of them prefer to do some of their own calendar management), in each case I have routinely exercised my own independent judgment and discretion regarding these extremely significant aspects of their work.  I have done this through a combination of my experience, my knowledge of the Company and the people who work here, the relationships I have built with Executive Assistants and others across the business and my skills as an administrator.  While I have consulted one of my executives on those rare scheduling conflicts which, in my judgment, require their input to resolve, I have frequently and routinely made other long- and short-term scheduling decisions on their behalf without consulting them.

8.   Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being

developed or launched.  This means that my executives' priorities and needs change along with those of the business.  It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.

9.  Many (if not most) executives at the company spend a great deal of time in business meetings with other executives, third parties, or both.  Consequently, it is important that the various executives' schedules be coordinated.  Each week a group of the Executive Assistants and administrative assistants meet together for approximately one hour to review, plan, and coordinate our boss' schedules.  Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules. This meeting is organized and conducted by the Executive Assistants ourselves; no one else at the company instructs us to do this or provides any of the content (except in cases where we invite a speaker in from another department).  .

10. Throughout my employment at VBM I have operated as a "gatekeeper" for the executives I support, in that most meeting requests for them typically are directed through me.  I use my judgment to determine the priority of these requests.  It is only when I am for some reason unsure about what the priorities should be that I consult the executive.

11.  The different executives for whom I have worked also have different preferences regarding management of their email accounts.  Consequently, I exercise different levels of control with each of them over the review and management of their emails. Most of the executives I have supported have expected me to review their emails, flag important emails for their attention, and delete "junk" email from their accounts.  In order to make such judgments about the various priorities of different emails, I have leveraged my knowledge of my executives' priorities and of the importance of various issues within the business.

4

12.  I also process my executives' expenses.  In so doing I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on their behalf.

13. There is no single company-wide method or system for organizing files, emails, or other documents.  To my knowledge, each Executive Assistant (including me) develops his or her own organizational and filing systems for both hard copy and electronic information.  I have thus developed my own systems for organizing my own records and information and, where appropriate, that of my executives as well.

14. Similarly, because to my knowledge there is no formal training program for administrative assistants, each of us has had to learn on our own and from each other how best to do the many facets of our jobs.  We work together as a team of assistants and routinely share best practices with each other and pass along to each other information that will help all of us do our jobs effectively.  It is my understanding that, on her own initiative, former assistant Leisa Tremper (who is now a Senior Generalist in Human Resources) also prepared a large notebook of materials which has been used on occasion to assist in on-boarding of assistants.

15. My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  As an example of this second category, I routinely handle information regarding the salaries and performance reviews of others in the company. I am required to have a high level of discretion as to how confidential information is treated and who needs to or should be able to see it.

16.  I have also done a variety of forms of special project work during my years as an Executive Assistant at VBM.  For example, I have been on the committees for United Way and

Giving Tree charitable campaigns for the company and coordinated a company food drive. I have also taken on projects concerning coordination of responses to subpoenas for employee records. More recently I have assisted with managing a database tracking cases of H1N1 flu in our stores, and have responsibility for keeping the HR team up-to-date on any resulting staffing issues that may need to be addressed due to flu outbreaks. With this project and others I have developed my own systems of organization.

17. Occasionally, but not often, I assist my executives with personal matters or pick up their lunch.

18. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

19. Virtually every aspect of my job as an Executive Assistant requires, and always has required, the routine exercise of my discretion and independent decision-making, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

20. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

21.   I understand that this Declaration was obtained for purposes of the defense of

_Fredda Malena v. Victoria's Secret Direct, LLC, et al._ (the "Litigation"), which alleges claims

for alleged overtime compensation on behalf of Executive Assistants and Administrative

Assistants.  The statements made in this Declaration are truthful and voluntary.  I am aware that I

might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to

monetary relief if I opt-in and the plaintiffs are successful.  Additionally, Ms. Ford informed me

that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with

her.  She told me if I experienced any retaliation, I could contact Human Resources immediately.

