# EXHIBIT S

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

    -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.

----------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
DONNA STROUP**

    I, Donna Stroup, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

    1. I am employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio, and have been employed at VBM since October 10, 2007. I have been an Executive Assistant throughout my employment at VBM and have over 25 years experience overall, for various entities, as an executive assistant. I currently support Joe Proctor, Vice President, Brand Strategy, and Amish Desai, Vice President, Brand Integration, along with Cliona Miller, Vice President, Customer and Marketing Insights.

2.   In my experience, and based on my observations of and interactions with other Executive Assistants, the precise job duties of different Executive Assistants at VBM vary, due in large part to the varying responsibilities, subject matter area, and personal preferences of the executives those assistants support.

3.   Throughout my tenure at VBM, I have been paid on an exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work. I have kept no records of my hours worked on a daily on-going basis.

4.   I estimate that I currently work an average of about 45-50 hours per week and have worked, on average, a similar number of hours per week throughout my employment at VBM. Although my hours of work are somewhat fluid, on most days I arrive between 7:30 and 7:45 in the morning and leave at about 6:00 in the evening, Monday through Friday. Although this schedule includes an hour for lunch each day, I often eat lunch at my desk. I typically perform work during some of my lunch hour.

5.   During the summer months, our office observes what are known as "summer hours." This means that most of the office staff stops working and leaves the office at around 1:00 on alternate Friday afternoons during the summer. I have participated in this program and left early on many summer Fridays over my years at VBM. In recent years I have developed a system together with another Executive Assistant, Debbie Wardlow, in which we each provide additional supports to each others' executives on alternative summer Fridays, allowing us each to take full advantage of the summer Friday program. During my time at VBM, I have always kept a record of the number of summer Fridays and PTO (paid time off) taken throughout the year. On occasion I would come in late or leave for a doctor's appointment or family emergency. I did not record this time or to my knowledge no one else has recorded this time either.

6.   Once in a great while I perform work from home, typically by logging into the company computer system from my home.

7.   I estimate that I currently spend about 50% of my working time on calendar management issues for the three executives I support.  The executives I have supported spend a great deal of their time in meetings, which are in essence the platform of their work.  In providing calendar-related support to my executives, I have routinely exercised my own independent judgment and discretion regarding these extremely significant aspects of their work. I have done this through a combination of my experience, my knowledge of the Company and the people who work here, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator.  While I have consulted executives on those rare scheduling conflicts which, in my judgment, require their input to resolve, I have frequently and routinely made other long- and short-term scheduling decisions on their behalf without consulting them.

8.   Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched.  This means that my executives' priorities and needs change along with those of the business.  It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.

9.   Many (if not most) executives at VBM spend a great deal of time in business meetings with other executives, third parties, or both.  Consequently, it is important that the various executives' schedules be coordinated.  Each week a group of the Executive Assistants

and administrative assistants meet together for approximately one hour to review, plan, and coordinate our boss' schedules. I have sometimes, but not regularly, attended this meeting.

10. I operate as a "gatekeeper" for the three executives I support, in that most meeting requests for them typically are directed through me. I use my judgment to determine the priority of these requests. It is only when I am for some reason unsure about what the priorities should be that I consult the executive.

11. I am also responsible for reviewing, on an ongoing basis throughout the day, the emails of the three executives I support. In doing so I monitor the email inboxes, print out emails and documents where appropriate, flag emails that are of particular importance, and delete emails that I conclude are "junk" mail or are duplicative (such as those involving a series of emails on the same subject). In order to make such judgments about the various priorities of different emails, I leverage my knowledge of my executives' priorities and of the importance of various issues within the business.

12. I also process my executives' expenses. In so doing I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on their behalf.

13. There is no single company-wide method or system for organizing file, emails, or other documents. To my knowledge, each Executive Assistant (including me) develops his or her own organizational and filing systems for both hard copy and electronic information. I have thus developed my own systems for organizing my own records and information and, where appropriate, that of my executives as well.

14. Similarly, because to my knowledge there is no formal training program for administrative assistants, each of us has had to learn on our own and from each other how best to

do the many facets of our jobs. We work together as a team of assistants and routinely share best practices with each other and pass along to each other information that will help all of us do our jobs effectively.

15. My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. As an example of this second category, I routinely handle information regarding the salaries and performance reviews of others in the company. I am required to have a high level of discretion as to how confidential information is treated and who needs to or should be able to see it.

