Michael G. Long, *pro hac vice*
Allen S. Kinzer, *pro hac vice*
Michael C. Griffaton, *pro hac vice*
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216-1008
(614) 464-6297

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FREDDA MALENA, on behalf of herself and
all others similarly situated,

Plaintiff,

09 Civ. 5849 (WHP)

     -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S
SECRET STORES, LLC, VICTORIA'S SECRET
STORES BRAND MANAGEMENT, INC., LIMITED
BRANDS, INC., LIMITED BRANDS DIRECT
MEDIA PRODUCTION, INC. and ANN O'MALLEY,

Defendants.

-----------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 3

I.     DEFENDANTS' REQUEST TO COMMUNICATE DIRECTLY WITH
       POTENTIAL CLASS MEMBERS WAS DENIED AS DUPLICATIVE OF
       OTHER COMMUNICATIONS APPROVED BY THE COURT ..................................... 3

II.    DEFENDANTS' GENERAL COUNSEL ADVISED HIS CLIENTS ON THE
       COURT-APPROVED NOTICE. ........................................................................ 4

III.   THE GENERAL COUNSEL'S PRIVILEGED COMMUNICATION TO HIS
       CLIENTS TRACKED THE LANGUAGE IN THE COURT-APPROVED
       NOTICE ...................................................................................................... 7

IV.    THE PRIVILEGED COMMUNICATION HAD NO IMPACT IN THIS CASE .......... 10

LAW AND ARGUMENT ............................................................................................ 10

I.     DEFENDANTS' GENERAL COUNSEL'S COMMUNICATION TO HIS
       CLIENTS DID NOT VIOLATE THE COURT'S ORDER ........................................ 10

II.    THE GENERAL COUNSEL'S COMMUNICATION WITH HIS CLIENTS
       WAS PROPER, ACCURATE, TRUTHFUL, AND NOT PREJUDICIAL .................... 12

       A.     E-mail was the appropriate means of advising Defendants' executives .............. 13

       B.     The General Counsel's communication was accurate and non-prejudicial ......... 15

       C.     The General Counsel's communication had no impact on the Executive
              Assistants' decision to opt-in or not to opt-in ...................................... 19

       D.     Nothing about counsels' actions warrant sanctions ............................... 20

       E.     The General Counsel's communication was protected by the First
              Amendment ................................................................................... 22

CONCLUSION ........................................................................................................ 24

CERTIFICATE OF SERVICE .................................................................................... 25

## INTRODUCTION

Plaintiff's Motion for Sanctions (Dkt. #54-58) misrepresents both the Court's December 19, 2010, Order (Dkt. #46) and the nature of Defendants' General Counsel's privileged communication with his own clients. Based on pure speculation and motivated, no doubt, by a decided lack of interest in this case by putative class members, it endeavors to twist proper, accurate, and necessary attorney-client communication – advice required to insure the Executive Assistants would *not* be improperly influenced on their opt-in decisions – into some scheme to circumvent the Court's Order, which it decidedly is not. Plaintiff is attempting to create an issue where none exists.

Distilled of its rhetoric and hyperbole, Plaintiff's argument boils down to several erroneous conclusions. First, Plaintiff asserts the General Counsel's privileged communication with his own clients is the same as *ex parte* communications with class members. It is not. But Plaintiff wants the Court to interpret its Order as a prior restraint on communications between a lawyer and his clients – communications protected by the First Amendment and Due Process. The Court has never ordered such a restraint in this case. Second, Plaintiff speculates the purpose of the communication was an "ingenious plan" to influence the Executive Assistants' opt-in decisions, which it was not. Rather, the only evidence on this point undisputedly shows the purpose of the legal advice, given after consultation with outside counsel, was to insure that the business and the Human Resources (HR) executives of the Executive Assistants, if asked, would lawfully respond that they could not discuss the case, and would advise that the Executive Assistants should make the decision on their own. Third, Plaintiff asserts the communication was sent by e-mail, as opposed to telephonic communication or ordinary mail marked "Confidential," because Defendants knew the Executive Assistants may have had access to their

executives' e-mails. This is untrue. The communication was sent by e-mail because this was the only means of quickly and effectively providing this critical advice to thirty-eight business and HR executives in a few short days which included the New Year holiday weekend (Plaintiff's counsel would not disclose when he was going to mail the Court-approved Notice). These thirty-eight executives were widely scattered in various locations, and e-mail was the only practical means to quickly disseminate the advice. Fourth, the privileged communication tracked the language of the Court-approved Notice and, contrary to Plaintiff's hyperbole, was not incorrect, misleading, or prejudicial, even if read by an Executive Assistant. Fifth, Plaintiff asserts, contrary to the evidence, that all thirty currently employed Executive Assistants would have read the e-mail communication. Instead, the evidence on this point shows that, while the Executive Assistants had access to their executives' e-mails, most would not have read an e-mail designated as "Privileged and Confidential – Attorney/Client Communication – Attorney Work Product." Finally, Plaintiff speculates the General Counsel's privileged communication somehow chilled Executive Assistants' participation in the collective action. It did not. Plaintiff's belief is belied by the non-prejudicial nature of the communication itself and the complete lack of evidence that any Executive Assistant actually read the communication, or that a single Executive Assistant was dissuaded from joining the collective action because of it. In fact, only one of fifteen former employees, who had no opportunity to access the e-mail, opted-in and has since changed her mind.

Unlike the cases Plaintiff relies upon, the issue here has nothing to do with a defendant's improper or misleading communication with class members. Instead, her Motion is a last-ditch gambit to get the Court to do what the merits of her case could not – force other Executive Assistants to join her lawsuit. Plaintiff's Motion is meritless and should be denied.

