Anthony Carabba, Jr. (AC 1487)
Carabba Locke LLP
100 William Street
New York, New York 10038
(212) 430-6400

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FREDDA MALENA, on behalf of herself and
all others similarly situated,

                              Plaintiff,

                                                        09 Civ. 5849 (WHP)(AJP)

            -against-

VICTORIA'S SECRET DIRECT, LLC, VICTORIA'S
SECRET DIRECT NEW YORK, LLC, VICTORIA'S
SECRET DIRECT MEDIA, INC., VICTORIA'S
SECRET STORES, LLC, VICTORIA'S SECRET
STORES BRAND MANAGEMENT, INC., LIMITED
BRANDS, INC., LIMITED BRANDS DIRECT
MEDIA PRODUCTION, INC. and ANN O'MALLEY,

                              Defendants.
-------------------------------------------------------------------X


## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS


                              CARABBA LOCKE LLP
                              100 William Street
                              New York, New York 10038
                              (212) 430-6400

                              *Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page**

PRELIMINARY
STATEMENT……………………………………………………………………………1


ARGUMENT……...……………………………………………………….…………2

    A.  DEFENDANTS ADMIT TO VIOLATING THE ORDER……...…………….2

    B.  DEFENDANTS GIVE NO LEGITIMATE REASON FOR
       SENDING THE LAWYER LETTER BY EMAIL……..…………………..3

    C.  DEFENDANTS GIVE NO LEGITIMATE REASON FOR INCLUDING
       INFORMATION BEYOND THAT IN THE NOTICE…………………….5

    D.  DEFENDANTS GIVE NO LEGITIMATE REASON FOR AVOIDING
       SANCTIONS…………………….…..…………………………………....8

CONCLUSION……………………………………………………………...….........10

## PRELIMINARY STATEMENT

Defendants' opposition reinforces what Plaintiff already knew: they sent their Lawyer Letter knowing that potential opt-ins would read it.  Defendants also admit -- and even stress -- that the Lawyer Letter contains much of the same information Judge Pauley specifically directed them not to send. Thus, there is no question that Defendants violated Judge Pauley's Order.

Given the violation, Defendants' opposition is devoted mostly to damage control, where they invent imaginary reasons for why they "had" to send the Lawyer Letter; invent a deadline for when it "had" to be sent; and even invent a way to *blame Plaintiff's counsel* for the violation (it's because Plaintiff "refused" to reveal when the Court-issued Notice would be sent).

Defendants are doomed by the undisputable facts and common sense.  If it were true that the Lawyer Letter had to be sent to inform the executives that "they could not discuss the case," and to tell them to "advise" the Executive Assistants to make the opt-in decision "on their own" (Defs.' Mem. at 1), the Lawyer Letter would have conveyed those points only.  Instead, the Lawyer Letter provides inaccurate information about the overtime exemption for administrative employees, gives an incomplete picture of damages, references a DOL audit and an internal audit, and reiterates the General Counsel's prior conclusion that the potential opt-ins are exempt.

Defendants, moreover, proffer no legitimate reason for sending this "extra" information.  The best they can do is claim the audits relate to their "good faith defense" against liquidated damages under the FLSA and that it is not prejudicial because it reflects similar arguments they made previously in this case, which are "available on-line, in the public record, to any potential class member who chose to read them."  Defs.' Mem. at 17.  It is remarkable that Defendants could make such representations to this Court.  The executives had absolutely no need to know about a purported "good faith defense" to liquidated damages and, perhaps more significantly, as lay people they had no way of knowing the audit was linked to that defense nor could they be expected to do their own legal analysis by signing up for

PACER to peruse the docket.  Even setting that aside, Defendants' claims are of no consequence, since the law is uniform that courts must protect against one-sided, unrebutted statements such as those here.