Also, I know that I will receive no special treatment for providing my statement.  Ms. Ford told

me that she does not represent me individually.  I understand that she represents only the

Defendants in the Litigation.

22.   The statements made in this Declaration (consisting of seven pages) are truthful and

voluntary.


I declare under penalty of perjury under the laws of the United States of America and the

State of Ohio that the foregoing is true and correct.


_____
Janette McCann

_____
11/2/09
Date

7

# EXHIBIT O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                     Plaintiffs,

       -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                     Defendants.
-----------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
LISA MCCLELLAN**

     I, Lisa McClellan, being first duly cautioned and sworn, and being more than age

eighteen years of age and competent to testify about the matters contained herein, hereby declare

and state as follows upon personal knowledge or information:

     1.  I am currently employed by Express, LLC. ("Express") in Columbus, Ohio.  I was

employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio,

from May 20, 2007 until February 10, 2008.  I am an Executive Assistant currently at Express

and was also an Executive Assistant at VBM.  During the time I was at VBM, I supported Pam

White, Executive Vice President and Chief Financial Officer.

     2.  During the time I was an Executive Assistant at VBM, I was paid on an exempt,

salaried basis.  I was never paid overtime as an Executive Assistant, nor required to "clock in" or

otherwise record my hours of work.  However, on an "honor system" basis I worked extra hours to "make up for" those occasions when I arrived to work late or left early, or when I took Fridays off as part of the "summer Fridays" program.  I also recorded my vacation time (PTO, or paid time off) during my time at VBM.  Other than the PTO records, I kept no records of my hours worked at VBM and, to my knowledge, no one else kept any records of my hours either.

3.  During my employment at VBM, I typically worked an average of about 45-48 hours per week.  Although my hours of work varied somewhat, on most days I arrived at work around 7:00 in the morning and left at around 4:30 in the evening, Monday through Friday.  Although this included an hour for lunch, I sometimes ate lunch at my desk and performed work during some of my lunch hour; on other occasions I took the entire lunch hour off.

4.  I have never had a Blackberry or similar device, company-issued or otherwise.  I don't recall ever doing work from home or on a weekend during my employment at VBM.

5.  During my employment at VBM, I occasionally (though not frequently) did personal errands or assisted with other personal projects for the executive I supported.

6.  Based on my observations and experiences at VBM, the precise duties of the various Executive Assistants within VBM varied.  The seniority level of the executive being supported, the particular preferences of that particular executive, the needs of their particular departments and the overall priorities of the Company as they changed from time, are all factors in contributing to these job variances among the Executive Assistants at VBM.

7.  During my employment at VBM I spent approximately 60% of my working time on calendar management issues.  Because so much of the Company's executives' work was meeting-based (both at BBW and at VBM), it was always critical that I keep my executive's calendar current and accurate.  Her calendars were, in essence, the platform of her work, as being

2

in the right place, at the right time, with the correct group of people, with the correct materials, could make the difference between her being able to do her job effectively or being unable to do it effectively.  As a result, at VBM I spent well over half of my time reviewing and responding to meeting requests on behalf of Ms. White, resolving scheduling conflicts on her calendar, and otherwise assisting in planning her schedule and ensuring that the meetings and other agenda items scheduled on her calendar reflected her priorities and those of her area of the business.  In so doing, I routinely exercised my own independent judgment and discretion regarding these extremely significant aspects of Ms. White's work.  I did this through a combination of my experience, my knowledge of the Company and the people who worked there, the relationships I had built with Executive Assistants and others across the business and my skills as an administrator. While I consulted Ms. White on scheduling conflicts which, in my judgment, required her input to resolve, I routinely made other long- and short-term scheduling decisions on her behalf without consulting her.