16. On rare occasions I have assisted my executives with personal matters or picked up their lunch.

17. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

18. Virtually every aspect of my job as an Executive Assistant requires, and always has required, the routine exercise of my discretion and independent decision-making, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

19. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required

to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

20.   I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

21.   The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

Donna Stroup

11/10/09

Date

# EXHIBIT T

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

     -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

               Defendants.
-----------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
VALLORI C. THOMAS**

    I, Vallori C. Thomas, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

    1.  I am employed by Victoria's Secret Direct Brand Management, LLC, dba Victoria's Secret Direct New York, LLC ("VSN"). I have been employed continuously by VSN since March 7, 2005. I have never been employed by Victoria's Secret Stores Brand Management, Inc. ("VBM") or Limitedbrands Direct Media Productions, Inc. ("VDM"). Throughout my employment at VSN, I have been an Executive Assistant.

    2.  At all times during my employment as an Executive Assistant at VSN, I have been paid on an exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work. I have kept no records of my hours worked.

1

3.   I estimate that I work an average of 45 hours per week.  Typically I come in to work at about 9:00 in the morning and leave between 6:00 and 6:30 in the evening, five days a week. By my own choice, and on my own initiative, I sometimes come in to the office before 9:00 in the morning, especially if I know that it is going to be a busy day that day, or is going to be a busy week.  This has been true throughout my tenure as an Executive Assistant at VSN. Although this schedule includes an hour each day for lunch, I often eat lunch at my desk and perform work during some of my lunch hour.  On other occasions, I go out for lunch.  If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I typically do not record that time as PTO (paid time off) or in any other way.  To my knowledge, no one else at the Company tracks how much time I or any other Executive Assistant takes for lunch or otherwise tracks my hours worked.

4.   I occasionally work for home.  For example, I have worked from home on occasions when I have been ill and not been feeling well enough to come into the office.

5.   I am the Executive Assistant to Velyna Morales, President of Merchandising, Fashion and Design, as I have been throughout my tenure as an Executive Assistant at VSN.

6.   VSN is a calendar-driven company.  I spend well over half of my working time on calendar management and related issues for Ms. Morales.  Because so much of her work is meeting-based, it is critical that I keep her calendar current and accurate.  In fact, Ms. Morales often has days when she is literally in meetings all day long, with few if any breaks.  I spend over half of my working time reviewing and responding to meeting requests on her behalf, resolving scheduling conflicts on her calendar, and otherwise assisting in planning her schedules. In so doing, I routinely exercise my own independent judgment and discretion regarding these

2

extremely significant aspects of Ms. Morales's work.  This process includes coordinating her meetings with the meetings of various merchants, Ms. Morales' direct reports, and other executives.  While I occasionally consult Ms. Morales on scheduling conflicts which, in my judgment, require her input to resolve, I make most scheduling decisions on her behalf on my own, on a routine basis.  I make such decisions using my experience, my knowledge of the company, my knowledge of which meetings are more important and which are less important, and my knowledge of Ms. Morales's own priorities. In making these decision, I frequently coordinate my own activities and decisions with those of cross-functional partners in the business.

7.   While  calendar-related responsibilities have always been a major portion of my job as an executive assistant, they become more complex after the re-organization that occurred at VSN in 2007.

8.   In addition to scheduling and coordinating hundreds of meeting a year for Ms. Morales, I also prepare various reports for her.  For example, if she is in charge of a particular meeting regarding a merchandising process, it is my job to anticipate, and schedule, preparation sessions for the meeting, and to know what materials may be needed (and to ensure that those materials are ready and delivered appropriately at or in advance of the meeting).  On some occasions I am provided with data and must them, on my own, compile that data into various reports. In doing so I typically work from a template (derived from prior reports).

9.   I am also responsible for monitoring certain aspects of our budget.  The Finance Department calculates an appropriate operational budget for expenses of our department.  The funds for this budget are allocated at the beginning of the year, and I then "police" our department's spending for various types of ongoing expenses, to ensure that we do not exceed

the budget. For example, I track various expenses incurred in business-related retail shopping trips by various merchants within the company.  I do this for all departments that report to  Ms. Morales.  If at any time I detect that the budget has been exceeded, or is at risk of being exceeded, I report that to Ms. Morales.