## STATEMENT OF FACTS

Plaintiff, a former Executive Assistant, claims that she and other Executive Assistants were misclassified as exempt and should have received overtime pay.  Plaintiff filed a collective action under the Fair Labor Standards Act (FLSA) and a class action under New York's wage and hour laws for allegedly unpaid overtime compensation.  (Dkt. #1)  She subsequently filed a motion for conditional certification as an FLSA collective action on behalf of herself and the other current and former Executive Assistants, which the Court granted on November 16, 2010.  (Dkt. #44)

## I.   DEFENDANTS' REQUEST TO COMMUNICATE DIRECTLY WITH POTENTIAL CLASS MEMBERS WAS DENIED AS DUPLICATIVE OF OTHER COMMUNICATIONS APPROVED BY THE COURT

Following the Court's conditional certification, the parties negotiated the notice to be sent to the potential class members.  The Court approved the "Notice of Lawsuit with Opportunity to Join" on December 14, 2010, and set an opt-in period to end February 28, 2011.  (Dkt. #46, at Tabs A and B)

At the same time, Defendants sought the Court's permission to send their own letter to the potential opt-in plaintiffs informing them that their names and addresses had been disclosed by their employer as required by the Court.  (Dkt. #46, at Tab C)  Plaintiff argued against sending such a letter, claiming that it was "unnecessarily duplicative" and "highly prejudicial."  (Dkt. #47)  The Court denied Defendants' request, but not because it was prejudicial.  To the contrary, the Court merely ruled that the letter request was "denied as *duplicative*" of the Court-approved Notice.  (Dkt. #46) (emphasis added).  In compliance with the Court's Order, Defendants did not send their letter, or any other communication, to the potential opt-in plaintiffs.

3

On or about January 7, 2011, Plaintiff mailed the Court-approved Notice to thirty current Executive Assistants and fifteen former Executive Assistants. Declaration of Michael G. Long ¶12 and Exhibit C to that Declaration. Ultimately, only two Executive Assistants – one current employee and one former employee – chose to opt-in. (Dkt. #48-49) After doing so, however, both refused to participate in discovery and both refused to appear for their noticed depositions. Long Decl. ¶13. This paucity of interest by both current and former Executive Assistants shows just how little support there is overall for the Plaintiff's allegations.

## II.  DEFENDANTS' GENERAL COUNSEL ADVISED HIS CLIENTS ON THE COURT-APPROVED NOTICE.

The Court approved the Notice on December 14, 2010, and provided the Executive Assistants until February 28, 2011, to opt-in (Dkt. #46). On December 22, Defendants' counsel at the Vorys firm provided Plaintiff's counsel with the names and addresses of the Executive Assistants. Long Decl. ¶2. Just before the Christmas holiday weekend, Vorys asked Plaintiff's counsel when he intended to mail the Court-approved Notice. Although he refused to disclose when this mailing would go out, Defendants reasonably assumed he would promptly mail it so that the Executive Assistants would have as much time as possible to make a decision before the February 28 cut-off date. Long Decl. ¶3. Given that the Executive Assistants had close working relationships with their executives and given that each of the Executive Assistants had an HR executive from whom to seek advice on sensitive company matters, Defendants' counsel was concerned that an executive or HR executive questioned by an Executive Assistant about her opt-in decision might unknowingly and unintentionally violate the desired independence of the decision-making process.

To avoid any potential problem of the opt-in process, and to advise the executives about the Company's position and obligations in the case, on December 27, 2010, Vorys advised

4

Douglas Williams, Defendant's General Counsel, to notify the executives and the HR executives that they could not give advice to, or discuss the case with, any Executive Assistant who came to them with questions, and that in response to any such inquiry, they should advise the Executive Assistants that they must make the decision on their own. Attached as Exhibit A to Mr. Long's Declaration is a copy of this December 27, 2010, advice.[1] Long Decl. ¶9. Mr. Williams knew that Executive Assistants have strong, professional relationships with their executives, and with their HR executives, and so it was highly probable that an Executive Assistant would ask either her executive and/or her HR executive what to do once she received the Court-approved Notice. Declaration of Douglas L. Williams ¶4. He also knew that it was highly probable the executives themselves or the HR executives (who are neither lawyers nor litigants), would not know the rights of a potential opt-in plaintiff, or know that it was important not to give any substantive counsel to the potential plaintiffs about their decisions in order to avoid any claim that the Company interfered with the opt-in process. Williams Decl. ¶5. Thus, Mr. Williams needed to quickly communicate legal advice to his clients (the executives and the HR executives) on how to lawfully respond.

A draft of the legal advice was provided by Vorys to Mr. Williams on Tuesday, December 28, two days before the New Year's holiday weekend. Long Decl. ¶8 and Exhibit A. These e-mails of December 27-28, 2010 (Exhibit A) are the full extent of communications on this issue between Vorys and Mr. Williams. Long Decl. ¶9. As the Court can see from these documents, there was no discussion with Mr. Williams or within the Vorys firm about the form

---

[1] By waiving the attorney-client privilege on matters confined to this communication from the General Counsel to his clients, Defendants do not intend to waive, and specifically reserve their rights to assert, their attorney-client privilege on all other matters in this case. *See Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 2001 U.S. Dist. LEXIS 16063, at **3-4 (S.D.N.Y. 2001).

of transmitting this communication to the executives, and no consideration was given to the possibility of Executive Assistants accessing this attorney-client privileged communication. Mr. Williams knew that only a few of the thirty-eight executives and HR people would be in their offices the week between Christmas and New Year's, and would be widely scattered on personal, holiday leave. Williams Decl. ¶9. Given the uncertainty as to when the Court-approved Notice would be mailed by Plaintiff's counsel, an e-mail communication on Monday, January 3, was the only practical way clear, consistent legal advice could be simultaneously and effectively communicated to these thirty-eight individuals before the Executive Assistants received the Court-approved Notice. Because Monday, January 3, was their first day back in their offices for most of them, Mr. Williams knew those executives would be extremely busy and many would be booked in meetings virtually all day. Additionally, these executives' offices are in multiple locations, including two separate offices in Manhattan, three separate locations in Columbus, Ohio, and one executive is located in London, England. Williams Decl. ¶10.