The defense team are highly experienced labor lawyers.  They knew -- as reiterated by the courts -- that the critical period in FLSA cases is the start of the opt-in phase and they knew that potential opt-ins could be influenced, especially by the employer's top legal officer.  Even accepting Defendants' assertion that they were unaware that potential opt-ins would read the email (which runs directly counter to the evidence) the result is the same, since the only reason to include the audit information, or their view of the exemption, or their view of damages, is so it would be relayed to the potential opt-ins in discussions with the executives.  Defendants admit that they were certain those discussions would occur.

## ARGUMENT

### A.  DEFENDANTS ADMIT TO VIOLATING THE ORDER

Defendants admit that Judge Pauley expressly rejected the dissemination of certain information to the potential opt-ins.  They admit that their Lawyer Letter contains much of the same information that the Court had rejected.  They admit that they knew some (but maybe not all) of the opt-ins would read it.  Defendants therefore violated the Order.

Defendants make some additional admissions, by their silence or otherwise, that are probative.  They admit to never seeking review or clarification of the Order.  They do not claim that the Order was unclear.  They admit to not asking for Court permission to send the Lawyer Letter, whether by email or otherwise (Plaintiff would have objected since Defendants argued repeatedly that an Assistant's key job duty is to read their executive's emails).  They admit that they did not inform Plaintiff's counsel of the Lawyer Letter, and that it was produced only upon Plaintiff's demand (and only after Plaintiff happened to learned about it through another source).

Defendants do, however, make a half-hearted claim that the Lawyer Letter is protected by the First Amendment. They assert that interpreting the Order as Plaintiff suggests would amount to "an unconstitutional prior restraint on [their] First Amendment Rights" thereby opening Judge Pauley's Order to "serious constitutional challenge." Defs.' Mem. at 22-23. This is silly. This "argument" is premised on Defendants' assertion that the General Counsel had a constitutional right to communicate with his clients, Victoria's Secret *high level executives*. Plaintiff, of course, is not seeking sanctions for communications with executives. Defendants should be sanctioned for sending improper information to the executives with the intent of, and knowing, that *the potential opt-ins* -- who are not their clients -- would obtain the information. Moreover, the First Amendment does not protect a employer from violating a Court Order.

## B.   DEFENDANTS GIVE NO LEGITIMATE REASON FOR SENDING THE LAWYER LETTER BY EMAIL

Defendants claim that they were compelled to send the Lawyer Letter by email, rather than other means, because they had to "quickly" communicate with the executives based on some self imposed deadline. They add that disseminating an email on January 3, 2011 was the "only practical way" to convey the information, since Plaintiff refused to say when the Notice would be mailed and because individuals were scattered due to the holidays. Defs.' Mem. at 6.

This is pretextual. The Court certified the collective action on November 16, 2010. From that time Defendants knew the Notice would be sent to the opt-ins. They could have communicated with the executives then. Instead they chose a day just before the Notice would be sent, to achieve maximum impact. The blame-it-on-the-holidays approach is unavailing.

Further, Plaintiff never "refused" to reveal when the Notice would be sent. Instead, Plaintiff objected to Defendants' attempt limit when Plaintiff could send the Notice. Specifically, by letter to Plaintiff dated December 16, 2010, Defendants said that they would be producing names of the potential

opt-ins and that they understood Plaintiff "will be mailing the Notices…after the New Year." A copy of this letter is attached at Tab A to the accompanying Declaration of Anthony Carabba, Jr. In a subsequent phone call with defense counsel Michael G. Long and Allen S. Kinzer, they explained that Plaintiff should wait to send Notice until the New Year so they would less likely get lost/forgotten in the holiday mail. At the time, Plaintiff was perplexed as to why Defendants were concerned about the Notices getting lost. (Little did Plaintiff know, Defendants were scheming for additional time to send their Lawyer Letter). Plaintiff simply objected to Defendants' attempt to put constraints on the timing. See Carabba Declr. at Tab C.