8.   Because the fashion retail business is so dynamic, the work I performed at VBM was neither routine nor repetitive.  This means that Ms. White's priorities and needs changed along with those of the business.  It was my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.  I also used my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for Ms. White.  Among other factors, I routinely and frequently resolved conflicts regarding potential meetings on her schedule – without consulting Ms. White – based on factors such as the numbers of people involved in the various meetings, the importance of each meeting (including both those already scheduled and those being proposed), the required length for each meeting, whether the various meetings were stand-alone meetings, were part of a series of

3

meetings, or were part of a cascade of meetings (meaning that they were meetings that interrelated to other scheduled meetings, such that canceling one meeting would have an impact on other scheduled meetings), and whether the meeting was one at which a formal decision of some sort was expected to be the substantive outcome. In order to make these kinds of judgments about the meetings at issue, I had to understand the fundamentals of the business itself, so as to be able to decide which meetings should take priority over others.

9. Like Ms. White, many other executives at VBM spent a great deal of time in business meetings with other executives, third parties, or both. Consequently, it was important that the various executives' schedules be coordinated. Each week, the Executive Assistants and administrative assistants met together (typically on Thursdays) for approximately one hour to review, plan, and coordinate our bosses' schedules. The primary objective of these meetings was to resolve any scheduling conflicts among our bosses' schedules. The agenda was set by the Executive Assistants, who also conducted the meetings. We made these decisions of our own initiative and, in the vast majority of cases, did so without consulting any of the executives.

10. I was responsible for determining which materials Ms. White needed in order to participate in various meetings she attended and for providing those materials to her. This required me, on my own initiative, to review her calendar on a frequent basis, identify upcoming meetings, identify what materials she would need for those meetings, then compiling those materials for her. I was expected to act independently, think on my own, and proactively manage her calendar and related issues.

11. I operated as a "gatekeeper" for Ms. White in that meeting requests for her typically were directed through me. I used my judgment to determine the priority of these requests. It

was only on those rare occasions when I was for some reason unsure about what the priorities should be that I consulted Ms. White.

12.  I also routinely reviewed Ms. White's emails.  I routinely exercised my discretion in deciding which if any emails to flag for her attention or to print out for her review.

13.  My work at VBM required me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the Company that was not to be shared with outsiders, and internally confidential information.  As an example of this second category, I routinely assisted Ms. White in the preparation of the performance reviews of her direct reports, and was privy to their salary information as well. I was required to have a high level of discretion as to how this information was treated and who needed to or should be able to see it.

14.  Any performance review done of me covering any portion of the period when I worked at VBM would not accurately reflect the full range of duties I performed as an Executive Assistant there.  This is because the review only captured the high and low points, so to speak, and did not discuss the full range of responsibilities that I had as an Executive Assistant at VBM.

15.  I have never seen any evidence of any kind that any executive at VBM holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

16.  I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed me that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

5

17.   I understand that this Declaration was obtained for purposes of the defense of

Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims

for alleged overtime compensation on behalf of Executive Assistants and Administrative

Assistants.  The statements made in this Declaration are truthful and voluntary.  I am aware that I

might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to

monetary relief if I opt-in and the Plaintiffs are successful.  Ms. Ford told me that she does not

represent me individually.  I understand that she represents only the Defendants in the Litigation.

18.   The statements made in this Declaration (consisting of six pages) are truthful and

voluntary.


I declare under penalty of perjury under the laws of the United States of America and the

State of New York that the foregoing is true and correct.


Lisa McClellan

11/13/09

Date

6

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

               Plaintiffs,

     -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

               Defendants.
-----------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF PEGGY
POULTON**

     I, Peggy Poulton, being first duly cautioned and sworn, and being more that age eighteen

yeas of age and competent to testify about the matters contained herein, hereby declare and state

as follows upon personal knowledge or information:

     1.  I was employed as an Executive Assistant for Victoria's Secret Stores from February,

2004 until July, 2005.  In July, 2005 I transferred to an Executive Assistant position supporting a

Senior Vice President at Express, LLC, which was at that time a wholly owned subsidiary of

Limited Brands. When Limited Brands sold Express in 2008, I remained with Express as an

Executive Assistant, and remain an Executive Assistant with that company today.