10. Like Ms. Morales, many other executives at the Company spend a great deal of time in meetings with other executives, third parties, or both.  Consequently, it is important that the various executives' schedules be coordinated.  Each week the executive assistants and administrative assistants meet together (typically on Thursdays) for approximately one hour to review and coordinate our boss' schedules.  I created this "administrative counsel" of my own initiative, in order to build and create a culture of cooperation among the assistants and to enhance our effectiveness as a team. Among other things, at these weekly meetings we discuss our executives' upcoming deliverables and travel, share best practices, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules.  We use our independent judgment (which is in turn based on our knowledge of the company and its priorities, our knowledge of our bosses preferences and priorities, and our overall administrative knowledge and skill)  to resolve these conflicts and make these decisions independent of the executive team. Also as result of these meetings we developed a "buddy system," by which we each try to pair up with another assistant to forward calls to when we're out or away from our desks, to cover for each other when we're on PTO (paid time off) and to otherwise work together and coordinate our needs and those of our executives.  Our weekly meetings are organized and conducted by the assistants ourselves; no one has instructed us to do this.

11. I am responsible for providing Ms. Morales with materials she needs in order to participate in various meetings she attends.  This requires me, on my own initiative, to review

her calendar on a frequent basis, identify upcoming meetings, identify what materials she will need for those meetings, then gather or print those materials for her. I am expected to think on my own, to act proactively, and to proactively manage her calendar and related issues.

12. I operate as a "gatekeeper" for Ms. Morales, in that meeting requests for her typically are directed through me. I use my judgment to determine the priority of these requests. When I am not sure what the priority is, I consult Ms. Morales. I also answer most of her phone calls, and in so doing I use my discretion to decide which if any calls to put through to her when she is in a meeting or on another call. I exercise my discretion in determining what the appropriate priorities are.

13. I also am responsible for monitoring Ms. Morales's emails. I have the authority and discretion to delete emails that I determine are "junk" mail or otherwise are not ones that, in my judgment, they need to see. I exercise my discretion in deciding which if any of such emails to flag for her attention or to print out for her review. On other occasions I respond to emails on her behalf, and exercise my judgment about when it is appropriate to do this without specifically consulting her.

14. I also process Ms. Morales's travel expenses. In so doing I reconcile her travel receipts to credit card billing statements and provide relevant information to the Company's accounting department.

15. My job also includes organizing Ms. Morales's office itself. For example, I commonly organize various materials for her, using various file systems and reminder systems that I have developed on my own. None one has ever given me a filing system or instructed me to use any particular system; instead, I have developed and implemented such systems on my own initiative.

5

16.   My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  I am required to have a high level of discretion.  As an example, I see the performance reviews for Ms. Morales's direct reports, and also see, on a routine basis, highly confidential financial information of the company. I also see and work with, on a routine basis, information concerning daily sales, creative concepts for upcoming catalogues, and numerous other forms of confidential business information.

17.   I have never seen any evidence of any kind that any current executive at VSN (or at VDM or VBM)  holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.  I  have two step-children of my own, currently ages 6 and 14.  Neither Ms. Morales nor anyone else has never shown any negative attitude or any negative behavior toward me of any kind  in relationship to any of my family-related or childcare responsibilities.  If I need to leave work for a family-related reason I try, when possible, to talk to her about it in advance, and I can take the time I need without any difficulty.  In doing so I have made every effort to schedule my absences so as to create the least likelihood of disruption for Ms. Morales in my absence.  I feel that my work-life balance is recognized and respected by her and by others with whom I work.

18. Based on my observations, there are variances in the job duties among Executive Assistants with whom I interact.

19.   I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration.  Ms. Ford informed me that I was not required

to speak with her and that I could have ended our conversation at any time.  She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

20.  I understand that this Declaration, consisting of seven (7) pages, was obtained for purposes of the defense of <u>Fredda Malena v. Victoria's Secret Direct, LLC, et al.</u> (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of certain Executive Assistants and Administrative Assistants.  The statements made in this Declaration are truthful and voluntary.  Ms. Ford informed me that no retaliation would be permitted if I refused to speak with her or if I chose to participate in any way in the Litigation.  She told me if I experienced any retaliation, I could contact Human Resources immediately.  Also, I know that I will receive no special treatment for providing my statement.  Ms. Ford told me that she does not represent me individually.  I understand that she represents only the Defendants in the Litigation.

21.  The statements made in this Declaration are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

_Vallori Thomas_
Vallori C. Thomas
_12 / 11 / 2009_
Date

7

# EXHIBIT U

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                      Plaintiffs,

      -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                    Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
TONI TINSLEY**

      I, Toni Tinsley, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

      1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio.  I have been employed by VBM since August 15, 2005.  I have been an Executive Assistant throughout my employment at VBM.   During that time, I have supported several different executives in several different parts of the company.  I currently support Vice President of Bras Ann Stephenson, Vice President of Panties Lisa Rogers, and Vice President of Space, Planning and Assortment Dan Sierzputowski.