Because Mr. Williams wanted the instruction to the executives and HR executives to be clear, consistent, memorialized, and readily retrievable by them, the advice needed to be in a written format. Defendants' executives and HR executives customarily store important e-mails for later retrieval, and Mr. Williams knew that an Executive Assistant could come to talk to an executive or HR executive weeks after receipt of the Court-approved Notice (until February 28, 2011, when the opt-in period ended). Williams Decl. ¶11.

Plaintiff's contention that Mr. Williams could have used video-conferencing or regular mail is not well-founded for a number of reasons. Even if all of the executives could have participated at the same time (which they could not), video-conferencing would not have enabled his advice to be memorialized or retrievable for the executive's or HR executive's later use in the

6

event an Executive Assistant sought their advice weeks later.  Additionally, oral communication could have caused his advice to be misinterpreted.  Letters in envelopes through the regular mail would not have worked either.  The letters might not have arrived in time through the holiday mail.  In any event, the same Executive Assistants who have access to their executives' e-mail also have access to their executives' mail.  Williams Decl. ¶12.

Accordingly, on Monday, January 3, 2011, Mr. Williams sent via e-mail the communication to thirty of the highest-ranking executives within the company, and eight HR executives, informing them of the pendency of the lawsuit, that the Court-approved Notice was being mailed out, that the Executive Assistants may approach them about that Notice once they receive it, and providing legal advice on how to lawfully respond.  Williams Decl. ¶13.  Because he knew that most Executive Assistants did not read e-mails designated as attorney-client privileged, and to underscore the confidentiality of the communication, Mr. Williams designated the January 3 e-mail as, "Privileged and Confidential – Attorney/Client Communication – Attorney Work Product."  Williams Decl. ¶14.  Mr. Williams recently confirmed that a vast majority of Executive Assistants do not read e-mails designated as attorney-client privileged.  Id.

## III.   THE GENERAL COUNSEL'S PRIVILEGED COMMUNICATION TO HIS CLIENTS TRACKED THE LANGUAGE IN THE COURT-APPROVED NOTICE.

There was nothing incorrect, misleading, or prejudicial in the information or legal advice the General Counsel communicated to his clients.  To the contrary, the Notice to the executives reiterated what the Court already approved communicating directly to the Executive Assistants themselves.  Thus, on the off chance that the Executive Assistant would ignore the "Confidential" heading of the e-mail and read it, the communication would not have provided the Executive Assistant with more or different information than what was contained in the Court-approved Notice – except to the extent that it (1) added a statement reminding the executives that

7

the decision about whether to opt-in was to made *solely* by the Executive Assistant without any influence from the executives, and (2) added a factual statement regarding the outcome of a prior DOL audit of the Company's classification of Executive Assistants (a statement which Defendants have made repeatedly in documents filed with the Court and available on-line in the public record). The table below shows how closely the communication's language tracked that of the Court-approved Notice.

| GENERAL COUNSEL'S PRIVILEGED COMMUNICATION (EXHIBIT A) | COURT-APPROVED NOTICE (DKT. #46) |
|---|---|
| Because of pending litigation involving the company, within the next two weeks or so your Executive Assistant may receive a "Notice of Lawsuit with Opportunity to Join" authorized by the Court in the case of <u>Fredda Malena v. Victoria's Secret Direct, LLC</u>. | The purpose of this Notice is to inform you of the existence of a collective action lawsuit in which you potentially are "similarly situated" to the named Plaintiff, to advise you of how your rights may be affected by this suit, and to instruct you on the procedure for participating in this suit. This notice has been judicially approved. (¶1) |
| Fredda Malena, a former Executive Assistant, has filed a lawsuit under the Fair Labor Standards Act ("FLSA") on behalf of herself and all other Executive Assistants who are or were employed from December 1, 2007 to December 1, 2010 by any of the following: Victoria's Secret Direct, LLC; Victoria's Secret Direct New York, LLC; Victoria's Secret Direct Media, Inc.; Victoria's Secret Stores, LLC; Victoria's Secret Stores Brand Management, Inc.; Limited Brands, Inc.; and Limited Brands Direct Media Production, Inc. | The named Plaintiff seeks to sue on behalf of herself and also on behalf of other employees with whom she is similarly situated. Specifically, the Plaintiff seeks to sue on behalf of any and all individuals employed as Executive Assistants by defendants Victoria's Secret Direct, LLC, Victoria's Secret Direct New York, LLC, Victoria's Secret Direct Media, Inc., Victoria's Secret Stores, LLC, Victoria's Secret Stores Brand Management, Inc., Limited Brands, Inc. and/or Limited Brands Direct Media Production, Inc. who were or are employed within the past three (3) years, i.e., between December 1, 2007 and December 1, 2010. (¶3) |
| Ms. Malena alleges, among other things, that she was unlawfully denied overtime compensation at the rate of one and one-half (1½) times the regular rate for which she was paid for hours worked in excess of forty (40) in one week. | Plaintiff alleges, among other things, that she was unlawfully denied overtime compensation at the rate of one and one-half times the regular rate at which she was paid for hours worked in excess of forty (40) in one week. The lawsuit is seeking back pay and liquidated damages from the Defendants as well as costs and attorney's fees. (¶2) |