Defendants' explanation for why they had to use email, rather than other means, does not withstand scrutiny. They claim that scheduling a video conference was impossible because the executives would be "extremely busy" on January 3, 2011. Defs.' Mem. at 6. Why were they not able to schedule a video conference or conference call on January 4? Or January 5? Defendants do not say.[1] Next, they claim communication by video/conference call was impossible because the advice needed to be written and "readily retrievable" so that the "exact language could be referred to later." Defs.' Mem. at 6 & 14. This is similarly unavailing. Again, Defendants tell us that the point of the Lawyer Letter was to direct the executives not to discuss the case with, or provide advice to, the potential opt-ins. Defendants now try to morph this simple instruction into a concept warranting a written record for the executives to later retrieve and study its "exact language." Top executives can generally be expected to remember simple instructions. That the General Counsel professes worry that they could "forget" the instruction, and therefore discuss the case and try to convince the opt-ins not to join, unless they could resort to a copy of the email to remind themselves, is astonishing.[2]

_____

[1] Defendants pretend that scheduling a call for employees in "two separate offices in Manhattan" and "three separate locations in Columbus," is an unattainable, herculean task. Limited Brands is an $11 billion company. It is able to set up a conference call for a handful of executives.

[2] Of course, a record of the email could be used to refresh their recollection about the terms of the audit or about how the General Counsel believes the administration exemption works, for those discussions with the opt-ins.

As set forth in Plaintiff's opening brief, one of the easiest/most obvious ways to ensure that the opt-ins would not read the email was to make it password protected.  Defendants offer no response to this in their opposition.  They are silent because the evidence establishes that in the past, they have sent password protected emails *for the executive's eyes only* when sensitive information was to be kept from the Assistants.  As one of Defendants' Assistants testified:

Q:   So, in other words, sometimes documents are distributed by email where you have information entered and a specific code is needed to get into the document?

A:   Some documents come across that way, sure.

Q:   And do you have the code or does it get forwarded over to [your boss]?

A:   They get forwarded over to [my boss].

A copy of the relevant page of the deposition of Nicole Interlandi is attached to the accompanying Carabba Declr. at Tab B.

## C.   DEFENDANTS GIVE NO LEGITIMATE REASON FOR INCLUDING INFORMATION BEYOND THAT IN THE NOTICE

Defendants muster little opposition to the unavoidable conclusion that the information in the Lawyer Letter was incorrect, misleading and prejudicial.  Responding to why they "needed" a paragraph about the DOL audit and the internal audit in the Lawyer Letter, Defendants claim that the information was "relevant to Defendants' good faith defense to liquidated damages under Section 260 of the Act." Defs.' Mem. at 17.  This claim is absurd.  Defendants have absolutely no legitimate need to inform the executives about any "good faith defense."  And even if they did, the Lawyer Letter does not mention the defense.  Defendants seemingly ask the Court to believe that the executives (who are non-lawyers) would figure out for themselves that the audits related to a good faith defense, but that the executives would not use that knowledge, because the purpose of the Lawyer Letter was only to direct them not to

talk about the case.  At some point, a lawyer's assertion is so plainly implausible as to cast doubt on their entire submission.  That point has been reached here.

Defendants similarly falter when responding to why they needed to add a section stating the "all of our Executive Assistants are required to regularly exercise their discretion and independent judgment to exempt them from overtime requirements."  In fact, they offer *no reason* for why they "had" to include that language.  Instead, they defend the language by insisting that it conveys an "accurate statement of Defendants' defense" which was "readily available through a simple on-line review of the public docket in this case."  Defs.' Mem. at 17-18.  This affords Defendants no protection.  First, Defendants do not claim that it is an accurate statement, just an accurate statement of their defense. Next, the notion that the statement cannot be deemed prejudicial because the Assistants could find a similar statement upon review of the docket, is baseless for a number of reasons.  It assumes that the Assistants know that there is an available public docket and are willing to sign up for a PACER account and pay a fee, and then are able to somehow find the appropriate documents to review.  It also assumes that unilateral, unrebutted statements from a General Counsel, no matter how misleading, are acceptable, provided they are also contained somewhere in the employer's filed memoranda.  This is contrary to established law and Defendants cite no case supporting the proposition.