     2.  Throughout my career as an Executive Assistant, I have been paid on an exempt,

salaried basis.  I have never been paid overtime.  I have never been required to "clock in" or

otherwise record my hours of work.

3.  I estimate that during my tenure at Victoria's Secret, I worked an average of approximately 45 hours per week.  In general I worked more hours during busy periods (such as the holiday season) and fewer hours during slower times of the year (such as during the summer months).

4.  In 2005, I was interviewed by a representative of the United States Department of Labor.  It is my understanding that that interview was part of an investigation by the Department, focusing on whether certain positions within Victoria's Secret were or were not properly characterized as exempt.   I provided truthful answers to the questions I was asked during that interview, which focused on my jobs duties as an Executive Assistant.

5.  During my employment at Victoria's Secret, I was the Executive Assistant to Executive Vice President of Operations and Administration Wendy Burden.  I also provided support to Vice President of Finance Joan Hilson and other executives as necessary.  My key job functions were to ensure the proper management of communications, planning, and meeting coordination, while contributing to the overall performance of the department's functional and cross-functional teams.  My responsibilities included the following tasks:

a.  Reviewing and responding to emails directed to my boss.  I reviewed Ms. Burden's email inbox throughout the day, determined which emails were appropriate for me to respond to on her behalf, and responded to such emails without consulting her further.  I made judgment calls every day, over and over, about which emails should be responded to by me and which should be reviewed and responded to by her personally.  I also was required to exercise my judgment about the priority of such emails, and to flag for her attention and review those emails which were, in my judgment, of an urgent nature.

2

b.  Scheduling and re-scheduling meetings, and responding to meeting requests directed to my boss via email.  To my knowledge, Ms. Burden never once responded to an emailed meeting request herself.  Instead, it was my duty to respond on her behalf, and to schedule meetings for her.  For the most part, I made these decisions without consulting Ms. Burden.  It was not uncommon for Ms. Burden to have meetings scheduled back-to-back through an entire day.  Because of the volume of meetings Ms. Burden attended,  I spent a significant portion of my time scheduling and re-scheduling meetings and otherwise administering her calendar.  Because the same was true for other Executive Assistants, the Executive Assistants in both Ohio and New York met together as a single group each week (with the New York Executive Assistants participating by telephone) to coordinate the calendars of the Executives we supported.  This standing meeting lasted anywhere from one to two hours, due to the complexity and interrelated nature of the various executive's calendars.

c.  Operating as a "gatekeeper" for Ms. Burden, in the sense that, for the most part, individuals within the company who desired to meet with Ms. Burden were expected to contact me to request  a meeting.  I was required to exercise my personal judgment to determine the priority of such requests.

d.  Producing PowerPoint presentations, agendas,  and spreadsheets, based on data, notes, and other information provided to me by Ms. Burden and others.

e.  Making travel arrangements.  In arranging Ms. Burden's travel, I routinely exercised my judgment when choosing between various options for transportation and hotels.  Occasionally I found the options as presented by the company's travel

3

department to be in adequate in one way or another, and on those occasions I went outside the travel department and called hotels directly to make arrangements for Ms. Burden. After doing so, I then contacted the finance department to obtain approval for the alternative arrangements, then looped back again to the travel department for finalization of the arrangements.

f. Processing reimbursements for executives' travel and other expenses. I was required to exercise my judgment regarding which expenses were subject to reimbursement by the company, and to process those reimbursement requests. In doing so, I was required to be familiar with the company's policies on travel and expense reimbursement. After submitting reimbursement requests, I also kept track of which ones had and had not been processed, and as necessary followed up with other departments regarding same.

g. Exercising initial approval and processing of invoices of up to $1,000.00.

h. Answering all of Ms. Burden's telephone calls, and providing "back up" to other Executive Assistants to ensure that most if not all phone calls to the executives were answered by an Executive Assistant and did not "roll" to voicemail.

i. Handling, and maintaining the confidentiality of, sensitive information. As one example, I was responsible for typing up the performance reviews of associates who reported to Ms. Burden.