2.   Throughout the time that I have been an Executive Assistant at VBM, I have been paid on an exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work. I have kept no records of my hours worked.

3.   I estimate that I currently work an average of about 45 hours per week. Although my hours of work vary somewhat, on most days I arrive at work between 8:30 to 9:00 am in the morning and leave between 6:00 and 6:15 in the evening, Monday through Friday. I occasionally come in to work earlier than 8:30, particularly if I know there are critical meetings going on that day that my Executives may need additional support for. Although this includes an hour for lunch, I sometimes perform work during some of my lunch hour, but on other occasions I do no work during the lunch hour. If I take a long lunch, or need to run a personal errand during the course of the day, or need to leave early for a doctor's appointment or for some other personal reason, I have the discretion to do that, and I typically do not record that time as PTO (paid time off) or otherwise record it.

4.   I occasionally, but not routinely, read and/or respond to my work email on evenings or weekends or do other work from home. I do this of my own initiative; I have not been specifically instructed by anyone to do this. I see it as my responsibility to do what needs to be done to try to meet my deadlines and those of the executives I support.

5.   I currently spend well over half of my working time attending to calendar, email and related issues for the Executives I support. Of this time, the majority is devoted to calendar-related issues. Because so much of their work is meeting-based, it is critical that I keep their calendars current and accurate. Their calendars are, in essence, the platform of their work, as being in the right place, at the right time, with the correct group of people, with the correct

2

materials, makes the difference between their being able to do their jobs effectively or being

unable to do them effectively.  It is not uncommon for the executives I support to have meetings

back-to-back throughout the work day, with few (if any) breaks.  As a result, I spend over half of

my working time reviewing and responding to meeting requests on their behalf, resolving

scheduling conflicts on their calendars, and otherwise assisting in planning their schedules.  In so

doing, I routinely exercise my own independent judgment and discretion regarding these

extremely significant aspects of their work.  I do this through a combination of my experience,

my knowledge of the Company, its business cycles, and the people who work here, the

relationships I have built with Executive Assistants and others across the business, and my skills

as an administrator. While I consult my Executives on those rare scheduling conflicts which, in

my judgment, require their input to resolve, I routinely make other long- and short-term

scheduling decisions on their behalf without consulting them.

   6.  Because the fashion retail business is so dynamic, the work I perform is neither

routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when

the meeting must be held, and who must attend constantly change depending on what is being

developed or launched.  This means that my Executives' priorities and needs change along with

those of the business.  It is my responsibility to be aware of those changes and quickly respond to

them with minimal immediate direction and supervision.  I also use my knowledge of these

changes in deciding among conflicting meeting requests and making other scheduling decisions

for my Executives.

   7.  Like Ms. Greeley, many other executives at the company spend a great deal of time in

business meetings with other executives, third parties, or both.  Consequently, it is important that

the various executives' schedules be coordinated.  Each week the Executive Assistants and

3

administrative assistants meet together for approximately one hour to review, plan, and coordinate our boss' schedules. I do not presently particular in this meeting on a regular basis, but have done so during prior years of my employment with VBM.

8. I am responsible for determining which if any materials my Executives need in order to participate in various meetings she attends, and for providing those materials to them. This requires me, on my own initiative, to review their calendars on a frequent basis, identify upcoming meetings, identify what materials they will need for those meetings, then compile those materials for them. I am expected act independently, think on my own, and proactively manage their calendars and related issues.

9. I operate as a "gatekeeper" for my Executives, in that meeting requests for them typically are directed through me. I use my judgment to determine the priority of these requests. It is only when I am for some reason unsure about what the priorities should be that I consult any of the Executives I support.

10. I am responsible for coordinating my executives' calendars with their travel schedules and also make travel arrangements for them. When the executives I support are making visits to Company stores, I coordinate and make the arrangements for those store visits as well.

11. I enjoy project work and have many different types of projects during my employment at VBM, some of which came about by my own initiative. For example, I worked on the "Ops Dashboard" project and was in charge of a project creating a new conference room scheduling system. I also helped plan and conduct the Administrative Professionals Day event.

12. I have also been responsible for event planning in the course of my work as an Executive Assistant. For example, when I supported Keith Knopf, a former Vice President with the Company, I planned and set up numerous off-site meetings for the VOT offsite.