| GENERAL COUNSEL'S PRIVILEGED COMMUNICATION (EXHIBIT A) | COURT-APPROVED NOTICE (DKT. #46) |
|---|---|
| Our position is that we have complied in full with all applicable laws, and we deny any wrongdoing or liability to Ms. Malena. We also claim that Ms. Malena and all of our Executive Assistants are required by their jobs to regularly exercise their discretion and independent judgment sufficient to exempt them from overtime pay requirements. | Defendants claim, among other things, that they complied in full with all applicable laws and deny any wrongdoing and/or liability to Plaintiff Fredda Malena, the potentially similarly situated employees or any other past or present employee. If they prevail, Defendants allege that they would be owed their court costs for defending this action. (¶2) |
| The Court-approved notice will notify your Executive Assistant that she can, if she chooses to, join Fredda Malena as a plaintiff in this lawsuit. | If you fit the definition above and believe that Defendants failed to pay you overtime wages, you may join this lawsuit (that is, you may "opt in") by mailing the "Consent to Become Party Plaintiff" form to Plaintiff's counsel at the following address... (¶4) |
| Your Executive Assistant may ask you about this lawsuit or simply ask you, "What should I do?" The answer is that it is her decision, and you should not give her advice. She is free to join the lawsuit and free not to join the lawsuit. Federal law prohibits us from discharging or in any other manner taking adverse action or retaliating against any Executive Assistant because the Executive Assistant chooses to join the lawsuit or in any way exercises her rights under the FLSA. | Federal law prohibits Victoria's Secret, including managers, from discharging or in any other manner taking adverse action or retaliating against you because you "opt in" to this case or in any other way exercise your rights under the Fair Labor Standards Act. (¶7) |
| The lawsuit is in its early stages and the federal court has not made any determination as to whether either party is correct. | The lawsuit is currently in the early pretrial stage. (¶2)<br><br>The Court has made no decision in this case about the merits of Plaintiff's claims or of Defendants' defenses. (Conclusion) |
| In 2005, the United States Department of Labor audited Victoria's Secret Stores-Home Office and determined that the Executive Assistants were properly classified as exempt from the FLSA's overtime pay requirements. In 2006, we analyzed the Executive Assistant positions and again determined which positions should be exempt under the FLSA. The current lawsuit is challenging those two conclusions. | ———— |

9

## IV.    THE PRIVILEGED COMMUNICATION HAD NO IMPACT IN THIS CASE.

The e-mail was not addressed to the Executive Assistants, and even though Executive

Assistants have access to their executives' e-mails, the vast majority do not read e-mails

designated, as this one was, "Privileged and Confidential – Attorney/Client Communication –

Attorney Work Product." *See* Williams Decl.¶14 and Douglas Williams Dep. at 234-25

(attached to Long Decl. as Exhibit D).  Because the e-mail was sent only to current executives,

only the thirty current Executive Assistants would have had the possibility of accessing it.  The

other fifteen potential opt-ins could not have accessed the e-mail.  Thus, only a small percentage

of the forty-five potential opt-ins, if any, might have actually read the communication.[2]  Only

one current employee and one former employee returned opt-in forms.  Both later changed their

minds, and have refused to communicate with Plaintiff's counsel or appear for their depositions.

Further, Plaintiff's counsel informed Mr. Long that the two opt-ins had not communicated with

him.  Long Decl. ¶13.

## LAW AND ARGUMENT

## I.    DEFENDANTS' GENERAL COUNSEL'S COMMUNICATION TO HIS CLIENTS DID NOT VIOLATE THE COURT'S ORDER.

The record before the Court demonstrates that Defendants' General Counsel sent an e-

mail communication, not to the Executive Assistants or to the former Executive Assistants, but to

his clients – the business and HR executives – in an attempt to do the right thing and avoid a real

world business problem:  imparting critical legal advice to their executives and the HR

executives of the Executive Assistants that would insure – not undermine – the integrity of the

---

[2] Plaintiff offered no evidence that any Executive Assistant opened the e-mail or read it.  Indeed, the only way Plaintiff received the e-mail was by Defendants' agreeing to waive the attorney-client privilege and produce it.  Long Decl. ¶15.  Defendants produced it, ironically, to avoid the very issue raised here.

Court-approved Notice by preventing them from influencing the Executive Assistants' decision. Far from harming the opt-in process, the communication was designed to insure the Executive Assistants' decisions would be made without any interference from company executives.

Contrary to Plaintiff's contentions, there is no basis in law or fact to find that the General Counsel's lawful and proper legal advice to his clients was somehow a clandestine attempt to undermine the Court-approved Notice or the collective action process.[3] The Court should reject Plaintiff's contentions.

Plaintiff's cited cases are inapposite and provide no support for her motion. The Eleventh Circuit's decision in *Kleiner v. First Nat'l Bank*, 751 F.2d 1193 (11th Cir. 1985), involved egregious facts in which attorneys counseled disobedience of the Court's order that the defendant-bank not engage in *ex parte* or unapproved communications with members of a class. Moreover, in *Kleiner* the bank engaged in deliberate and wide-ranging telephone campaign to convince class members to opt-out of the class. *Id.* at 1197-98, 1201 n.6.

*Belt v. Emcare, Inc.*, 299 F. Supp.2d 664 (E.D. Tex. 2003), involved particularly egregious conduct, with the defendant health care providers sending communications directly to the class members to influence them not to join the suit. *Id.* at 666. The Court specifically found that defendant's letter misrepresented issues and tapped into fears and concerns of medical

---

[3] Nor, contrary to Plaintiff's intimation, have Defendants previously violated an Order of this Court. As to the prior "sanction," Plaintiff's counsel had informed Defendants they had failed to give him prior notice of the subpoena under FRCP 45 being served on Plaintiff's new employer. In response, Defendants immediately withdrew the subpoena and returned the documents unopened and unread. Long Decl. ¶16. Plaintiff then moved to quash the subpoena, which the Court quashed (Dkt. #42). The Court did ***not*** order Defendants to pay Plaintiff's attorney's fees. Instead, the Court directed Plaintiff's counsel to file a motion for attorney's fees if he so desired. Rather than going through additional motion practice in this regard, and in a spirit of professional cooperation, Defendants offered to pay Plaintiff's counsel for 1½ hours of his time, which he accepted. Long Decl. ¶16. This sequence – including voluntary payment of an agreed small sum in attorney's fees – does not remotely compare to violating a Court order.

professionals, including fears of a malpractice suit, though the class action was actually a suit for unpaid wages. *Id.* at 666-67 and n.6. It was on this egregious conduct that the Court found the communication undermined the purposes of a collective action. *Id.* at 668-69.