Defendants also claim it was not prejudicial to inform the potential opt-ins that they are exempt due the regular exercise of discretion and independent judgment, without explaining that discretion only on "matters of significance" is enough.  Defs.' Mem. at 17-18.  They explain that Mr. Williams was not writing a "treatise" and did not have to relay every element of the exemption.  Defendants again miss the point.  The parameters of what to convey to the opt-ins is not left to Defendants' whim.  The Notice is the vehicle by which the potential opt-ins are apprised of the case.  Because that document is so significant, it is heavily negotiated by the parties and can only be disseminated with court approval.  By sending their own letter, Defendants circumvented the court-monitored notice process.

Moreover, Defendants' opposition reinforces the prejudicial nature of the Lawyer Letter's statements on the exemption. Defendants assert that the Assistants who read the Lawyer Letter "believed that they exercise discretion and independent judgment over matters of significance" citing to their previously submitted declarations which indicated that they kept their bosses' calendars "current and accurate." Id. at 18. But this is certainly not the type of discretion (such as the discretion to negotiate contracts or handle third party complaints) sufficient to give rise to the exemption. In fact, it is precisely the type of work (secretarial) that the regulations expressly exclude from the definition of discretion. See Pl's Opening Memorandum of Law at 13 n.2. Having the opt-ins read, close in time to the opt-in decision, the General Counsel's conclusion about discretion is misleading and prejudicial.

It is important to stress that Defendants *admittedly* understood and recognized the harm caused by unsupervised, unrebutted contact with the potential opt-ins. In their December 16, 2010 letter, Mr. Kinzer wrote to Plaintiff's counsel: "*Other than the mailing of the Notice, you will not be initiating contact with any of the potential opt-in plaintiffs. As we have discussed, such initiation of contact would eviscerate the Court's Notice. Additionally, such initiation of contact would be inappropriate, given Judge Pauley's ruling that the employer's General Counsel could not initiate contact with the potential opt-in plaintiffs.*" Carabba Declr., Tab A (emphasis added). So at the same time Defendants were instructing Plaintiff not to initiate any type of contact so as to eviscerate the Court's Notice, Defendants were doing just that.

At bottom, if the information was not prejudicial, Defendants would have asked for it to be included in the Court Ordered Notice (which would have been rejected). And if they were concerned about paralleling the language of the Notice (so as to not coerce the opt-ins by including objectionable language), they could have simply attached a copy of the Notice to the email for the description of the case. They did neither. Common sense dictates that arming the executives with significant information about the case *encourages them to talk about it*, especially in terms of relaying the information

- 7 -

provided to them.  So whether the potential opt-ins learned of the prejudicial information by reading the email, or learned about it by speaking with the executives, the impact would be the same.

**D.    DEFENDANTS GIVE NO LEGITIMATE REASON FOR AVOIDNG SANCTIONS**

Defendants' effort to avoid the imposition of sanctions by arguing there is no evidence that any Executive Assistant was influenced by the Lawyer Letter to not join the action, and there is no evidence that they would have read it, is a red herring.  First, under Defendants' specific threats, Plaintiff was not permitted to "initiate contacts" with the potential opt-ins, including to find out if they were coerced.  Second, the whole point of the restrictions on a employer's ability to make unilateral, unrebutted communications with the potential class is because employees are easily coerced and will never admit to being coerced (as set forth in Plaintiff's opening brief, given the at-will relationship, such contact is "*inherently* coercive").  Coming forward with an employee willing to say that she was coerced by Victoria's Secret's General Counsel into not joining the suit is simply not a prerequisite for obtaining sanctions.  Third, there is clear evidence that at least some, but maybe not all, of the potential opt-ins would have read the Lawyer Letter, because General Counsel Williams testified to that fact:

Q:     So, wouldn't all of the opt-ins have read your [Lawyer Letter]?

A:     It was marked confidential, so I'm not sure confidential attorney/client privileged emails everyone would read.  Some would, some wouldn't.