6. In thinking back over my job as an Executive Assistant at Victoria's Secret, I believe that no more than 25% of my job responsibilities could have been delegated to others, or been performed by a "temp." This is because my job required the routine exercise of my discretion, which was in turn based on a combination of my expertise and skills, my knowledge of company

4

policies and procedures, my ability to research and otherwise find a "work around" when difficulties arose,  my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I supported.

7.   I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in <u>Fredda Malena v. Victoria's Secret Direct, LLC, et al.</u> (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time.

8.   I understand that this Declaration was obtained for purposes of the defense of the Litigation, which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants.  I further understand that, because I never worked for any of the entities identified as Defendants in the Litigation, I am not eligible to "opt in to" or otherwise participate in the Litigation.  The company by which I am now employed is not owned or controlled by any of the Defendants in the Litigation or by any entity owned or controlled by Limited Brands.  I have thus concluded that I have no economic interest in the Litigation.

9.   The statements made in this Declaration are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

_____
Peggy Poulton

_____
Date   9/8/09

# EXHIBIT Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

     -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF TAMARA
REYES**

     I, Tamara Reyes, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

     1.  I am employed by Victoria's Secret Direct Brand Management, LLC, dba Victoria's Secret Direct New York, LLC ("VSN"). I was employed at VSN from February, 2005 – July, 2006, and have been employed again at VSN from January 14, 2007 to the present. I have been an Executive Assistant since April, 2006. From that time until the present I was employed by VSN, with the expectation of the time period from July 16, 2006 until January 13, 2007, during which time I was employed by Limited Service Corporation. I have never been employed by Victoria's Secret Stores Brand Management, Inc. ("VBM") or Limitedbrands Direct Media Productions, Inc. ("VDM").

1

2. During the time I have been an Executive Assistant at VSN I have been paid on an exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work. I have kept no records of my hours worked.

3. I estimate that I work an average of 45 hours per week. Typically I come in to work at about 9:00 in the morning and leave at around 6:00 in the evening, five days a week. This has been true throughout my tenure as an Executive Assistant at VSN. Although this schedule includes an hour each day for lunch, I often eat lunch at my desk and perform work during some of my lunch hour. If I need to run a personal errand in the course of the day or need to leave early for a doctor's appointment or for some other personal reason, I typically do not record that time as PTO (paid time off). To my knowledge, no one else at the Company tracks how much time I or any other Executive Assistant takes for lunch.

4. I am the Executive Assistant to CEO Pia Ferrario, as I have been throughout my tenure as an Executive Assistant at VSN.

5. I spend well over half of my working time on calendar management and related issues for Ms. Ferrario. Because so much of her work is meeting-based, it is critical that I keep her calendar current and accurate. In fact, Ms. Ferrario often has days when she is literally in meetings all day long, with few if any breaks. I spend over half of my working time reviewing and responding to meeting requests on her behalf, resolving scheduling conflicts on her calendar, and otherwise assisting in planning her schedules. In so doing, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of Ms. Ferrario's work. While I occasionally consult Ms. Ferrario on scheduling conflicts which, in my judgment, require her input to resolve, I make most scheduling decisions on her behalf on my

own, on a routine basis. I make such decisions using my experience, my knowledge of the company, my knowledge of which meetings are more important and which are less important, and my knowledge of Ms. Ferrario's own priorities.