13. I also review my Executives' emails. I have the authority and discretion to delete emails that I determine are "junk" mail or are duplicative. It is my responsibility to exercise my discretion in deciding which if any emails to flag for their attention or to print out for their review. I also decide, on my own, which emails to respond to on their behalf.

14. I also process my Executives' expenses. In so doing I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on their behalf.

15. My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information. As an example, during the course of my employment at VBM I have seen, in the course of my work, performance reviews of individuals reporting to my various bosses, salary information for those individuals, and a host of other forms of confidential information regarding the Company, its strategies, its operations, and its finances. I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

16. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

17. Virtually every aspect of my job requires the routine exercise of my discretion and independent decision-making, which is in turn based on a combination of my expertise and

5

skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the Executives I support.

18. Based on my observations, there are variances in the job duties performed by different Executive Assistants at the company.

19. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

20. I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

6

21.   The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

_Toni Tinsley_
Toni Tinsley

_11/11/09_
Date

7

# EXHIBIT V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                Plaintiffs,

    -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
LEISA TREMPER**

I, Leisa Tremper, being first duly cautioned and sworn, and being more that age eighteen

years of age and competent to testify about the matters contained herein, hereby declare and state

as follows upon personal knowledge or information:

1.  I am currently employed by Victoria's Secret Stores, Inc. ("VSS") as Senior HR

Generalist in the VSS Human Resources Department.  Prior to being promoted to my current

position I was employed as an Executive Assistant for approximately 15 years.  Among other

positions, I was an Executive Assistant at Victoria's Secret Stores Brand Management ("VBM")

in Reynoldsburg, Ohio from December, 2007 until January, 2009.  As an Executive Assistant at

VBM, I supported Executive Vice President of Human Resources Larry Fultz from December,

2007 until January, 2009.

1

2.  In my own experience, and based on my observations of and interactions with other Executive Assistants, while all Executive Assistants perform complex work that requires a high level of independent judgment and discretion, the complexity of the job of Executive Assistant typically increases as the level of responsibility of the executive being supported rises.  In other words, as a general rule, the higher the level of the executive, the more complex the job of the Executive Assistant.

3.  Throughout the time that I was an Executive Assistant at VBM, I was paid on an exempt, salaried basis.  I was never paid overtime as an Executive Assistant, nor  required to "clock in" or otherwise record my hours of work.  I kept no records of my hours worked.

4.  I estimate that as an Executive Assistant at VBM I worked an average of about 45 hours per week.  I typically arrived at work at around 8:00 in the morning and left at around 5:30 in the evening, Monday through Friday. I sometimes performed work during some or all of my lunch hour, but on other occasions I did  no work during the lunch hour.  If I took a long lunch, or needed to run a personal errand during the course of the day, or needed to leave early for a doctor's appointment or for some other personal reason, I had the discretion to do that, and I typically did not record that time as PTO (paid time off) or otherwise record it.

5.  As an Executive Assistant at VBM I spent approximately 60 – 75% of my working time attending to Mr. Fultz's calendar, email and related issues.  Of this time, the majority was devoted to calendar-related issues.  Because so much of his work was meeting-based, it was critical that I keep his calendar current and accurate.  His calendar was, in essence, the platform of his work, as being in the right place, at the right time, with the correct group of people, with the correct materials, could make the difference between him being able to do his job effectively or being unable to do it effectively.  As a result, I spent over half of my time reviewing and

responding to meeting requests on his behalf, resolving scheduling conflicts on his calendar, and otherwise assisting in planning his schedule.  In so doing, I routinely exercised my own independent judgment and discretion regarding these extremely significant aspects of Mr. Fultz's work.  I did this through a combination of my experience, my knowledge of the Company and the people who work here, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. While I consulted Mr. Fultz on those rare scheduling conflicts which, in my judgment, require his input to resolve, I  routinely made other long- and short-term scheduling decisions on his behalf without consulting him.

     6.   Because the fashion retail business is so dynamic, the work I performed as an Executive Assistant was neither routine nor repetitive.  For example, the type of meeting, what was required for the meeting, when the meeting must be held, and who must attend constantly changed depending on what was being developed or launched.  This meant that Mr. Fultz's priorities and needs changed along with those of the business.  It was my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.  I also used my knowledge of these changes in deciding among conflicting meeting requests and making other scheduling decisions for Mr. Fultz.

     7.   Like Mr. Fultz, many other executives at VBM spent a great deal of time in business meetings with other executives, third parties, or both.  Consequently, it was important that the various executives' schedules be coordinated and that the Executive Assistants communicate well with each other and share best practices. I took the initiative to create  a monthly meeting of the assistants to allow us to collectively cross-train each other and share best practices.  At some of the meetings we had guest speakers regarding various aspects of the company and its procedures.