*Gortat v. Capela Bros., Inc.*, 2010 U.S. Dist. LEXIS 45549 (E.D.N.Y. 2010), involved an attorney violating the rules of ethics in insisting on the right to communicate to the class members to opt-out of the action. *Id.* at *13.

None of Plaintiff's cases is applicable here or support Plaintiff's claim that Defendants' actions violated this Court's Order or warrant sanctions. The remainder of the cases involve violations of preliminary injunction orders, consent judgments, or facts that have nothing to do with the issues raised here.

## II.   THE GENERAL COUNSEL'S COMMUNICATION WITH HIS CLIENTS WAS PROPER, ACCURATE, TRUTHFUL, AND NOT PREJUDICIAL.

Because the Court never restricted communications between Defendants and their counsel, Plaintiff misleads the Court in conflating attorney-client communications with communications with potential class members. They are not the same, and Plaintiff again cites no case in which a party or its counsel were sanctioned for attorney-client communications. Instead, the cases Plaintiff relies upon involve only "unsupervised, unilateral communications *with the plaintiff class...*" *Kleiner*, 751 F.2d at 1203 (Plf. Memo. 11) (emphasis added). That did not happen here. Thus, because the facts do not support her theory and because the case law is inapposite, Plaintiff premises her Motion on the baseless argument that the communication to executives and HR executives was really a clandestine attempt to communicate with the Executive Assistants so as to taint the opt-in process. This is belied by the undisputed facts surrounding the drafting and dissemination of the communication and by the dearth of evidence

12

that any Executive Assistant even read the communication, much less was dissuaded from joining the collective action because of it.

### A.      E-mail was the appropriate means of advising Defendants' executives.

Although Defendants were unsure when Plaintiff would mail out the Court-approved Notice because Plaintiff's counsel refused to tell them, they believed it would be promptly after the first of the year 2011, since Plaintiff's counsel was provided with the contact information on December 22, and would want to maximize the time between the opt-in notice and the February 28 cut-off date, while avoiding the week between Christmas and New Year's, when many Executive Assistants might be away.  At the same time, Defendants had decided that their executives must be advised on proper conduct, and about the Executive Assistants' rights to make independent decisions in this matter, before the Executive Assistants received that Notice. For the following reasons, e-mail was the only practical and effective way for the General Counsel to communicate his advice to thirty-eight executives in a timely manner after the holiday break.

First, e-mail was the quickest means by which to send written advice during the holiday period.  Additionally, Plaintiff's counsel declined to inform Defendants precisely when he would mail the Court-approved Notice, thus making speed a significant factor.  Ordinary mail would not be sufficiently timely, particularly during the holiday period.  In any event, the same Executive Assistants who have access to their executives' e-mail also have access to their executives' mail, and so sending the communication via mail would not have guaranteed any greater confidentiality.

Second, the General Counsel knew that only a few of the thirty-eight executives would be in their offices the week between Christmas and New Year's, and would be widely scattered on

personal, holiday leave.  Thus, an e-mail communication on Monday, January 3, to the
executives in six different offices located in New York City, Columbus, Ohio, and London,
England, was the only practical way to communicate urgent legal advice.  These executives
typically are booked in meetings all day long, and video-telephonic and/or in-person meetings
with all of these executives on Monday, January 3, simply was not possible.  Williams Decl.
¶¶10 - 12.

      Third, the advice needed to be consistent and retrievable, and Defendants' executives
customarily store important e-mails for later retrieval.  Williams Decl. ¶11.  The General
Counsel knew that an Executive Assistant could come to talk to an executive or HR executive
weeks after receipt of the Notice (until February 28, 2011, when the opt-in period ended).
Williams Decl. ¶11.  In one case Plaintiff relies upon, the court noted the problem inherent in
verbal transmission: "[B]oth the Bank's top management and its counsel knew that by verbally
providing information to customers through Defendant's employees there was a high likelihood
that the facts would become even further skewed in transmission. "  *Kleiner v. First Nat'l Bank*,
102 F.R.D. 754, 768 (N.D. Ga. 1983).  Therefore, the General Counsel knew that e-mail retrieval
was important so that the exact language could be referred to later, thereby ensuring the message
was uniform and consistent – something which could not be done by verbally conference call or
in-person meeting.