Williams Dep. at 234.  In his Declaration in Opposition to Sanctions, Mr. Williams changes his story, and claims that based on his many years of experience as Defendants' counsel, he knows that "most" assistants "did not read emails designated as attorney-client privileged."  Williams Declr. at ¶14.  This change of testimony acts only to make Defendants' assertions less believable.  Moreover, Defendants assert that although an assistant could "flag" an email for the executive, it does not mean she would actually "read its contents."  Defs.' Mem. at 19.  This is pure fabrication, since Mr. Williams testified

the Assistants did "review" emails for their bosses and the Assistants themselves swore that they "reviewed" the emails and decided "which emails to respond to." Pl's Mem. at 4. It is hard to imagine being able to respond to an unread email. Fourth, Plaintiff is aware that potential opt-ins read the Lawyer Letter shortly after it was sent, and were aware of its content, because Plaintiff's counsel was informed of that fact by a potential opt-in who read it and decided not to join. Carabba Declr. at ¶ 6.

Defendants make little effort to address Plaintiff's request for relief/sanctions and fail to explain why the relief sought (and cases cited to support that relief) are improper. One of the few cases Defendants cite, Abdallah v. The Coca-Cola Co., 186 F.R.D 672 (N.D. Ga. 1999), offers them no comfort. There, in addressing correspondence between the employer's CEO and the potential class in a race case, the court recognized the "inherent danger that these types of internal communication could deter potential class members from participating in the suit out of concern for the effect it could have on their jobs." The court also recognized the oft-repeated sentiment that "unsupervised, unilateral communications...sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damages from misstatements could well be irreparable." Id. at 678 (quotation omitted). The court, however, declined to sanction the employer, noting that the CEO's emails actually "assured employees that Coca-Cola did not tolerate discrimination" and that management was "taking the allegations seriously." The court indicated that one of the CEO's emails concluded by promising that he would "do the right thing." It also indicated that the CEO met with black employees "to get their opinions on the circumstances that have led to this serious litigation." Id. at 674-75. Thus, the employees were not *misinformed* about the case as here. Moreover, the tenor of the emails showed the employer was proactive, was looking into the allegations, and was trying to "do the right thing." Defendants can point to nothing of the sort here.

The other case cited, Burrell v. Crown Cent. Petroleum, Inc., 176 F.R.D. 239 (E.D. Texas 1997), is unavailing as well. Also a discrimination case, the issue was the employer's statements linking the

discrimination litigation to a union campaign.  The court found the statements not sanctionable because they were not abusive, were not misleading, were not coercive and there was even no "potential" for abuse.  Id. at 245.  The contrary is true here.[3]

Defendants make no other effort to distinguish the cases, cited throughout Plaintiff's opening brief, ordering various forms of sanctions for similar violations, including monetary sanctions and lawyer disqualification.  They also fail to address Plaintiff's request to treat the FLSA collective action as an opt-out class or to permit opt-ins after a finding of liability.[4]

## CONCLUSION

For all of the foregoing reasons, and as set forth in Plaintiff's opening brief, Plaintiff respectfully requests that the Court issue a Report and Recommendation imposing sanctions against Defendants and their counsel as requested, together with such other and further relief as the Court deems just and proper.

Dated: July 29, 2011

Respectfully submitted,
CARABBA LOCKE LLP

By: _____
Anthony Carabba, Jr. (AC 1487)
100 William Street
New York, New York 10038
(212) 430-6400

*Attorneys for Plaintiff*

---

[3] Neither decision involved a violation of a court order and neither involved an "opt in" class, so the employer's conduct was far less objectionable.

[4] A final point about Defendants' conduct in this case.  Defendants mischaracterize their prior violation of the FRCP.  Defs.' Mem. at 11, n.3.  They did not simply "volunteer" to pay sanctions to Plaintiff.  Judge Pauley quashed their subpoena because they were caught doing an end run around Rule 45.  At oral argument, the Court addressed Plaintiff's request for sanctions by explaining that Plaintiff *could* file a request for attorney's fees, but stated that payment for one and one half hours of lawyer time would be an appropriate sanction.  Because Plaintiff had no desire to belabor the issue, and because Plaintiff's point was made, Plaintiff happily accepted the Court's number in lieu of seeking more.