6. Because I am the Executive Assistant to the CEO, I also work closely with the master calendar coordinator to schedule cross functional meetings that involve Pia. This requires me to coordinate the scheduling of the major meetings for each fashion "season." Because a variety of top executives (from the departments of marketing and finance departments and a host of other areas) must be in certain "set" meetings which occur each season, and because those meetings are in turn the platform on which dozens if not hundreds of other meetings are scheduled, it is my job to be certain that this master calendar is developed and managed in a manner that protects the scheduling of the "set" meetings. Some of the set meetings are scheduled up to 18 months in advance.

7. Like Ms. Ferrario, many other executives at the Company spend a great deal of time in meetings with other executives, third parties, or both. Consequently, it is important that the various executives' schedules be coordinated. Each week the executive assistants and some of the administrative assistants meet together (typically on Thursdays) for approximately one hour to review and coordinate our boss' schedules. Among other things, we discuss our executives' upcoming deliverables and travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules. We use our independent judgment (which is in turn based on our knowledge of the company and its priorities, our knowledge of our bosses preferences and priorities, and our overall administrative knowledge and skill) to resolve these conflicts and make these decisions independent of the executive team. These meetings are organized and

3

conducted by the assistants themselves; no one has instructed us to do this.  One of the assistants develops the agenda for each meeting based on input from the other assistants.

8.  I am responsible for providing Ms. Ferrario with materials she needs in order to participate in various meetings she attends.  This requires me, on my own initiative, to review her calendar on a frequent basis, identify upcoming meetings, identify what materials she will need for those meetings, then gather or print those materials for her.   I am expected to think on my own, to act proactively, and to proactively manage her calendar and related issues.

9.  I operate as a "gatekeeper" for Ms. Ferrario, in that meeting requests for her typically are directed through me.  I use my judgment to determine the priority of these requests.  When I am not sure what the priority is, I consult Ms. Ferrario. I also answer most of her phone calls, and in so doing I use my discretion to decide which if any calls to put through to her when she is in a meeting or on another call; even if the caller requests to be put though to her, it is up to me whether I do that or not. In some case the answer is yes, in others, no; again, I exercise my discretion in determining what the appropriate priorities are.

10.  I also occasionally review Ms. Ferrario's emails.  I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, they need to see.  I exercise my discretion in deciding which if any of such emails to flag for her attention or to print out for her  review.  On other occasions, Ms. Ferrario may read an email then forward it to me with a request that I respond to it on her behalf.

11.  I also process Ms. Ferrario's travel expenses.  In so doing I reconcile her travel receipts to credit card billing statements and provide relevant information to the Company's accounting department.

4

12. My job also includes organizing Ms. Ferrario's office itself. For example, when she is out of her office I commonly organize the materials on her desk, using various file systems and reminder systems that I have developed for our joint use. None one has ever given me a filing system or instructed me to use any particular system; instead, I have developed and implemented such systems of my own design, and on my own initiative.

13. My independent decision-making and authority extends to messenger invoices as well. I am authorized to approve such invoices on my own, without the oversight or approval of anyone else.

14. My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. I am required to have a high level of discretion. As an example, I see the performance reviews for Ms. Ferrario's direct reports, and also see, on a routine basis, highly confidential financial information of the company. I also see and work with, on a routine basis, information concerning daily sales, creative concepts for upcoming company catalogues, and numerous other forms of confidential business information.

15. I have never seen any evidence of any kind that any current executive at VSN or Victoria's Secret Stores Brand Management (VBM) holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence. I have two children, ages seven and nine. Neither Ms. Ferrario nor anyone else has ever shown any negative attitude or any negative behavior toward me of any kind in relationship to either my pregnancy-related leave of absence (taken for the birth of my second child) or my ongoing childcare-related responsibilities. On various occasions I have had to leave work early

for parent-teacher conferences or other activities or issues related to my children.  In doing so I have made every effort to schedule my absences so as to create the least likelihood of disruption for Ms. Ferrari in my absence.  I feel that my work-life balance is recognized and respected by her and by others with whom I work.