8.  I also worked with representatives from the top executives of the company to organize, and develop the content for,  Administrative Professionals Day .  I also developed, on my own initiative, "on-boarding" (orientation and training) materials for assistants.  These on-boarding materials became a thick notebook over time, which was then copied and used to train other assistants over the years. I also on occasion participated directly in the on-boarding of new Executive Assistants; the last of these was in the fall of 2008, when I assisted in on-boarding new Executive Assistant Molly Gebensleben.  Although I am aware of various situations in which these materials were used to on-board new assistants in the Company's Ohio offices, I do not have any knowledge regarding whether such materials were used in any of the Company's New York offices.  As part of the on-boarding process,  I also participated in the creation of a system whereby each new assistant would be paired with a more senior assistant, who could in turn help the new assistant learn about the company and the roles and responsibilities of assistants.

9.   Another special project I worked on at VBM was the annual United Way  "sample sale" fundraiser, at which associates were allowed to purchase Company products at a discount. I coordinated and supervised the work of the various departments responsible for the sale, drafted proposed rules and procedures for those assisting at the sale, put together the invitations, and coordinated the communications among the security personnel, building personnel and others involved in planning and conducting the sale.  It is my understanding that the work I did on the sale is now being done by an outside vendor.

10. While I was an Executive Assistant at VBM I had the authority to purchase supplies on my own; I did not require any other approval in order to approve purchases of supplies. I also worked directly with vendors in planning off-site events.

11. I operated as a "gatekeeper" for Mr. Fultz, in that meeting requests for him typically were directed through me. I used my independent judgment to determine the priority of these requests. It was only when I was for some reason unsure about what the priorities should be that I consulted Mr. Fultz.

12. I was responsible for coordinating Mr. Fultz's calendar with his travel schedule and also make travel arrangements for him.

13. I also reviewed Mr. Fultz's emails. I exercised my discretion in deciding which if any emails to flag for his attention or to print out for his review. I also decided, on my own, which emails to respond to on his behalf and which ones to direct to others in the business to review and respond to.

14. I also processed Mr. Fultz's expenses. In so doing I was required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to record and process such expenses on his behalf.

15. As an Executive Assistant at VBM I created filing systems for both hard copy documents and emails. To my knowledge there is no universal filing system at VBM, and each assistant must develop his or her own systems for organizing and, where appropriate, retaining information for both the assistant and for the executive being supported.

16. My work as an Executive Assistant at VBM required me to handle, and to maintain the confidentiality of, a great deal of confidential information. By "confidential information" I mean both information about the company that was not to be shared with outsiders, and internally confidential information. As just one example, I was routinely privy to information about the performance reviews and salaries of individuals who reported to Mr. Fultz, as well as extensive information about the company's strategy and finances. I was required to have a high

5

level of discretion as to how such information was treated and who needed to or was able to see it.

17. It was extremely rare for Mr. Fultz to ask me to perform any personal errands for him.

18. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

19. Virtually every aspect of my job as an Executive Assistant required the routine exercise of my discretion and independent decision-making, which was in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arose, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

20. Based on my observations, there were variances in the job duties performed by different Executive Assistants at VBM.

21. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

22. I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I

6

might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

23.    The statements made in this Declaration (consisting of seven pages) are truthful and voluntary.

I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

_Leisa Tremper_
Leisa Tremper

_11-6-09_
Date

# EXHIBIT W

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FREDDA MALENA,
on behalf of herself and all others similarly situated,

                     Plaintiffs,

       -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S SECRET
STORES, LLC, VICTORIA'S SECRET STORES BRAND
MANAGEMENT, INC., LIMITED BRANDS, INC.,
LIMITED BRANDS DIRECT MEDIA PRODUCTION,
INC., and ANN O'MALLEY

                   Defendants.
------------------------------------------------------------------------X

Case No. 1:09-cv-05849 (WHP III)
(AJP)

**DECLARATION OF
DEBBIE WARDLOW**

     I, Debbie Wardlow, being first duly cautioned and sworn, and being more that age eighteen years of age and competent to testify about the matters contained herein, hereby declare and state as follows upon personal knowledge or information:

     1.  I am employed by Victoria's Secret Stores Brand Management ("VBM") in Reynoldsburg, Ohio. I have been employed by VBM since November, 2007. I have been an Executive Assistant throughout my employment at VBM. I currently support Jami Dewolf, Executive Vice President of Brand Strategy and Integration.