      Finally, while Plaintiff complains of the possibility that Executive Assistants might have
accessed the e-mail, the General Counsel took reasonable measures to preserve the
confidentiality of the attorney-client communication with the executives.  Vorys advised the
General Counsel to mark his communication "Privileged and Confidential/Attorney-Client
Privilege."  Long Decl. ¶8.  The General Counsel did so and added the designation "Attorney

Work Product" as well.  Long Decl. ¶11; Williams Decl. ¶¶8, 14.  Contrary to Plaintiff's

mischaracterization of his deposition testimony (Plf. Memo. 5), the General Counsel testified

that the "confidential" and "attorney-client privilege" designations made it less likely that an

Executive Assistant would read the e-mail and that he did not know whether any Executive

Assistant, in fact, did read the e-mail:

> Q. So there was a document that went from you to the bosses to the executives?
> A. Correct.
> Q. Now, you understood, though, that the opt-ins would read that document?
> A. Some would, some wouldn't, yes.
> Q. Well, you described earlier in your testimony that one of their job responsibilities is to review e-mails?
> A. Um-hmm.
> Q. So, wouldn't all of the opt-ins have read your document?
> A. It was marked attorney/client privilege.  Some may not, some may.  It was marked confidential, so I'm not sure confidential attorney/client privilege e-mails, everyone would read. Some would, some wouldn't.
> Q. They reviewed, according to your testimony, a host of very sensitive and confidential information every day in their job.
> A. Attorney/client privilege, confidential, I think is a higher level of confidentiality with most executives.
> Q. Okay. So some did and some didn't, potentially?
> A. I don't know that some did, some --

Williams Dep. 234-35 (attached to Long Decl. as Exhibit D).  Plaintiff improperly redacted the

General Counsel's testimony in a misleading manner.  The full content and context of his

testimony confirms that there was no intent to try to influence the Executive Assistants.  Rather,

the intent was solely to give proper and needed legal advice to the executives so that they would

*not* influence the Executive Assistants' decision.

**B.   The General Counsel's communication was accurate and non-prejudicial.**

Plaintiff argues, in the alternative, that even if Defendants did not violate a Court Order,

they should still be subject to draconian sanctions because the General Counsel's e-mail was

somehow "factually inaccurate, misleading and prejudicial . . ." Plf. Memo. 16-17.  There is no

basis and no citation for such a conclusion.  The General Counsel's e-mail to the executives of

the Defendants instructing them not to discuss the case with the Executive Assistants or to in any

way influence their decision was not actually incorrect, misleading, or prejudicial, and it did not

coerce any Executive Assistant not to join the action.  Significantly, Plaintiff's entire argument

ignores the clear factual record that:  (1) this Court did not find the "lawyer's letter" that

Defendants asked to send to be prejudicial or coercive.  The sole ground stated by the Court for

denying the request to send the "lawyer letter" was that it was "duplicative" (Dkt. #46); and (2)

the General Counsel's e-mail was not directed to the Executive Assistants. Instead, it was sent,

marked "Privileged and Confidential — Attorney/Client Privilege – Attorney Work Product," to

specifically avoid any interference with the Court process and instruct the executives not to

discuss the matter with their Executive Assistants.

 Thus, there is not a shred of evidence that any Executive Assistant read the e-mail.  Even

if it happened that a few did, there is no evidence that any Executive Assistant was influenced by

it not to join the collective action.

 The gravamen of Plaintiff's complaint is the two sentences concerning the United States

Department of Labor (DOL) investigation and the internal audit.  Plf. Memo. 13-14.  There was

nothing misleading or inaccurate about these two sentences in the communication.  These

accurately recite the fact of the DOL audit and the internal analysis to inform the executives that

the General Counsel had previously reviewed the matter, and some executives may have

remembered the DOL audit.  The communication correctly states the lawsuit is challenging the

DOL's conclusion.  Plaintiff inaccurately claims the Court already found the Portal-to-Portal Act

is not a defense.  The Court ruled only that Section 259 of the Act (29 U.S.C. § 259) was not a

grounds for partial summary judgment "because the contours of Executive Assistants' duties are

in dispute, Defendants' motion for partial summary judgment is denied." (Dkt. #44, at 5)  And

while Plaintiff claims that the DOL audit and the General Counsel's conclusions "are probative

of nothing" (Plf. Memo. 14), she is wrong on that count as well.  Both are relevant to

Defendants' good faith defense to liquidated damages under Section 260 of the Act (29 U.S.C. §

260).[4]  Defendants did not argue this point in their motion for partial summary judgment, and the

Court has made no ruling on this issue.  Consequently, even if an Executive Assistant read the

communication – even though it was not addressed to her and was marked "Privileged and

Confidential/Attorney-Client Communication/Attorney Work Product" – it would not have

provided any information that contradicted or in any way undermined the Court-approved

Notice.  Indeed, it is hard to imagine that any such factual statements and defenses could be said

to be improperly "prejudicial" when they are restatements of the same arguments Defendants

have made repeatedly in documents filed with the Court and available on-line, in the public

record, to any potential class member who chose to read them.

     Plaintiff further complains that the General Counsel told the executives that, "We also

claim that Ms. Malena and all of our Executive Assistants are required by their jobs to regularly

exercise their discretion and independent judgment *sufficient to exempt them from overtime pay

requirements*."  Exhibit B to Long Decl. (emphasis added).  Notably, the sentence is premised

with the words "we also claim," which is an accurate statement of Defendants' defense – a

statement which, like all the others, was readily available through a simple on-line review of the

---

[4] Section 259 of the Portal-to-Portal Act provides complete immunity to liability under the FLSA
for actions taken in good faith in conformity with and in reliance upon any written ruling or
regulation of the DOL.  29 U.S.C. § 259.  Section 260 of the Act provides a defense to the award
of liquidated damages "if the employer shows to the satisfaction of the court that the act or
omission giving rise to such action was in good faith and that he had reasonable grounds for
believing that his act or omission was not in violation of the Fair Labor Standards Act..."  29
U.S.C. § 260.

public docket in this case. Yet, Plaintiff complains the sentence is somehow prejudicial because it does not say that Executive Assistants must exercise discretion and independent judgment "over matters of significance." Plf. Memo. 12-13. Plaintiff is wrong. The italicized language subsumes the issue of "matters of significance." The General Counsel was not writing a treatise on wage-hour law, and nothing required him to give his clients a formulaic recitation of every single legal element of the administrative overtime exemption.