16. I occasionally, but not routinely, perform personal errands for Ms. Ferrario, such as getting her lunch for her.  I estimate that such personal accounts account for less than two percent of my working time.

17. I do not perform any work from home.  I do no read or respond to work emails from home, and I do not have a Blackberry or other mobile device for reading emails.

18. Prior to becoming an executive assistant, I worked as an administrative assistant. During that time I was paid on an hourly basis rather than on a salaried basis. The primary difference between the work I did as an administrative assistant and the work I now do as an executive assistant is that, as an executive assistant, I do (and am expected and paid to do) much more independent decision-making, and far less "secretarial" work.

19. Based on my observations, there are variances in the job duties among the Executive Assistants with whom I interact.

20.  I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time.  She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

21.  I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims

6

for alleged overtime compensation on behalf of certain Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. Ms. Ford informed me that no retaliation would be permitted if I assisted any party in the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

22. The statements made in this Declaration are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Tamara Reyes

11/3/09

Date

7

# EXHIBIT R

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                    Plaintiffs,

      -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                  Defendants.
-----------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
JOAN ROGAN**

      I, Joan Rogan, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

      1.  I was employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio as an Executive Assistant.  I was employed at VBM from July 17, 2005 to September 29, 2007.  I was the Executive Assistant to Grace Nicols, Chief Executive Officer for Victoria's Secret Stores, until her retirement in April, 2007.  Thereafter I was the Executive Assistant to Jami Dewolf, Senior Vice President of Strategy and Operations, until September, 2007.  I am currently an Executive Assistant at Bath and Body Works, Inc.

      2.  During the time I was an Executive Assistant at VBM, I was paid on an exempt, salaried basis.  I was never paid overtime as an Executive Assistant, nor required to "clock in" or

1

otherwise record my hours of work. I have kept no records of my hours worked during the time that I worked as a salaried Executive Assistant.

3. I estimate that during my employment as an Executive Assistant at VBM I typically worked an average of about 45 to 50 hours per week. Although my hours of work varied somewhat, on most days I arrived at work around 8:00 in the morning and left at around 5:30 in the evening, Monday through Friday. Although this included an hour for lunch, I typically worked through some portion of my lunch hour. If I took a long lunch, or needed to run a personal errand during the course of the day, or needed to leave early for a doctor's appointment or for some other personal reason, I typically did not record that time as PTO (paid time off) or otherwise record it.

4. In addition to my regular hours of work, while at VBM I occasionally read and/or responded to my work email, or performed other work, on evenings or weekends. I did this of my own initiative; I was not specifically instructed by anyone to do this. I did it because it helped me stay on top of my workload at particularly busy times.

5. I have remarked that Victoria's Secret "lives by the calendar." By this I mean that virtually every aspect of the business operations that I observed at VBM revolved around meetings and other calendar-based commitments. I spent 70 – 80% of my working time at VBM attending to Ms. Nichols's and Ms. Dewolf's calendars and related issues. Because so much of their work was meeting-based, it was critical that I keep their calendars current and accurate. It was not unusual for either one of them to have meetings literally all day long, with few if any breaks between meetings. The meetings ranged in size from one-on-one meetings to meetings with large groups, with those groups of people ranging from other executives to outside vendors to a variety of others both in and out of the business. The executives' calendars were, in essence,

the platform of their work, as being in the right place, at the right time, with the correct group of people, with the correct materials, could make the difference between their being able to do their jobs effectively or being unable to do them effectively.  As a result, I spent well over half of my time reviewing and responding to meeting requests on their behalf, resolving scheduling conflicts on their calendars, and otherwise assisting in planning their schedules.  This required me to think ahead as much as 12 months in advance, because many meetings involving multiple executives were scheduled six to 12 months in advance.