     2.  During the time I have been an Executive Assistant at VBM, I have been paid on an exempt, salaried basis. I have never been paid overtime as an Executive Assistant, nor been required to "clock in" or otherwise record my hours of work. I have kept no records of my hours

1

worked.  The only exception would be my recording of the time I take as paid time off (PTO), which I take in increments of one half-day or more.

    3.   I estimate that I currently work an average of about 50-55 hours per week.  Although my hours of work vary somewhat, on most days I arrive at work at or before 8:00 in the morning and leave between 5:30 and 6:30 in the evening, Monday through Friday.  Although this includes an hour for lunch, I often eat lunch at my desk.  I routinely perform work during some of my lunch hour.  I routinely stay later in the evening during times when Ms. Dewolf is in meetings.  I don't take long lunches.  I have not run personal errands during work hours.  If I need to leave early for a doctor's appointment or for some other personal reason, I have the discretion to do that, and I typically do not record that time as PTO (paid time off) or otherwise record it.

    4.   During the summer months, our office observes what are known as "summer hours." This means that most of the office staff leaves stops working at around 1:00 on seven Fridays during the summer.  As a result, on seven Fridays during the summer months I leave work at around 1:00 in the afternoon on those seven Fridays (which occur on a bi-weekly basis).  If I take an entire Friday off on one of the summer Fridays, I always take half of that day as PTO (the other half of the day being attributable to summer hours).

    5.   I rarely read or respond to my work email on evenings or weekends.

    6.   I spend approximately two-thirds of my working time attending to Ms. Dewolf's calendar, email and related issues.  About a third of my total working time is devoted to calendar-related issues.  Because so much of Ms. Dewolf's work is meeting-based, it is critical that I keep her calendar current and accurate.  Her calendar is, in essence, the platform of her work, as being in the right place, at the right time, with the correct group of people, with the

correct materials, makes the difference between her being able to do her job effectively or being unable to do it effectively.  As a result, I spend a significant portion of my time reviewing and responding to meeting requests on her behalf, resolving scheduling conflicts on her calendar, and otherwise assisting in planning her schedule.  In so doing, I routinely exercise my own independent judgment and discretion regarding these extremely significant aspects of Ms. Dewolf's work.  I do this through a combination of my experience, my knowledge of the Company and the people who work here, my knowledge of Ms. Dewolf's working style and personal preferences, the relationships I have built with Executive Assistants and others across the business, and my skills as an administrator. While I consult Ms. Dewolf on those scheduling conflicts which, in my judgment, require her input to resolve, I routinely make other long- and short-term scheduling decisions on her behalf without consulting her. I also have developed a "current issues" document to keep Ms. Dewolf apprised of issues which in my judgment are ones that need to be brought to her attention.

     7.   I have created and implemented my own filing system for use in supporting Ms. Dewolf. No one instructed me to do this, much less how to do it.  I simply used my own judgment to create a system that I determined would be useful for both me and Ms. Dewolf.

     8.   Because the fashion retail business is so dynamic, the work I perform is neither routine nor repetitive.  For example, the type of meeting, what is required for the meeting, when the meeting must be held, and who must attend constantly change depending on what is being developed or launched.  This means that Ms. Dewolf's priorities and needs change along with those of the business.  It is my responsibility to be aware of those changes and quickly respond to them with minimal immediate direction and supervision.  I also use my knowledge of these

changes in deciding among conflicting meeting requests and making other scheduling decisions for Ms. Dewolf.

9.   Like Ms. Dewolf, many other executives at the company spend a great deal of time in business meetings with other executives, third parties, or both.  Consequently, it is important that the various executives' schedules be coordinated.  Each week the Executive Assistants meet together for approximately one hour to review, plan, and coordinate our boss' schedules.  The meeting often is done by conference call. Among other things, we discuss our executives' upcoming travel, and identify and attempt to resolve any scheduling conflicts among our bosses' schedules.

10. I am responsible for determining which if any materials Ms. Dewolf needs in order to participate in various meetings she attends, and for providing those materials to her.  This requires me, on my own initiative, to review her calendar on a frequent basis, identify upcoming meetings, identify what materials she will need for those meetings, then compile those materials for her.  I am expected act independently, think on my own, and proactively manage her calendar and related issues.  My practice is to ask Ms. Dewolf the day before to review items I have put aside for the next day to see if she wants anything in addition to what I suggested.