Moreover, "[t]he term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). Based on the Declarations Defendants submitted in support of their opposition to conditional certification (Dkt. #34), at least twenty of the thirty Executive Assistants who could have seen the General Counsel's communication believed they exercise discretion and independent judgment over matters of significance. For example, Deborah Belleau testified:

> Because so much of his work was meeting-based, and because he traveled a great deal, *it was critical* that I keep his calendar current and accurate. His calendar was, in essence, the platform of his work, as being in the right place, at the right time, with the correct group of people, with the correct materials, *made the difference between his being able to do his job effectively or being unable to do it effectively.* As a result, I spent well over half of my time reviewing and responding to meeting requests on his behalf, resolving scheduling conflicts on his calendar, and otherwise assisting in planning his schedule. In so doing, I routinely exercised my own independent judgment and discretion regarding these *extremely significant* aspects of Mr. Fultz's work.

Declaration of Deborah Belleau ¶7 (emphasis added). *See also* Declarations of Alejandra Camberio ¶7; Kendra Clanin ¶6; Cynthia Egan ¶8; Kimberly Garavuso ¶7; Molly Gebensleben ¶6; Josephine Giliberti ¶5; Ahmina Graham ¶6; Jamie Hall ¶6; Patricia Kelly-Kerr ¶6; Donna Kirk ¶6; Jan McCann ¶7; Lisa McClellan ¶7; Tamara Reyes ¶7; Joan Rogan ¶6; Donna Troup ¶7;

Vallori Thomas ¶6; Toni Tinsley ¶5; Leisa Tremper ¶5; Debbie Wardlow ¶6.[5]  Plaintiff argues that the jury will decide this case "based on their determination of facts." Plf. Memo. 14. These Declarations factually establish the level of importance of the work and the consequences for not doing the work – and, hence, demonstrate it is a "matter of significance." Notably, these Declarations were signed months before the General Counsel's communication was even conceived.

### C.   The General Counsel's communication had no impact on the Executive Assistants' decision to opt-in or not to opt-in.

Lastly, Plaintiff's argument that the communication somehow affected the opt-in process is total speculation. As such, Plaintiff incorrectly assumes two unsubstantiated facts:  first, that all Executive Assistants read the privileged communication, and, second, that all Executive Assistants were influenced by it. Both are pure conjecture. There is no evidence that the communication had any impact at all.

At the outset, Plaintiff never explains how the fifteen *former* Executive Assistants in the potential class *who never had access to or received  the e-mail* (one-third of the class) could have read or been influenced by it. Only one of these former employees opted in, and she quickly changed her mind and refused to participate in the lawsuit. Long Decl. ¶13.

Moreover, Plaintiff provides no evidence that all (or any) of the thirty current Executive Assistants read the privileged communication. The General Counsel testified he is unaware of any Executive Assistant actually reading the e-mail. The fact that an Executive Assistant may "review" an e-mail and flag it for the executive's attention does not mean she "read" its contents, especially when it has been marked "Privileged and Confidential/Attorney Client

---

[5] These Declarations are attached to the Declaration of Michael C. Griffaton in Support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Certification (Dkt. #34).

Privilege/Attorney Work Product." *See* Williams Dep. 234-25.  In fact, most Executive

Assistants do not read e-mails designated as attorney-client communications.  Williams Decl.

¶14.

Further, Plaintiff provides no evidence that any current Executive Assistant who may

have read the privileged communication was dissuaded from joining the collective action

because of it.

### D.    Nothing about counsels' actions warrant sanctions.

Given the dearth of any evidence that either Vorys or the General Counsel did anything

improper or had any impact on the opt-in process, no sanctions of any sort are warranted –

especially the draconian sanctions Plaintiff requests.  What occurred here is in complete contrast

to the cases Plaintiff cites (Plf. Memo. 15-16).  *Kleiner*, *Belt,* and *Gortat* represent the most

extreme violations in class action law.  It cannot be overstated that, in this case, the General

Counsel's communication was directed to the executives and HR executives, ***not*** to the potential

class members.  Unlike *Kleiner*, *Belt*, and *Gortat*, the avowed purpose of that communication

was to advise the executives and HR executives ***not*** to speak with the Executive Assistants about

the lawsuit or their decision to opt-in.  This is the exact opposite of the attorneys'

communications directly to class members in *Kleiner*, *Belt*, and *Gortat*.

Moreover, even if the General Counsel's email could be construed as an "improper"

communication because it may potentially have been accessed by a few Executive Assistants, the

draconian sanctions urged by Plaintiff are completely unwarranted.  Courts have repeatedly held

that any curative action should be limited to what is necessary to remedy any chilling effect a

misleading communication may have on a putative plaintiff's decision to participate in the

collective action.  *Georgine v. Amchem Prods.*, 160 F.R.D. 478, 502 (E.D. Pa. 1995) ("[i]t is

basic that a remedy should be restricted to the minimum necessary to correct the effects of improper conduct"); *Burrell v. Crown Cent. Petroleum, Inc.*,176 F.R.D. 239, 243 (E.D. Texas 1997) (a "court should only consider the narrowest possible relief 'that limits speech as little as possible consistent with the rights of the parties under the circumstances.'" (quoting *Gulf Oil*, 452 U.S. at 102)).

Thus, the need to issue a curative notice only arises if "the defendant employer create[s] a hostile atmosphere for employees associated with the class and transmit[s] internal communications to members of the class *with the intention of discouraging them from participating*." *Abdallah v. The Coca-Cola Co.*, 186 F.R.D. 672, 679 (N.D. Ga. 1999) (emphasis added). In *Abdallah*, the improper communications consisted of emails from Coca-Cola's CEO directed to putative class members, which denied the class allegations and noted that the claims were "troubling to him." *Id.* at 674. The court held that the CEO's emails "pale in comparison [to communications warranting sanctions] and do not justify requiring Coca-Cola to issue a curative notice." *Id.* at 679. *See also In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1267 (D. Kan. 2006) ("a corrective notice is unnecessary here because the supplemental notice was not materially misleading").