    6.  Most requests for meetings with Ms. Nichols and Ms. Dewolf were sent directly to me.  Sometimes a proposed or requested new meeting conflicted with one already on their calendars.  I then had to assess whether an existing meeting could be re-scheduled or whether the request for a new meeting would have to be postponed or denied.  Moving a single meeting often resulted in a domino effect of moving other meetings which interrelated to the one that was originally moved.  In responding to meeting requests and working out thee scheduling conflicts, I routinely exercised my own independent judgment and discretion regarding these extremely significant aspects of my bosses' work.  I did this through a combination of my experience, my knowledge of the Company and the people who worked there (and their particular personalities and preferences), my knowledge of my executives' priorities and those of the business as a whole, the relationships I built with executive assistants and others across the business, and my skills as an administrator.  While I consulted Ms. Nichols or Ms. Dewolf on scheduling conflicts which, in my judgment, required their input to resolve, I daily and routinely made other long- and short-term scheduling decisions on their behalf without consulting them.  This activity – making judgments and decisions on my own, without specific direction from Ms. Nichols, Ms. Dewolf, or anyone else – was at the core of my job.

7. I operated as a "gatekeeper" for Ms. Nichols and Ms. Dewolf, in that meeting requests typically were directed through me. I used my judgment to determine the priority of these requests. It was only when I was for some reason unsure about what the priorities should be that I consulted Ms. Nichols or Ms. Dewolf.

8. Because the fashion retail business is so dynamic, the work I performed was neither routine nor repetitive. For example, the type of meeting, what was required for the meeting, when the meeting had to be held, and who had to attend constantly changed, depending on the subject matter. This meant that Ms. Nichols's and Ms. Dewolf's priorities and needs changed along with those of the business. It was my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision. I also used my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for them.

9. Like Ms. Nichols and Ms. Dewolf, many other executives at VBM spent a great deal of time in business meetings with other executives, third parties, or both. Consequently, it was important that the various executives' schedules be coordinated and that any scheduling conflicts be eliminated. Each week the executive assistants and administrative assistants met together for approximately one hour to collectively review, plan, and coordinate our boss's schedules. The meeting often was done by conference call. Among other things, we discussed our executives' upcoming deliverables and travel, and identified and attempted to resolve any scheduling conflicts among our boss's schedules. Some of the things that typically got resolved in these meetings were scheduling conflicts arising from such factors as changed priorities in the business and the need to coordinate the activities of executives in both the New York and Ohio offices of

the company. This weekly meeting was organized and conducted by the assistants themselves; no executive or other person in the company instructed us to do this.

10. I spent approximately one hour or less per week doing filing for Ms. Nichols or Ms. Dewolf.

11. In addition to managing Ms. Nichols's and Ms. Dewolf's calendars I also managed their email inboxes. I had the authority and discretion to delete emails that I determined were "junk" mail, duplicative, or otherwise not ones that, in my judgment, they needed to see. I exercised my discretion in deciding which if any emails to flag for their attention or to print out for their review.

12. I was responsible for coordinating Ms. Nichols's and Ms. Dewolf's calendars with their travel schedules, and also made national and international travel arrangements for them.

13. My work at VBM required me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. Such information included, for example, salary information and performance reviews of my bosses' direct reports. I was required to have a high level of discretion as to how this information was treated and who needed to or should be able to see it.

14. I never saw any evidence of any kind that any executive at VBM held or demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence. If anything, I think the company is exemplary in its treatment of women, including those who are pregnant or have children.

15. Based on my observations, there are variances in the job duties performed by different Executive Assistants at the company.

5

16. I occasionally performed personal errands for Ms DeWoolf. For example, I typically picked up her lunch for her. I also occasionally, though not regularly or routinely, drove to her home to drop off business-related mail or papers.

17.  I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

18.  I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary.  I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

19.   The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.

6

I declare under penalty of perjury under the laws of the United States of America and th

State of Ohio that the foregoing is true and correct.

Joan Rogan

_____11/3/09_____
Date

7