11. I operate as a "gatekeeper" for Ms. Dewolf, in that meeting requests typically are directed through me. I use my judgment to determine the priority of these requests.  It is only when I am for some reason unsure about what the priorities should be that I consult Ms. Dewolf.

12.  I am responsible for coordinating Ms. Dewolf's calendar with her travel schedule and also make travel arrangements for her.  I have independently developed an Excel spreadsheet to track her New York travel. I created this of my own initiative.

4

13.   I also review Ms. Dewolf's emails.  Management of her emails accounts for approximately 50% of my working time.  I have the authority and discretion to delete certain types of emails that I determine are "junk" mail or otherwise are not ones that she needs or wants to see.  To facilitate this process, I developed, on my own, an Excel spreadsheet identifying the types of emails that could be deleted and those that can or should be printed for her review.

14.   I also process Ms. Dewolf's expenses.  In so doing I reconcile Ms. Dewolf's travel receipts to credit card billing statements and provide relevant information to the company's accounting department.  I am required to be familiar with the company's policies regarding reimbursement of expenses, and to use the on-line Ariba system to records and process such expenses on her behalf.  I also am required to be familiar with the company's budgeting process so that I know which budget lines, or which departments, certain expenses should be charged to.

15. I occasionally prepare PowerPoint presentations and other reports for Ms. Dewolf. In doing so I sometimes draw from existing reports from prior presentations based on Ms. Dewolf's direction.  Ms. Dewolf then makes the final decisions about the content of the presentations.

16.   My work requires me to handle, and to maintain the confidentiality of, a great deal of confidential information.  By "confidential information" I mean both information about the company that is not to be shared with outsiders, and internally confidential information.  The internally confidential information includes performance reviews and salary information for individual s reporting to Ms. Dewolf.  The externally confidential information includes non-public strategic and financial information about the company.  I am required to have a high level of discretion as to how this information is treated and who needs to or should be able to see it.

17. I rarely leave the building during the work day.  It is extremely rare for Ms. Dewolf (or anyone else) to ask that I perform tasks away from the office, personal or otherwise.  When

5

exiting our building (which is in Reynoldsburg, Ohio) no card "swipe" is required. Not every entrance to the building requires a badge to be swiped in order to gain entry either. The building has two entrances, one of which (the main entrance) requires no swipe to enter during business hours and the other of which does require a swipe for entry. However, even the records of swipes on this second door would not show a full record of the times individuals came and went from the building, both because no swipe is required to leave the building and because, if two people are entering the building at the same time, or if someone is entering when another person is exiting, not every person's entry to the building will be reflected in a swipe of their own badge.

18. I have never seen any evidence of any kind that any executive at this company holds or has demonstrated any bias of any kind toward pregnant women, women with children, or women who have taken a leave of absence.

19. Virtually every aspect of my job requires the routine exercise of my discretion and independent decision-making, which is in turn based on a combination of my expertise and skills, my knowledge of company policies and procedures, my ability to research and otherwise find a "work around" when difficulties arise, my ability to work collaboratively with other Executive Assistants, my discretion, and my ability to learn and act upon the personal preferences and needs of the executive I support.

20. Based on my observations, there are variances in the job duties performed by different Executive Assistants at the company.

21. I voluntarily spoke with Jackie Ford, one of the attorneys representing the Defendants in Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), with respect to the issues set forth in this Declaration. Ms. Ford informed me that I was not required

to speak with her and that I could have ended our conversation at any time. She also informed that there was no "reward" for speaking to her, nor any penalty for not speaking to her.

22.   I understand that this Declaration was obtained for purposes of the defense of Fredda Malena v. Victoria's Secret Direct, LLC, et al. (the "Litigation"), which alleges claims for alleged overtime compensation on behalf of Executive Assistants and Administrative Assistants. The statements made in this Declaration are truthful and voluntary. I am aware that I might be entitled to opt into the Litigation, if the court allows it, and that I could be entitled to monetary relief if I opt-in and the plaintiffs are successful. Additionally, Ms. Ford informed me that no retaliation would be permitted if I opted into the Litigation or if I refused to speak with her. She told me if I experienced any retaliation, I could contact Human Resources immediately. Also, I know that I will receive no special treatment for providing my statement. Ms. Ford told me that she does not represent me individually. I understand that she represents only the Defendants in the Litigation.

23.   The statements made in this Declaration (consisting of eight pages) are truthful and voluntary.


I declare under penalty of perjury under the laws of the United States of America and the State of Ohio that the foregoing is true and correct.

_Debbie Wardlow_
Debbie Wardlow
_10/20/09_
Date

7