Indeed, sanctions are only warranted where a defendant actually threatens or coerces putative plaintiffs in a purposeful effort to improperly discourage class participation. *Burrell*, 176 F.R.D. at 244 ("It is not enough that a *potentially* coercive situation exists.") (emphasis in original)). Where nothing "indicates that the company was threatening its employees if they decided to participate in the class action," court intervention is improper. *Id.* at 244-45.

Here, the General Counsel's communication did not actually (or even impliedly) threaten or coerce the Executive Assistants. Thus, even if she read it, an Executive Assistant would have

positive statements by the General Counsel that the decision about whether to opt-in was to made *solely* by her without any influence from the executives and that executives were prohibited from retaliating against her because of her decision. This simply "pale[s] in comparison" to the cases Plaintiff relies upon. *See Abdallah*, 186 F.R.D. at 679.

### E. The General Counsel's communication was protected by the First Amendment.

Nowhere in the Court's December 19 Order – or at any other time during this case – has the Court explicitly or implicitly forbidden Defendants' counsel from communicating with their own clients. The General Counsel sent his communication to Defendants' corporate officers and executives whose Executive Assistants would be receiving the Court-approved Notice as well as to key HR executives. These executives are the clients of the General Counsel, who was entitled – and, indeed, was required by his ethical obligations – to communicate with his clients about a legal matter that directly pertains to and concerns them and their duties as officers and executives. *See Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981); *Rossi v. Blue Cross & Blue Shield*, 73 N.Y.2d 588, 592 (N.Y. 1989). To interpret the Court's Order the way Plaintiff contends would amount to an unconstitutional prior restraint on Defendants' First Amendment rights. *United States v. Salameh*, 992 F.2d 445, 446 (2d Cir. 1993); *United States v. Quattrone*, 402 F.3d 304, 309-10 (2d Cir. N.Y. 2005).

Moreover, prohibiting an attorney from speaking with – and providing legal advice to – the attorney's own client would be highly unusual if not unprecedented and would deprive Defendants and their counsel of core First Amendment rights without the requisite due process. *See, e.g.*, *Salameh*, 992 F.2d at 446-47. "Where a gag order is sought against an attorney, the [party] must show that the attorney's actions present a 'substantial likelihood of materially prejudicing an adjudicative proceeding.'" *Jemine v. Cake Man Raven, Inc.*, 2009 U.S. Dist.

LEXIS 92083, at *2 (E.D.N.Y. 2009) (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991)); *Salameh*, 992 F.2d at 446-47. The Second Circuit "has stated that before a district court issues a blanket prior restraint, it must, *inter alia*, explore whether other available remedies would effectively mitigate the prejudicial publicity, and consider the effectiveness of the order in question to ensure an impartial jury." *Id.* at 446-47 (quotation marks and citation omitted). "[E]ach [alternative] must be explored and ultimately rejected as inadequate – individually and in combination – as a remedy for pretrial publicity before a restraining order is entered." *Dow Jones & Co.*, 842 F.2d 603, 610, 611 (2d Cir. 1988), *cert. denied*, 488 U.S. 946 (1988).

Here, the Court made no findings that Defendants' General Counsel's communication with his own clients would present "a substantial likelihood of materially prejudicing an adjudicative proceeding." *Gentile*, 501 U.S. at 1075. None of the cases Plaintiff cites in support of her Motion have anything to do with regulating communications between a party and the party's own attorneys. Even an order barring or limiting communications between a party and potential class members must be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981). Reading the Order to prohibit Defendants' counsel from communicating with their clients "absent a showing of the required degree of abuse, would effectively open Judge [Pauley's] order to serious constitutional challenge." *See Hinterberger v. Catholic Health Sys., Inc.*, 2010 U.S. Dist. LEXIS 96435, at *20 (W.D.N.Y. 2010) (citing and quoting *Gulf Oil*, 452 U.S. at 104). Consequently, the Court could not have intended to prevent Defendants' General Counsel from communicating with his own clients and so no order was violated by doing so.

## CONCLUSION

At all times, Defendants have complied with the Court's December 19 Order and their ethical and legal obligations regarding communications with class members.  At no time have Defendants, their General Counsel, or their lawyers acted improperly in communicating with their clients and Plaintiff's sanctions are wholly unwarranted.  Ultimately, none of Plaintiff's assertions matter unless the Court first finds the General Counsel's communication was really intended for the Executive Assistants rather than his clients.  To reach this conclusion, the Court must ignore the communication's plain language; the fact that it was addressed to the executives, not to the Executive Assistants; the "Confidential and Privileged/Attorney-Client Privilege/Attorney Work Product" designation; counsels' expressed reasons for drafting the communication and for sending it via e-mail; the dearth of evidence that any Executive Assistant read or was influenced by the communication; the fact that twenty of the thirty current Executive Assistants submitted Declarations supporting Defendants' position months before the communication was sent; and the fact that of fifteen former Executive Assistants who never could have seen the communication, only one initially opted-in.  Given this, Defendants request that Plaintiff's Motion for Sanctions be denied and that Defendants be awarded their attorney's fees and costs in responding to it.

Dated:   Columbus, Ohio
         July 22, 2011

                                          Respectfully submitted,

                                          //s//Michael G. Long_____
                                          Michael G. Long, *pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of July, 2011, I caused a copy of Defendants'

Memorandum of Law in Opposition to Plaintiff's Motion for Sanctions to be served via the

Court's electronic filing system upon the following:

> Anthony Carabba, Jr. (AC 1487)
> Carabba Locke LLP
> 100 William Street
> New York, NY  10038
>
> Attorneys for Plaintiff

> //s//Michael C. Griffaton _____